1   Steven L. Hoard (Texas Bar No. 09736600)
    shoard@mhba.com
2   MULLIN HOARD & BROWN, L.L.P.
3   P. O. Box 31656
    Amarillo, Texas 79120-1656
4   Tel: (806) 372-5050/Fax: (806) 372-5086

5   Steven Jay Katzman (California Bar No. 132755)
    skatzman@bmkattorneys.com
6   BIENERT, MILLER & KATZMAN, PLC
7   903 Calle Amanecer, Suite 350
    San Clemente, California 92673
8   Tel: (949) 369-3700/Fax: (949) 369-3701

9   Leonard J. DePasquale (Rhode Island Bar No. 4753)
10  ldepasquale@fdic.gov
    Counsel, FDIC Legal Division
11  VS-B-7058
    3501 North Fairfax Drive
12  Arlington, VA 22226-3500

13  Attorneys for Plaintiff
14  FEDERAL DEPOSIT INSURANCE CORPORATION
    as Receiver of Washington Mutual Bank

15

16          IN THE UNITED STATES DISTRICT COURT

17      FOR THE CENTRAL DISTRICT OF CALIFORNIA

18

19  FEDERAL DEPOSIT INSURANCE           Case No.   SACV11-706 JST(MLGx)
20  CORPORATION, as Receiver of
    Washington Mutual Bank,              COMPLAINT FOR:
21                                        (1)  GROSS NEGLIGENCE
22          Plaintiff,                     (Against All Defendants)
                                          (2)  BREACH OF CONTRACT
23  v.                                     (Against LSI);
24                                        (3)  BREACH OF CONTRACT
25  LSI APPRAISAL, LLC; FIDELITY          (Against FNTS);
    NATIONAL INFORMATION                  (4)  ALTER EGO, SINGLE
26  SERVICES, INC.; LENDER                BUSINESS ENTERPRISE,
    PROCESSING SERVICES, INC.;            JOINT VENTURE
27  LENDER PROCESSING SERVICES,           (Against FNIS; LPS, Inc.; LPS, LLC;
28  LLC; LPS PROPERTY TAX                 FNTS; LSI Title CO.; and LSI Title,
    SOLUTIONS, INC., f/k/a FIDELITY

1
COMPLAINT

NATIONAL TAX SERVICE, INC.; LSI TITLE COMPANY; and LSI TITLE AGENCY, INC.,

Defendants.

LLC)

**JURY TRIAL DEMANDED**

Plaintiff, the Federal Deposit Insurance Corporation ("FDIC"), as Receiver of Washington Mutual Bank, files the following complaint against LSI Appraisal, LLC; Fidelity National Information Services, Inc., Lender Processing Services, Inc.; Lender Processing Services, LLC; LPS Property Tax Solutions, Inc., f/k/a Fidelity National Tax Service, Inc.; LSI Title Company; and LSI Title Agency, Inc.

## I.   INTRODUCTION

1.    The FDIC brings this case in its capacity as Receiver of Washington Mutual Bank ("WaMu" or the "Bank") pursuant to its authority granted by 12 U.S.C. § 1821. The FDIC seeks to recover losses of at least $154,519,071.10 that WaMu suffered as a direct and proximate result of the gross negligence of Defendant LSI Appraisal, LLC ("LSI") and its repeated breaches of contractual provisions designed to protect the Bank.

2.    In July 2006, WaMu hired LSI to provide appraisal services for residential properties in all fifty states and the District of Columbia.  The relationship and respective duties and obligations between WaMu and LSI were memorialized in an Appraisal Outsourcing Services Agreement dated October 16, 2006 (the "LSI Agreement"), a true and correct copy of which is attached hereto as Exhibit A and incorporated herein for all purposes.  LSI represented and warranted, both before and after it entered into the LSI Agreement, that each and every appraisal service it provided would conform to federal and state law, regulatory guidelines, and all applicable industry standards, specifically including the Uniform Standards of Professional Appraisal Practice ("USPAP").  LSI also agreed to serve as the "gatekeeper" with respect to the appraisal services it provided for WaMu.  LSI agreed to insure the competency and qualifications of its appraisers, to conduct a meaningful quality control review of the appraisals, and to police WaMu's loan

staff and act as an intermediary between WaMu's loan originators and LSI's appraisers. In the LSI Agreement, LSI specifically promised to inform WaMu of any inappropriate contacts or requests by WaMu employees concerning an appraisal or the assignment of an appraisal. *See* Exhibit A, p. 29, Exhibit A thereto.

3.      Despite the representations and promises LSI made to WaMu, at least 220 of the appraisal services LSI provided failed to comply with federal and state law, regulatory guidelines, and USPAP.   LSI used appraisers who lacked the skill, experience, and qualifications necessary to perform the appraisals requested.   LSI's "quality control" of the appraisals it provided to the Bank was severely inadequate.   Consequently, LSI delivered appraisal services that were conducted and prepared in a grossly negligent manner and which contained substantially inflated appraised values.   But for the inflated appraisal services by LSI, WaMu would not have made the residential mortgage loans at issue and would not have suffered losses on those loans.   The losses that WaMu incurred on loans made in reliance on the inflated appraisals provided or approved by LSI were clearly foreseeable.   Each of the 220 loans made by WaMu in reliance on LSI's appraisal services was held by WaMu for investment and not sold into the secondary market.

4.      The FDIC asserts claims against LSI and the other Defendants named herein for gross negligence and breach of the LSI Agreement and seeks damages for the loan losses WaMu incurred as a result of its reliance on appraisal services provided by LSI.   As set forth below, the other Defendants named herein are the ultimate or intermediate parent entities of LSI.   The other named Defendants controlled and directed the actions of LSI. As such they are directly liable for the damages resulting from the grossly negligent appraisal services provided by LSI.   Alternatively, they are liable under the Alter Ego Doctrine, the Single Business Enterprise Doctrine, and the Joint Venture Doctrine.   In addition, Defendant LPS Property Tax Service, f/k/a Fidelity National Tax Service, Inc. ("FNTS"), contractually guaranteed any damages caused by LSI's failure to perform its obligations under the LSI Agreement.   A true and correct copy of the Performance

Guaranty Agreement dated October 16, 2006, is attached hereto as Exhibit B and incorporated herein for all purposes.

## II.   PARTIES

### A.   Plaintiff

5.      Plaintiff is the Federal Deposit Insurance Corporation, acting as Receiver of WaMu, pursuant to 12 U.S.C. § 1811, *et seq.*  The FDIC was appointed Receiver on September 25, 2008, following the closure of the Bank by the Office of Thrift Supervision ("OTS").  As Receiver, the FDIC has the right to pursue all of WaMu's claims, including its claims against each of the Defendants named herein.

### B.   Defendants

6.      Defendant LSI Appraisal, LLC is a Delaware limited liability company, with its principal place of business located in Santa Ana, California.  LSI Appraisal, LLC may be served with process through its registered agent:  CT Corporation, 818 W. 7th Street, Los Angeles, California 90017.

7.      Defendant Fidelity National Information Services, Inc. is a Georgia corporation, with its principal place of business at 601 Riverside Avenue, Jacksonville, Florida, 32204.  Fidelity National Information Services, Inc. may be served with process through its registered agent:  CT Corporation, 818 W. 7th Street, Los Angeles, California 90017.

8.      Defendant Lender Processing Services, Inc. is a Delaware corporation, with its principal place of business at 601 Riverside Avenue, Jacksonville, Florida, 32204.  Lender Processing Services, Inc. may be served with process through its registered agent:  CT Corporation, 818 W. 7th Street, Los Angeles, California 90017.

9.      Defendant Lender Processing Services, LLC is a Delaware corporation, with its principal place of business at 601 Riverside Avenue, Jacksonville, Florida, 32204.  Lender Processing Services, LLC may be served with process through its registered agent:  CT Corporation System, 1200 South Pine Island Road, Plantation, Florida, 33324.

10.   Defendant LPS Property Tax Solutions, Inc., f/k/a Fidelity National Tax Service, is a Delaware corporation, with its principal place of business at 601 Riverside Avenue, Jacksonville, Florida, 32204.  LPS Property Tax Solutions, Inc. may be served with process through its registered agent:   CT Corporation, 818 W. 7th Street, Los Angeles, California 90017.

11.   Defendant LSI Title Company is a California corporation with its principal place of business at 601 Riverside Avenue, Jacksonville, Florida, 32204.   LSI Title Company may be served with process through its registered agent:  CT Corporation, 818 W. 7th Street, Los Angeles, California 90017.

12.   Defendant LSI Title Agency, Inc. is an Illinois corporation, with its principal place of business at 601 Riverside Avenue, Jacksonville, Florida, 32204.   LSI Title Agency, Inc. may be served with process through its registered agent:  CT Corporation System, 1200 South Pine Island Road, Plantation, Florida, 33324

## III.   JURISDICTION AND VENUE

13.   This Court has subject matter jurisdiction over this case under 12 U.S.C. § 1819(b)(2) and 28 U.S.C. §§ 1331 and 1345.

14.   The Court has personal jurisdiction over the Defendants because each of the Defendants engages in substantial business activities in the State of California.  Also, LSI Appraisal, LLC has its headquarters in Santa Ana, California, and LSI Title Company is a California corporation.

15.   Venue is proper in this District under 28 U.S.C. § 1391(b).

## IV.   FACTUAL BACKGROUND

### A.   The Importance of Appraisals to WaMu

16.   During the relevant time period, WaMu was one of the largest mortgage lenders in the United States.  Accurate appraisals were critical to WaMu's financial success.  WaMu depended on appraisers to fairly, accurately, and competently assess the residential property values that served as collateral for its loans.  WaMu was required by its primary banking regulator, the OTS, to maintain an appropriate real estate appraisal

program for all of its lending functions. The independence and competence of the real estate appraisers who determine the value of home loan collateral is of enormous importance in the mortgage industry. Real estate appraisals are intended to provide borrowers and lenders with an independent and accurate assessment of the market value of a home. This ensures that a mortgage or home equity loan is not under-collateralized, which in turn protects borrowers from being over-extended financially and lenders and investors from losses if the borrower defaults on the loan.

17. Because of the importance of appraisals in the home lending market, state and federal statutes and regulations require that appraisals be accurate and be prepared independently. In order to achieve these goals, federal statutes and regulations, and most state statutes and regulations, implement all or portions of USPAP to standardize how appraisals should be properly prepared. USPAP is formulated by the Appraisal Standards Board of The Appraisal Foundation, who "develops, publishes, interprets, and amends USPAP on behalf of appraisers and users of appraisals services."

18. The USPAP includes the following standards, among others:

    1.    Ethics

- an appraiser must perform assignments ethically and competently, in accordance with USPAP and any supplemental standards agreed to by the appraiser in accepting the assignment. … An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interest.

- an appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions.

    2.    Standards Rule 1-1. The appraiser must not render appraisal services in a careless or negligent manner, such as by making a series of errors, that, although might not significantly affect the results of an appraisal, in the aggregate affects the credibility of those results.

    3.    Standards Rule 1-4. Based on the type of valuation method used, the appraiser must collect data necessary for credible results.

4.      Standards Rule 3.  In performing an appraisal review assignment, an appraiser acting as reviewer must develop and report a credible opinion as to the quality of another appraisers' work and clearly disclose the scope of work performed.

5.      Standards Rule 3-1(d)-(g).  In developing an appraisal review, the reviewer must develop an opinion as to the completeness of the material under review, develop an opinion as to the apparent adequacy and relevance of the data and the propriety of any adjustments to the data, develop an opinion as to the appropriateness of the appraisal methods and techniques used and develop reasons for any disagreement; and develop an opinion as to whether the analyses, opinions, and conclusions are appropriate and reasonable and develop reasons for any disagreement.

19.      Many federal statutes and regulations incorporate USPAP directly.  For example, 12 C.F.R. § 564.4(a) requires all appraisals to conform to generally accepted appraisal standards as evidenced by USPAP.  Section 1110 of FIRREA (12 U.S.C. § 3339) likewise requires that real estate appraisals be performed according to certain minimum standards, which include those identified under 12 C.F.R. § 564.4. *See also* 61 Fla. Admin. Code 61J1-9.001 and Cal. Code Regs., tit. 10, § 3701.

20.      In addition to standards established in USPAP, the Freddie Mac Single-Family Seller/Servicer Guide ("Freddie Mac Guide") identifies unacceptable appraisal practices.  Some of the unacceptable practices in the Freddie Mac Guide are:

1)      It is unacceptable to include inaccurate or incomplete data about the subject property, the neighborhood or any comparable sale used in the appraisal analysis.

2)      It is unacceptable to rely on inappropriate comparable sales or to fail to use comparable sales that are more similar to or nearer to the subject property with adequate explanation.

3)      It is unacceptable to use inordinate adjustments for differences between the subject property and the comparable sales that do not reflect the market's reaction to such differences, or the failure to make proper adjustments when they are clearly necessary.

In addition to identifying these specific unacceptable practices, the Freddie Mac Guide also requires compliance with USPAP.

### B.   WaMu Outsourced its Appraisals to LSI

21.   Prior to July 2006, WaMu managed its own appraisal services with in-house appraisers and appraisal managers.  In 2006 WaMu re-evaluated its appraisal practices and ultimately decided to outsource its appraisal management services.  WaMu solicited detailed bid proposals from several national companies in the business of providing appraisals and appraisal management services.  WaMu specifically sought vendors who could ensure that the appraisals WaMu relied upon complied with USPAP, and vendors who could also mitigate the potential for loan officers to exert pressure on appraisers.  After careful consideration, in July 2006, WaMu retained two outside appraisal management companies – LSI and one of its competitors, CoreLogic Valuation Services, LLC, f/k/a eAppraiseIT, LLC ("EA").  These two companies both agreed to provide high quality and accurate appraisal services and to act as a structural buffer between the WaMu loan consultants and the appraisers to eliminate potential pressure or conflicts of interest.

### C.   The LSI Agreement

22.   LSI began providing appraisal services to WaMu in July 2006, and the relationship between LSI and WaMu was subsequently memorialized in the LSI Agreement entered into on or about October 16, 2006.  The services provided by LSI to WaMu and the promised quality of those services, however, did not materially change after the LSI Agreement was executed.  In the LSI Agreement, LSI agreed broadly to "provide Appraisal Services for residential properties located in the fifty (50) United States and the District of Columbia."  "Services" included 15 different types of "Appraisals," including standard "full appraisals" (known as 1004 appraisals because they are performed on Fannie Mae 1004 forms) which examined the interior and exterior of a residence, reconsiderations of value (services provided when there is a disagreement of the appraisal value based on supporting evidence), and desk and field reviews (performed to "review" the underlying appraisal for accuracy).  *See* LSI Agreement at sections

1(a)(15), 2.1(a)-(d) and Exhibit A. "In all cases, the Appraisal shall provide an estimated value of the real property based on replacement costs, sales of comparable properties, and future income from income producing properties (where applicable)." LSI Agreement at Exhibit A. In addition to the Appraisal Services LSI agreed to perform, LSI also agreed to act as the "gatekeeper" between WaMu loan staff and the actual appraisers, and LSI was to "report any inappropriate contacts or requests by [WaMu] employees concerning an appraisal or assigning an appraisal." *Id.* In exchange for these services, WaMu agreed to pay and did pay LSI more than $127 million in agreed upon fees. LSI Agreement at section 6.

23.     All the Services, including the ancillary services related to the performance of those Services, were to be provided by LSI in accordance with specific standards set out in the LSI Agreement. Specifically, Services were to "conform as applicable to USPAP and to Appraisal Standards of FNMA, FHLMC, and other investors." *Id.* at Exhibit A. Additional references to the USPAP standards are found in the respective provisions of the LSI Agreement Warranties and Additional Covenants, requiring compliance not only with USPAP, but also with FIRREA, all appraisal regulations set forth in 12 C.F.R. § 564, et seq. (which includes USPAP) and related appraisal guidance from the OTS. *See id.* at section 15.2(a) and Exhibit A. LSI also warranted and covenanted to "perform the Services, and develop the Deliverables, in accordance with applicable professional standards in the appraisal management industry." *Id.* at section 15.2(k).

24.     LSI also promised to ensure the qualifications of its appraisers and to stand behind its appraisers. Any appraisers LSI employed or contracted to perform Appraisal Services had to possess the appropriate license or certificate needed to perform the appraisal and also had to have the experience and competence necessary to complete the assignment. *See* LSI Agreement at section 4.3. Ensuring such qualifications should have been equally important to LSI because LSI stood behind those appraisers, as it stood behind any subcontractor it hired to perform Services under the LSI Agreement, and

1    remained "responsible and liable for a subcontractor's compliance with [the LSI

2    Agreement] and performance hereunder." *See id.* at section 4.4.

3        25.    Finally, under section 7.1(j) of the LSI Agreement, LSI agreed to indemnify

4    and hold harmless WaMu for loss, damage, claim, or expense arising out of or relating to

5    any claim "by WaMu relating to any breach of the representations and warranties

6    regarding the Services provided by [LSI] pursuant to this Agreement." *See* LSI

7    Agreement at section 7.1(j) and Exhibit A.

8        **D.    LSI's Common Law Duty to WaMu**

9        26.    Without regard to the LSI Agreement, LSI owed a duty to WaMu to exercise

10   reasonable care in the course of providing appraisal services to WaMu. The standard of

11   care owed by an appraiser to a client is embodied in USPAP, and applicable federal and

12   state standards and regulations, and applicable industry standards. Those standards are set

13   forth in summary form in paragraphs 18-20 above.

14       27.    Each of the appraisals provided or approved by LSI contains specific

15   representations regarding compliance with these standards, including the following

16   representations:

17           (a)    The appraiser, at a minimum, developed and reported the
18                  appraisal in accordance with the scope of work
                    requirements stated in the appraisal report;

19           (b)    The appraiser performed a complete visual inspection of
20                  the interior and exterior areas of the subject property.
                    The appraiser reported the condition of the improvements
21                  in factual, specific terms. The appraiser identified and
                    reported the physical deficiencies that could affect the
                    livability, soundness, or structural integrity of the
22                  property;

23           (c)    The appraiser performed this appraisal in accordance
                    with the requirements of USPAP;
24
             (d)    The appraiser developed his opinion of the market value
25                  of the real property that is the subject of this report based
                    on the sales comparison approach to value. The
26                  appraiser used adequate comparable market data to
                    develop a reliable sales comparison approach for this
27                  assignment;

28           (e)    The appraiser researched, verified, analyzed, and
                    reported the prior sales of the comparables sales for the

minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in the report;

(f)   The appraiser selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property;

(g)   The appraiser reported adjustments to the comparable sales that reflect the market's reaction to the difference between the subject property and the comparable sales;

(h)   The appraiser verified from a disinterested source, all information in this report that was provided by the parties;

(i)   The appraiser represented that he was aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area where the property is located;

(j)   The appraiser has taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. The appraiser has noted in this appraisal report any adverse conditions observed during the inspection of the subject property or that the appraiser became aware of during the research involved in performing this appraisal. The appraiser has considered these adverse conditions in the analysis of the property value, and has reported the effect of the conditions on the value and marketability of the subject property; and

(k)   The appraiser represented that any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability....

### E.   LSI's Gross Negligence and Breach of Contract

28.   LSI provided appraisal services to WaMu from July 2006 through November 2007. During this period, LSI provided or approved more than 386,000 appraisals for residential loans that WaMu originated or purchased. WaMu quickly became LSI's largest client. WaMu paid LSI over $127 million for its services.

29.   During all relevant times and with regard to the original appraisals provided by LSI, WaMu would request an appraisal from LSI electronically. LSI would then select one of its individual licensed appraisers located in the vicinity of the subject property to

perform the appraisal. Time was always of the essence, and WaMu required that the appraisal be completed in a timely manner – usually just a matter of days after the order was placed. When LSI's appraiser completed the appraisal, he or she would send it electronically to LSI. LSI's Quality Assurance Group would then process the appraisal by running it through a computerized rules based appraisal underwriting system that was supposed to determine whether the appraisal complied with approximately 100 appraisal underwriting rules.

30.    Notwithstanding the existence of the quality control system, LSI did not, for the most part, conduct any meaningful, substantive review of the 220 appraisal services provided to WaMu. To date, the FDIC and its experts have reviewed in depth only 292 of the many thousands of appraisals provided or approved for WaMu. Based on expert analysis of these appraisals, only 10 of the 292 appraisals, which is less than four percent of the appraisals reviewed, were found to be fully compliant with the applicable professional standards. On the other hand, 220 of the 292 appraisals, more than 75 percent of appraisals reviewed, were found to contain multiple egregious violations of USPAP and applicable industry standards. Those violations constitute a degree of carelessness that rises to the level of gross negligence. LSI's grossly negligent performance or approval of these 220 appraisals proximately and directly caused losses to WaMu of at least $154,519,071.10. WaMu relied on these appraisal services in making residential loans to its borrowers, and the Defendants knew that WaMu was relying on LSI's appraisal services in making the residential mortgage loans. WaMu would not have made these residential loans but for the inflated appraisals provided or approved by LSI. The remaining 62 appraisal services out of the 292 reviewed were found to contain violations of USPAP, but not to the same degree as the grossly negligent appraisals.

31.    With respect to the 220 grossly negligent appraisals, LSI failed to ensure that the appraisal services it provided conformed to USPAP. LSI's violations of USPAP include inadequate or improper licensing of appraisers, inadequate research, failure to perform required site visits, lack of support for site valuations, use of appraisers

unfamiliar with the relevant geographical area, failure to note information obtained from interested parties, use of improper comparables, unsupported adjustments to comparables, failure to report prior sales, failure to acknowledge a declining market or in-area price variations, and/or tying compensation or employment to appraisal results.   LSI represented and agreed that it would review each and every appraisal that it provided to WaMu to ensure that the appraisals complied with the federal and state statutes and guidelines and the industry standards, including USPAP.   Instead, LSI merely "rubber stamped" the appraisals, doing little more than checking required boxes and obtaining necessary signatures on review forms and providing no substantive assurance that any of the appraisers it provide complied with USPAP or other guidelines.   In addition, LSI's process made it nearly impossible for LSI to act as a "gatekeeper" between loan staff and appraisers as it had promised.   The automated order, mostly automated assignment, meant that LSI did not review information sent by the loan officer to the appraisers.

32.     The following are just two examples of the grossly negligent appraisal services provided by LSI to WaMu.   In May 2007, a property in Agoura Hills, California, appraised for $5,540,000, which resulted in WaMu approving a $4,155,000 loan.   (Loan No. 3017902135 on Exhibit C.)   The appraiser failed to adequately analyze the subject contract or the subject property's listing history as called for by the Fannie Mae Uniform Residential Appraisal Report form.   The subject property's original listing price was $4,795,000, which was increased to $5,200,000 on January 22, 2007.   The listing price was increased again on January 24, 2007, to $5,540,000, which was the contract price.   By failing to adequately analyze the subject contract and listing history, the appraiser failed to disclose that the contract price was actually $340,000, or 6.5 percent, *higher* than the already increased listing price, despite having been on the market for 485 days.   The appraiser should have recognized, reported, and analyzed the increased listing price in such temporal proximity to the contract date, since, atypically, the appraisal report was completed four months after the house was under contract, at a time when all of the information regarding the history of the listing price and the contract date, was readily

available to the appraiser.  The appraiser did disclose the prior site-only sale for $1,295,000, although he failed to explain how, 18 months later, he valued the site at $3,000,000.  All of this in a market the appraiser summarizes as "stable" with a three to six month marketing time, while the actual data he provides shows a two year supply of similar homes.  The appraiser also selected inappropriate "comparables."  The comparables the appraiser selected included a waterfront property with a private boat dock, a mountain-top property more than ten times the size of the subject property, and a "Rustic Contemporary" (compared to the Tuscan-style subject) on twice as much usable land.  Although the subject property had a dirt driveway with no paved access to the street and no landscaping whatsoever, the appraiser made no downward adjustments for the comparables' differences, which all contained complete and extensive landscaping and hardscaping.  This omission is especially egregious considering that homeowners who own homes in this price range have often invested many thousands of dollars in landscaping.  The borrower defaulted on the loan, and WaMu charged off $1,391,500.15.

33.    In September 2007, a property in Northridge, California appraised for $2.3 million, which resulted in WaMu approving a loan for $1.84 million.  (Loan No. 3018491617 in Exhibit C.)  The appraiser reported the prior sale of the property 25 months earlier for $732,000 and noted $250,000 in upgrades, but he provided no explanation as to how the property increased in that short time to a value of $2.3 million, a 200% increase, in a market he describes as "stabilizing."  The appraiser noted that the subject property was excessively larger in size than the surrounding homes, so much so that he justified increasing his search for comparables to a normally inappropriate ten-mile radius.  However, he failed to address whether this almost 6,000 square feet home is overbuilt for a neighborhood with surrounding 2500 to 3500 square foot homes.  The appraiser ignored nearly a dozen closer comparables that would have caused him to arrive at a much lower appraised value.  Instead, the appraiser used comparables that were dissimilar in size and location in order to support the higher value.  For these reasons and others, the $2.3 million appraised value was excessively inflated.  Ultimately, the

1 borrower defaulted on the loan, and WaMu charged off $1,033,020.16.

2      34.    A list of the 220 loans that WaMu made in reliance on LSI's grossly
3 negligent appraisal services that have so far been identified by the FDIC is attached hereto
4 as Exhibit C and incorporated herein for all purposes.  The list sets forth the basic
5 information for each of the 220 loans, identifies the appraiser or appraisers who provided
6 the grossly negligent appraisal, and sets forth the damages suffered by WaMu with respect
7 to each loan.  The damages total $154,519,071.10. The list also identifies by code number
8 the primary deficiencies in each of the 220 appraisals.  The "key" explaining the code
9 numbers is attached hereto as Exhibit D and incorporated herein for all purposes.  The list
10 of appraisal deficiencies is not intended to be exhaustive.  Out of the 220 grossly
11 negligent appraisals, 208 were relied upon by WaMu in making loans after the LSI
12 Agreement was entered into on October 16, 2006.  The damages on those 208 loans total
13 $146,168,762.34.

14     **F.**    **The Role of LSI's Related Entities**

15      35.    During the 18 month period in which the LSI appraisal services at issue were
16 provided, LSI's ultimate parent company was Fidelity National Information Services, Inc.
17 ("FNIS").  FNIS owned Lender Processing Services, Inc. ("LPS, Inc."). LPS, Inc., in
18 turn, owns Lender Processing Service, LLC ("LPS, LLC"). LPS, LLC owns FNTS.
19 FNTS owns LSI Title Company ("LSI Title Co."), which owns LSI Title Agency, Inc.
20 ("LSI Title, Inc."). LSI Title, Inc. owns LSI.

21      36.    On July 2, 2008, FNIS spun off LPS, Inc. LPS, Inc. continues to own LPS,
22 LLC; FNTS; LSI Title Co.; LSI Title, LLC; and LSI, and thus remains the ultimate parent
23 of LSI.

24      37.    FNIS; LPS, Inc.; LPS, LLC; FNTS; LSI Title Co.; and LSI Title, LLC,
25 effectively controlled and directed LSI's wrongful acts and omissions.  Many of LSI's
26 business practices and its relationships with the LSI related entities establish that all of the
27 Defendants were in fact operating as a single business entity.  LSI is a wholly owned
28 subsidiary, whose ultimate parent during the relevant time period was FNIS.  FNIS, in

turn, had complete ownership interest in the intermediate entities.

38.     There was such a unity of interest and ownership among these entities that the separateness of the entities ceased to exist with regard to the appraisal services provided by LSI to WaMu.  Treating the grossly negligent appraisal services provided by LSI to WaMu as the acts of LSI alone would cause an inequitable result.  The direction and control asserted by FNIS; LPS, Inc.; LPS, LLC; FNTS; LSI Title Co.; and LSI Title, LLC, over the actions of LSI with regard to the appraisal services provided by LSI to WaMu constitutes a joint undertaking to accomplish a common commercial purpose, with each of the participants having a right of control and agreeing to share in profits.

39.     The LSI Agreement itself designates a senior officer of LPS, Inc. to oversee and manage the appraisal services to be provided by LSI to WaMu.  The executive vice president of appraisal operations of LSI, Kathleen Marie Rice, has testified in an administrative deposition, under oath, that she reported to FNIS and LPS, Inc. leadership.  Specifically, Ms. Rice testified that she reported LSI's turnaround time, quality issues, and profitability of LSI to senior management at the parent entities.  Furthermore, Ms. Rice testified that Kathy Kohler, an employee of FNIS, had the authority to direct her actions as an LSI employee.

40.     As a result of this conduct, the FDIC asserts claims against FNIS; LPS, Inc.; LPS, LLC; FNTS; LSI Title Co.; and LSI Title, LLC, under theories of alter ego, single business enterprise, joint venture, and direct liability.

## V.     CLAIMS FOR RELIEF

### COUNT 1
### Gross Negligence
### (Against All Defendants)

41.     The FDIC re-alleges and incorporates by reference the allegations contained in paragraphs 1–40 above as if fully set out in this Count.

42.     Defendants owed duties to WaMu to use such skill, prudence, and diligence as other appraisers commonly possess and exercise.  These duties included the duty to ensure that each appraisal service provided by LSI for WaMu was compliant with USPAP

and all applicable state and federal statutes and regulations, as well as all other applicable industry standards.

43.     Defendants breached their duties and were grossly negligent by, among other things, (a) failing to provide WaMu with appraisals that were prepared with such skill, prudence, and diligence as other appraisers commonly possess and exercise; (b) failing to provide WaMu with appraisals that complied with USPAP and other applicable state and federal statutes and regulations; and (c) failing to provide WaMu with appraisals that complied with standards applicable to the appraisal industry.  More specifically, but without limitation, Defendants violated the applicable standard of care with respect to the 220 grossly negligent appraisals listed in Exhibit C attached hereto in the following respects:

- the use of improper comparables,
- the failure to include adequate comparables,
- the failure to accurately disclose prior sales history,
- the failure to perform site visits,
- the use of appraisers unlikely to be familiar with the area,
- the failure to identify information obtained from interested parties,
- the use of improper factors that impact value,
- the failure to consider factors that impact value,
- the failure to address long unsold listing periods, and
- inadequate or improper licensing of appraisers.

44.     Defendants' conduct amounted to the want of even scant care or, alternatively, an extreme departure from the ordinary standard of care.

45.     As a direct and proximate result of Defendants' gross negligence, WaMu suffered damages in the amount of at least $154,519,071.10.

## COUNT 2
### Breach of Contract
### (Against LSI)

46.    The FDIC re-alleges and incorporates by reference the allegations contained in paragraphs 1–45 above as if fully set out in this Count.

47.    WaMu and LSI entered into the LSI Agreement on October 16, 2006. Pursuant to the LSI Agreement, LSI agreed to provide WaMu with Appraisal Services, and other ancillary services, all of a certain type and quality in exchange for an agreed upon fee.

48.    WaMu fully performed its obligations pursuant to the terms of the LSI Agreement, but LSI has materially failed to comply with its own obligations  and is liable to WaMu for the provision of non-compliant Services under the LSI Agreement. Specifically, and as set forth above, LSI failed to comply with sections 2.1(a)-(d), 4.3, 4.4, 7.1(j), 15.2(a) & (k), Exhibit A, Exhibit A-1 and Exhibit A-2.

49.    LSI breached the LSI Agreement with respect to the 208 loans that are the subject of this Complaint with regard to the appraisal services that were provided by LSI and relied upon by WaMu after the LSI agreement was entered into on October 16, 2006, by, among other things, (a) failing to provide WaMu with appraisals that were prepared by appropriately licensed or certificated appraisers; (b) failing to provide WaMu with Appraisals that were prepared by appraisers with the experience and competence necessary to complete the assignment; (c) failing to provide WaMu with Appraisals and Appraisal Services that complied with USPAP and other applicable state and federal statutes and regulations; and (d) failing to provide WaMu with Appraisals and Appraisal Services that complied with standards applicable to the appraisal industry; (e) failing to take responsibility and assume liability for the Appraisals and Appraisal Services provided to WaMu; and (f) failing to indemnify WaMu for losses incurred by WaMu relating to the inadequacy of LSI's Services.

50.    As a direct and proximate result of LSI's breaches of the LSI Agreement, WaMu suffered damages in the amount of at least $146,168,762.34.

18

**COMPLAINT**

## COUNT 3
### Breach of Contract
### (Against FNTS)

51.  The FDIC re-alleges and incorporates by reference the allegations contained in paragraphs 1–50 above as if fully set out in this Count.

52.  As additional consideration for entering into the LSI Agreement, WaMu and FNTS entered into the Performance Guaranty Agreement on October 16, 2006.  Pursuant to the Performance Guaranty Agreement, FNTS agreed unconditionally and irrevocably to guarantee "all obligations" undertaken by LSI under the LSI Agreement.

53.  WaMu fully performed its obligations pursuant to the terms of the Performance Guaranty Agreement.

54.  FNTS breached the Performance Guaranty Agreement by failing to compensate WaMu or the FDIC for the damages cause by LSI's breach of the LSI Agreement as set forth above.

55.  As a direct and proximate result of FNTS' breach of the Performance Guaranty Agreement, WaMu suffered damages in the amount of at least $146,168,762.34.

## COUNT 4
### Alter Ego, Single Business Enterprise, Joint Venture
### (Against FNIS; LPS, Inc.; LPS, LLC; FNTS; LSI Title Co.; and LSI Title, LLC)

56.  The FDIC re-alleges and incorporates by reference the allegations contained in paragraphs 1– 55 above as if fully set out in this Count.

57.  As set forth above, FNIS; LPS, Inc.; LPS, LLC; FNTS; LSI Title Co.; and LSI Title, LLC, directed and controlled the actions of LSI with regard to the appraisal services provided by LSI to WaMu.  There was such a unity of interest and ownership among these entities that the separateness of the entities ceased to exist with regard to the appraisal services provided by LSI to WaMu.  Treating the grossly negligent appraisals provided by LSI to WaMu as the acts of LSI alone would cause an inequitable result.

58.  Accordingly, FNIS; LPS, Inc.; LPS, LLC; FNTS; LSI Title Co.; and LSI Title, LLC, should alternatively be held jointly and severally liable for the wrongful acts of LSI under both the Alter Ego Doctrine and the Single Enterprise Doctrine.

59.     The direction and control asserted by FNIS; LPS, Inc.; LPS, LLC; FNTS; LSI Title Co.; and LSI Title, LLC, over the actions of LSI with regard to the appraisal services provided by LSI to WaMu constitutes a joint undertaking to accomplish a common commercial purpose, with each of the participants having a right of control and agreeing to share in profits.

60.     Accordingly, FNIS; LPS, Inc.; LPS, LLC; FNTS; LSI Title Co.; and LSI Title, LLC, should alternatively be held jointly and severally liable for the wrongful acts of LSI under the Joint Venture Doctrine.

## VI.     ATTORNEYS' FEES

61.     Pursuant to section 1717(a) of the California Civil Code, the FDIC is entitled to recover its reasonable attorneys' fees against LSI incurred in this case, because this is a suit on a contract and the contract specifically provides for attorneys' fees and costs.

*     *     *

1

## **PRAYER**

2  WHEREFORE, PREMISES CONSIDERED, the FDIC prays that Defendants be

3  cited to appear and answer, and that upon final hearing, the FDIC have and recover

4  judgment against Defendants for the damages described above and for such other relief,

5  general or special, to which the FDIC may show itself justly entitled at law or in equity,

6  together with attorneys' fees and all costs of court.

7  Dated: May 9, 2011                    BIENERT, MILLER & KATZMAN, PLC

8

9

10  By: _Steven J Katzman_____

11  Steven Jay Katzman
    Attorneys for Plaintiff

12  FEDERAL DEPOSIT INSURANCE
    CORPORATION, as Receiver of Washington

13  Mutual Bank

14  MULLIN HOARD & BROWN, L.L.P

15  Steven L. Hoard
    John Mozola

16  Greg Dimmick
    Sarah D. Pelley

17  Attorneys for Plaintiff
    FEDERAL DEPOSIT INSURANCE

18  CORPORATION, as Receiver of Washington
    Mutual Bank

19

20  Leonard J. DePasquale
    Counsel, Legal Division - FDIC

21  Attorney for Plaintiff
    FEDERAL DEPOSIT INSURANCE

22  CORPORATION, as Receiver of Washington
    Mutual Bank

23

24

25

26

27

28

1

## DEMAND FOR JURY TRIAL

2      Pursuant to Rule 38 of the Federal Rules of Civil Procedure and Local Rule 38-1,

3   the Plaintiff in this action, by and through its counsel of record, hereby demands trial of

4   this cause by jury.

5   Dated: May 9, 2011                    BIENERT, MILLER & KATZMAN, PLC

6

7

8      By: _Steven J. Katzman_____

9          Steven Jay Katzman
           Attorneys for Plaintiff
10         FEDERAL DEPOSIT INSURANCE
           CORPORATION, as Receiver of Washington
11         Mutual Bank

12         MULLIN HOARD & BROWN, L.L.P
           Steven L. Hoard
13         John Mozola
           Greg Dimmick
14         Sarah D. Pelley
           Attorneys for Plaintiff
15         FEDERAL DEPOSIT INSURANCE
           CORPORATION, as Receiver of Washington
16         Mutual Bank
17
           Leonard J. DePasquale
18         Counsel, Legal Division - FDIC
           Attorney for Plaintiff
19         FEDERAL DEPOSIT INSURANCE
           CORPORATION, as Receiver of Washington
20         Mutual Bank
21

22

23

24

25

26

27

28

# EXHIBIT

# "A"

EXHIBIT A

Execution Copy

## APPRAISAL OUTSOURCING SERVICES AGREEMENT

THIS **APPRAISAL OUTSOURCING SERVICES AGREEMENT** (this "Agreement") is made and entered into as of the _16th_ day of _October_ , 2006 (the "Effective Date"), by and between **LSI APPRAISAL, LLC**, a Delaware limited liability company ("Company"), having offices located at 700 Cherrington Parkway, Coraopolis, PA 15108-4306, and **WASHINGTON MUTUAL BANK**, a federal savings association ("WM"), having offices located at 2273 North Green Valley Parkway, Suite 14, Henderson, NV 89014.   Both Company and WM are sometimes hereinafter referred to singularly as a "Party" and collectively as the "Parties".

### WITNESSETH:

**WHEREAS,** Company manages a network of residential real estate appraisers in all fifty (50) states of the United States and the District of Columbia;

**WHEREAS,** WM is in the business of making loans secured by a security interest in residential real estate and requires that certain appraisal services be performed in connection with said loans; and

**WHEREAS,** the Parties desire to enter into a business relationship pursuant to which Company will perform certain services, as more particularly specified herein, for and on behalf of WM in connection with residential mortgage loans made by WM.

**NOW, THEREFORE,** in consideration of the foregoing premises, the mutual covenants contained herein, and other good and valuable consideration, the receipt, adequacy, and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties hereby agree as follows:

### TERMS

1.   **Definitions and General Interpretive Rules.**

(a)   **Definitions.**   All words or phrases defined in this Paragraph 1 (except as herein otherwise expressly provided or unless the context otherwise requires) shall, for the purposes of this Agreement, have the respective meanings specified in this Paragraph 1:

(1)   **Appraisal Warranty.**   The appraisal warranty provided by Company to WM in connection with first Mortgage (as defined hereinafter) origination loan appraisals and second Mortgage origination appraisals (as applicable), as set forth in Exhibit B (Appraisal Warranty).

(2)   **Company Consents.**   All licenses, consents, permits, approvals and authorizations that are necessary to allow (A) Company and Company agents to use (1) the Company Software (as defined hereinafter), and (2) any assets owned or leased by Company; (B) Company and Company agents to (1) use any third party services retained by Company to provide the Services, (2) grant any license contemplated by this Agreement, and (3) assign to WM the Work Product (as defined hereinafter); and (C) WM and WM agents to use the Company Software.



Page 1 of 73



**Confidential Treatment Requested**

(3) **Company Governmental Approvals.** All licenses, consents, permits, approvals and authorizations of any Governmental Authority, or any notice to any Governmental Authority, the granting of which is required by law or regulatory requirements, for Company to perform the Services or fulfill any other obligation contemplated by this Agreement.

(4) **Company Software.** Software that is owned or licensed by Company and used by Company or WM to provide the Services under this Agreement, including, but not limited to, the Company Software listed on Exhibit F (Company Software).

(5) **Deliverables.** All data, materials, Work Product, and deliverables to be developed or delivered by Company in connection with the Services with respect to a Project (as defined in Section 2.3) hereunder as set forth in an applicable SOW (as defined in Section 2.3).

(6) **Fee Schedule.** The schedule of fees specifically described in Exhibit C (Fee Schedule), or any amendments thereto, which specifies the fees which WM will pay to Company for Services (as defined hereinafter) provided by Company under this Agreement.

(7) **FHLMC.** The Federal Home Loan Mortgage Corporation, also known as Freddie Mac.

(8) **FNMA.** The Federal National Mortgage Association, also known as Fannie Mae.

(9) **FIRREA.** The Financial Institution Reform, Recovery and Enforcement Act of 1989, Title X, as amended from time to time.

(10) **Governmental Authority.** Any federal, state, municipal, local, territorial, or other governmental department, regulatory authority, judicial or administrative body in any jurisdiction in which the Services are, or may be, performed or received.

(11) **Mortgage.** Mortgage, deed of trust, or other security instrument securing a loan on real property.

(12) **Order.** The request from WM to Company for Company to provide certain specified Services and all information from WM necessary to Company to provide the Services requested.

(13) **Pre-Existing Materials.** Any Software or work product owned or licensed by Company before the Effective Date, licensed by Company from a third party after the Effective Date, or developed by Company or Company agents independently of the Services during the Term (as defined in Section 9.1) of this Agreement.

(14) **Project Staff.** The personnel of Company, or Company's agents or subcontractors, who provide any of the Services.

**Confidential Treatment Requested**

LSI2-0429893

Execution Copy

(15)   **Services.** The products and/or services listed in Exhibit A (Services), or any amendment thereto, which are available to WM through Company under the terms of this Agreement and as more fully described in Section 2.1 of this Agreement.

(16)   **Software.** Unless the source code version is specifically identified in a particular case, the object code versions of any applications programs, operating system software, computer software languages, utilities, other computer programs and related documentation, together with all corrections, modifications, enhancements, improvements, updates, and releases thereof. For avoidance of ambiguity, Software will include the tangible media on which the Software is contained.

(17)   **USPAP.** Uniform Standards of Professional Appraisal Practice as issued and amended from time to time by The Appraisal Foundation.

(18)   **WM Consents.** All licenses, consents, permits, approvals and authorizations that are necessary to allow Company or Company agents to access and (A) use WM's owned and leased assets, (B) use the services provided for the benefit of WM under WM's third party services contracts, or (C) use the WM Proprietary Software or WM Third Party Software.

(19)   **WM Governmental Approvals.** All licenses, consents, permits, approvals, and authorizations of any Governmental Authority, or any notice to any Governmental Authority, the granting of which is required by law or regulatory requirements, for WM to consummate the transactions contemplated by this Agreement.

(20)   **WM Proprietary Software.** The Software owned, acquired, or developed by WM, provided by WM to Company, and used by Company in connection with the provision of the Services.

(21)   **WM Third Party Software.** The Software that is licensed or leased by WM from a third party, provided by WM to Company, and used by Company in connection with the provision of the Services.

(22)   **Work Product.** Literary works or other works of authorship created under this Agreement, including appraisal reports, reports with respect to the Services, training materials and documentation, but excluding Software and Pre-Existing Materials.

(b)   **General Interpretive Rules.** For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires or unless Exhibit B contains a contrary definition as to appraisals and the Appraisal Warranty, (1) the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular and the use of any gender herein shall be deemed to include the other gender; (2) reference herein to "Paragraphs," "Sections," and "Exhibits" without reference to a document are to be designated Paragraphs, Sections, and Exhibits to this Agreement; and (3) the words "herein," "hereunder," "hereto," or words of similar import refer to this Agreement as a whole and not to particular provisions.

**Confidential Treatment Requested**                    LSI2-0429894

Execution Copy

2.   **Services.**

    **2.1   Scope of Services.** Company will provide the following services to WM:

    (a)   Services set forth in Exhibit A (Services);

    (b)   Services set forth in one or more New Services Schedules (as defined in Section 2 4), if applicable;

    (c)   Project services; and

    (d)   all ancillary services, functions, or responsibilities related to the services referred to in subsection (a) through subsection (b) of this Section which are normal, customary, and incidental to the provision of the Services or which are subtasks of the services, functions, and responsibilities set forth herein, and are reasonably required for the proper performance and provision of such services, functions, and responsibilities, whether they are documented or not, including measurement and reporting of Service Levels (as defined in Exhibit A-1) and relationship and contract management (collectively, the "Services").

    **2.2   Provision of Services.** Upon receipt by Company of an Order from WM, Company shall provide WM with those Services specified in that Order. All Orders shall be transmitted by WM to Company by facsimile or by such other electronic means as agreed to by the Parties.

    **2.3   Projects.** From time to time during the Term, WM may engage Company to perform non-recurring discrete services other than the Services (a "Project") in accordance with the project engagement procedure set forth in Exhibit G (Governance). Each Project will be documented via a Statement of Work (an "SOW") setting forth the specific services encompassed in the Project, and such SOW will be made an attachment to this Agreement. Company will comply with Exhibit G (Governance) and perform each Project, complete all Project milestones, and provide all Deliverables in accordance with the applicable SOW.

    **2.4   New Services.** From time to time during the Term, WM may wish to add one or more new services to the scope of the Services ("New Services"). WM will provide Company with a description of such new services setting out the services, functions, and responsibilities within the new services (a "New Services Request"). In response to a New Services Request, Company will prepare a proposal to WM setting forth:

    (a) how it would perform the New Services;

    (b) the fees for the New Services;

    (c) when appropriate, a transition plan, including a timetable for commencing the New Services;

    (d) Service Levels to be applied to the New Services;

    (e) when appropriate, a description of any new or existing Software to be provided by Company in connection with such New Service; and

**Confidential Treatment Requested**

LSI2-0429895

Execution Copy

(f)  any other information related to the New Services requested by WM.

Pricing of New Services will be agreed upon in writing by the Parties and will be consistent with the then-current mechanisms in this Agreement. New Services shall be documented by one or more "New Services Schedules" that are executed by the Parties and made a part of this Agreement as an amendment.

**2.5  Governmental Approvals and Consents.**  Company will, at its own expense, obtain and maintain all licenses, consents, permits, approvals, and authorizations of or from any Governmental Authority, or any notice to any Governmental Authority, the granting of which is required by law or regulation, for Company to provide the Services contemplated by this Agreement.

## 3.  Service Levels.

**3.1  Service Levels.**  Company will perform the Services in accordance with the Service Levels set forth in Exhibit A-1 (Service Level Agreement).

**3.2  New Service Levels.**  Company will perform any New Services in accordance with the New Service Levels applicable to such New Services.

**3.3  Adjustment of Service Levels.**  The Executive Review Team (as defined in Exhibit G (Governance)) (1) will review the Service Levels for the preceding twelve (12) months on or before the anniversary of the Effective Date each year during the Term of this Agreement, (2) with respect to those Service Levels that are no longer appropriate because of an increase, decrease, or change to the Services, will adjust the Service Levels for the subsequent contract year, and (3) with respect to all other Service Levels, may adjust the Service Levels for the subsequent contract year. In addition, either Party may, at any time upon notice to the other Party, initiate negotiations to review and, upon agreement by the Executive Review Team, adjust any Service Level which such Party in good faith believes is inappropriate.

In addition, WM may, from time to time, change the Service Levels to reflect its changing business needs, including adding or removing a Service Level. A new Service Level for which there is historical data will take effect sixty (60) calendar days after WM gives Company a notice specifying the new Service Level. A new Service Level for which there is no historical data will take effect ninety (90) calendar days after WM gives Company a notice specifying the new Service Level, during which time the Parties will measure the new Service Level. If Company can demonstrate to WM's reasonable satisfaction that such new Service Level will materially increase Company's cost of performing the Services, WM may only add that new Service Level if:

(a)  Company agrees; or

(b)  Company does not agree, but:

(i)  WM removes an existing Service Level at the same time as introducing the new Service Level and the cost of providing the Services in accordance with the new Service Level and the cost of measuring and reporting on such new Service Level is not materially higher than the cost of providing the Services under the existing Service Level and the cost of measuring and reporting on the existing Service Level; or

Page 6 of 73

**Confidential Treatment Requested**

Execution Copy

(ii) WM agrees to pay Company for its incremental cost of providing the Services under the new Service Level and the cost of measuring and reporting on the new Service Level.

**3.4**    **Measurement and Monitoring Tools.**  As of the Effective Date (or other date specified in Exhibit A-1 (Service Level Agreement)), Company will implement the measurement and monitoring tools and procedures required to measure and report Company's performance of the Services against the applicable Service Levels.  Such measurement and monitoring and procedures will (1) permit reporting at a level of detail specified by WM that is sufficient to verify compliance with the Service Levels, and (2) be subject to audit by WM or its designee.

(a) Company will provide WM with on-line access to Service Level measurement and monitoring tools and information, so that WM is able to access the same information as soon as it is available on-line to Company;

(b) Company will provide WM with periodic reports on Company's compliance with the Service Levels as set forth in Exhibit A-1 (Service Level Agreement), or Exhibit A-2 (Reporting); and

(c) Company will provide WM and its designees access to and information concerning such measurement and monitoring tools and procedures upon request, for inspection and verification purposes.

**3.5**    **Root-Cause Analysis.**  If Company fails to provide the Services in accordance with the Service Levels, Company will (1) promptly investigate, perform a root cause analysis on the failure in accordance with Exhibit G (Governance), identify the problem causing the failure, and report to WM, (2) correct the problem as soon as practicable and resume meeting the Service Levels, (3) advise WM of the status of the problem at stages determined by WM, and (4) demonstrate to WM that all reasonable action has been taken to prevent any recurrence of such default or failure.  Company will, at any time at which Company anticipates that it will fail to meet a Service Level, advise WM of the status of the problem at time intervals determined by the Parties.

**3.6**    **Service Level Termination Threshold.**  In the event of a failure to provide the Services set forth in this Agreement in accordance with the applicable Service Levels, WM may upon notice to Company, terminate this Agreement, in whole or in part, in which case Section 9.3 (Termination for Breach) (including the Default Cure Period) will not apply, if:

(a) Company fails to meet the same Service Level four (4) consecutive times;

(b) Company fails to meet the same Service Level six (6) times within a rolling twelve (12) month period;

(c) Company fails to meet four (4) Service Levels in the aggregate, within a rolling twelve (12) month period;

(d) Company fails to meet the draft acceptable rate of eighty percent (80%) three (3) consecutive times; or

(e) Company fails to meet the draft acceptable rate of eighty percent (80%) four (4) times within a rolling twelve (12) month period.

**Confidential Treatment Requested**                                      LSI2-0429897

Execution Copy

4.    **Staffing Requirements.**

4.1    **Key Personnel.** With respect to the Key Personnel set forth and defined in Exhibit E (Key Personnel), the Parties agree as follows:

(a) All Key Personnel will be dedicated to the WM account at the levels indicated in Exhibit E (e.g., 50% dedication equals half-time dedication to the WM account, 100% dedication equals full-time dedication to the WM account);

(b) Before assigning an individual to a Key Personnel position, whether as an initial assignment or as a replacement, Company will (1) notify WM of the proposed assignment at least thirty (30) days before such proposed assignment, (2) unless otherwise agreed by WM, introduce the individual to appropriate representatives of WM, (3) provide WM with any information regarding the individual that may be reasonably requested by WM, and (4) obtain WM's approval for such assignment. Company will only assign an individual to a Key Personnel position who is approved by WM;

(c) Company will not replace or reassign (1) the Company Relationship Manager or the four (4) Priority Service Providers as set forth in Exhibit E (Key Personnel) unless WM consents to such reassignment or replacement or such Key Personnel (a) voluntarily resigns from Company, (b) is dismissed by Company for misconduct (e.g., fraud, drug abuse, theft), (c) fails to perform his or her duties and responsibilities pursuant to this Agreement, or (d) dies or is unable to work due to his or her disability;

(d) If WM decides that any Key Personnel should not continue in that position, then WM, in its sole discretion and upon notice to Company, may require removal of such Key Personnel from the Project Staff. Company will, as soon as reasonably practicable, replace such Key Personnel;

(e) Company will maintain backup procedures and conduct the replacement procedures for the Key Personnel in such a manner so as to assure an orderly succession for Key Personnel who are replaced; and

(f) Under no circumstances shall Key Personnel be deemed agents or employees of WM.

4.2    **Project Staff.** Company will appoint individuals to the Project Staff with suitable training and skills to perform the Services. Prior to assignment to the Project Staff, Company will:

(a) subject each member of the Project Staff to such background checks as WM may require from time to time. Company will not assign any person to the Project Staff who has been convicted of either (a) any felony, or (b) any misdemeanor involving a crime of moral turpitude (or the local equivalent of similarly serious crimes); and

(b) cause each member of the Project Staff to sign a written agreement, in a form reasonably satisfactory to WM, in which such person agrees to (i) comply with (X) the safety and security procedures of which Company has been informed that are

**Confidential Treatment Requested**

LSI2-0429898

applicable to WM premises when at the WM premises, including those set forth in Working with WaMu included in Exhibit H (WM Policies and Procedures), (y) WM information security policies, and (z) the confidentiality provisions of this Agreement; and (ii) assign intellectual property rights that Company is required to assign to WM under this Agreement.

**4.3    Appraiser Requirements.** Prior to retaining any appraiser to perform Services contemplated in Exhibit A (Services), Company shall ensure with respect to each such appraiser that he/she (i) holds a current appraisal license/certificate from the state in which the property resides, and (ii) has the experience and competence necessary to complete the assignment. The appraiser may not be on the FHLMC exclusionary list, nor may he/she have had his/her certificate or license revoked or suspended by any state prior to or as of the date of the appraisal. In addition, Company shall not retain any appraiser on WM's "Ineligible Appraiser" list to provide the Services under this Agreement, as such list may be provided to Company and updated from time to time.

(a) When an appraiser is added to the WM Ineligible Appraiser list, or the FHLMC exclusionary list, or is published as having a state revocation or suspension against him/her, Company shall provide WM with a report of all Services performed by the appraiser for WM denoting Company and WM reference numbers, valuation, date of valuation, and full address of the subject property. This report is to be delivered monthly and consolidate all such data for the immediately preceding month.

(b) WM issues compliance notifications to appraisers who are identified during WM quality assurance reviews as not complying with USPAP, FNMA or FHLMC, or investor guidelines. Copies of these notifications will be provided to Company where Company has engaged the appraiser in question. Company is not prohibited from assigning work to an appraiser who has received a compliance notification, nor is it required to block broker-provided appraisals performed by appraisers who have received a compliance notification. However, Company shall provide a monthly report of services completed by appraisers who have received compliance notifications containing the same information as required with respect to Ineligible appraisers in subsection 4.3(a).

(c) The WM Ineligible Appraiser list shall be treated as Confidential Information (as defined in Section 11.1) of WM and may not be redistributed by Company except to those employees of Company who have a need to know for purposes of compliance with this Agreement and are under written obligation to comply with the confidentiality obligations of this Agreement.

**4.4    Subcontracting.** Except for retaining appraisers to provide the appraisal services contemplated in Exhibit A (Services), Company may not subcontract any other Services without the prior written consent of WM. As with appraisers retained by Company to provide the Services, if WM authorizes Company to subcontract other Services, Company shall remain responsible and liable for a subcontractor's compliance with this Agreement and performance hereunder. WM may require Company to remove or replace any subcontractors whose performance is deemed unacceptable to WM.

**4.5    U.S. Services Only.** Company may not perform, or permit or cause to be performed, any of the Services, or any subpart thereof, outside the geographic boundaries of

Confidential Treatment Requested

Execution Copy

the United States absent WM's advance written approval.  Company acknowledges that this provision is required in order for WM to comply with its regulatory obligations.

**4.6    Compliance with WM Policies.**  Company will comply with the physical safety and security policies of which Company has been informed and that are applicable to the WM locations, including those set forth in Exhibit H (WM Policies and Procedures), when at the WM locations.

## 5.    Relationship Management.

**5.1    Governance Guidelines and Principles.**  Governance of the Parties' relationship pursuant to this Agreement will follow the guidelines and principles set out in Exhibit G (Governance), as such guidelines and principles are amended or supplemented by the Parties from time to time during the Term.

**5.2    Responsibilities.**  Each of WM and Company will make management decisions in a timely manner and perform its responsibilities set forth in this Agreement.

**5.3    WM Appointments.**  WM will appoint a WM Relationship Manager to manage the operation of this Agreement, in accordance with its terms, for WM.  Wherever WM's approval is required under this Agreement, WM will only give that approval through the WM Relationship Manager or a duly authorized delegate of the WM Relationship Manager, except as contemplated by this Section or Exhibit G (Governance).  Company agrees that it will not rely on the apparent or ostensible authority of any other WM personnel in relation to this Agreement, except as contemplated by this Section or Exhibit G (Governance).

**5.4    Company Appointments.**  Company will appoint:

(a) a Company Relationship Manager to manage the operation of this Agreement, in accordance with its terms, for Company.  Wherever Company's approval is required under this Agreement, Company will only give that approval through the Company Relationship Manager or a duly authorized delegate of Company Relationship Manager, except as contemplated by this Section or Exhibit G (Governance).  WM agrees that it will not rely on the apparent or ostensible authority of any other personnel of Company in relation to this Agreement, except as contemplated by this Section or Exhibit G (Governance).  Company will ensure that Company Relationship Manager is the single point of contact for WM for the purposes of this Agreement, has the authority and will be given the responsibility to perform for Company each of the tasks referred to in Section 5.5 (Role of Relationship Managers) and is a full-time employee of Company; and

(b) an Operational Executive (as defined in Exhibit G (Governance)) to manage day-to-day operations with respect to the Services.

**5.5    Role of Relationship Managers.**  The Relationship Managers (a) will meet at times as set forth in Exhibit G (Governance) or as otherwise agreed by the Parties, (b) will review and discuss reports submitted by Company, proposed changes to the Services or any part of this Agreement, any audits, the status of individual existing or planned Projects and financial performance, (c) as contemplated by Exhibit G (Governance), will prepare a monthly executive summary report for WM and Company reviewing Company's performance of the Services, (d) may raise any issues of concern or interest relating to this Agreement, and (e) will

**Confidential Treatment Requested**

LSI2-0429900

Execution Copy

work in good faith to resolve any issues of concern in accordance with the procedures as set forth in Exhibit G (Governance).

**5.6**    **Escalation Procedure for Relationship Issues.**  The Parties will follow the escalation procedure set out in Exhibit G (Governance) to resolve any issues concerning this Agreement.

## 6.    Compensation.

**6.1**    **Fees.**  WM shall pay Company on each transaction for which Company performs Services hereunder in accordance with the Fee Schedule as set forth in Exhibit C (Fee Schedule) and/or, with respect to a Project, only, on the basis set forth in the applicable SOW. Company shall not proceed with or be reimbursed for any Services in respect of a Project that (i) have not been authorized in advance by a WM representative in connection with an applicable SOW, or (ii) exceed any budget or expenditure limit set forth in an applicable SOW. There shall be no compensation due under this Agreement except as set forth in Exhibit C (Fee Schedule), as duly amended, or, in the case of a Project, an SOW.

**6.2**    **Adjustments to Fees.**  Except as agreed to by the Parties in a written amendment to this Agreement, there shall be no adjustments to fees during the Initial Term or during any subsequent Renewal Term.  The Fee Schedule may be updated by Company with respect to a Renewal Term, provided Company must provide written notice to WM at least ninety (90) calendar days prior to the end of the Initial Term or then-current Renewal Term in order for fee changes to be effective.  If notice is given pursuant to this Section, revised fees shall take effect on the inception date of the subsequent Renewal Term.

**6.3**    **Billing.**  Company will submit to WM each month a statement showing charges due for all Services provided by Company to WM during the previous month (the "Monthly Statement").  Company shall submit invoices to the address and WM representative set forth in this Agreement or the applicable SOW, and all Monthly Statements must include a detailed statement of the Services covered by such Monthly Statement.  WM agrees to remit to Company all undisputed portions of the balance due shown on correct and complete Monthly Statements within thirty (30) calendar days following WM's receipt of the Monthly Statement. Company shall waive all charges, fees and approved expenses that are not invoiced within ninety (90) calendar days after the end of the calendar year in which the charges were incurred.

**6.4**    **Expenses.**  Out-of-town travel expenses that are pre-approved in writing and are reasonable and necessary shall be reimbursed at actual cost without markup.  In no event will WM pay for travel time.  Airfares must be at coach rates, although Company may choose to upgrade at its own expense.  Where practical, airfares shall be booked at least seven (7) calendar days in advance.  Daily meal allowance is $35 per day ($50 per day in New York and Illinois) per Company personnel providing Services hereunder.  Ground transportation will be reimbursed at actual cost, not to exceed $40 per Company personnel per day.  Unless otherwise agreed in writing, hotels shall be reserved using WM's designated hotels where discounts have been negotiated.

**6.5**    **Taxes.**  WM is responsible for all applicable taxes, duties or other charges, including sales or use taxes, imposed by any federal, state, or local Governmental Authority on Services furnished by Company under this Agreement, except for taxes based on Company's net income, gross revenue or employment obligations.  If Company is obligated by applicable law or regulation to collect and remit any taxes relating to the Services, then Company will add

**Confidential Treatment Requested**

LSI2-0429901

Execution Copy

the appropriate amount to WM's Invoices as a separate line item. Company will indemnify, defend and hold harmless WM from and against any interest, penalties or other charges resulting from the non-payment or late payment of taxes or other charges for which Company failed to invoice WM or which Company otherwise failed to pay in a timely manner.

**7.    Indemnity.**

    **7.1    Indemnities by Company.** Subject to and in accordance with and in all respects as limited by this Section 7 and Section 8, Company will defend, indemnify and hold harmless WM and its affiliates, directors, officers, and employees, for loss, damage, liability, claim or expense they incur or to which they are subject arising out of or relating to any claim asserted by a third party (including Company's agents or employees):

        (a) that the Services, the Company Software, the Work Product, or any other resources or items provided to WM by Company infringe upon or misappropriate the proprietary or other rights of any third party;

        (b) relating to duties or obligations of Company owed to a third party;

        (c) relating to the breach of any representation or warranty made by Company in connection with this Agreement;

        (d) relating to death, bodily injury, or damage to tangible property resulting from Company's acts or omissions;

        (e) relating to Company's breach of Section 13.1 (Information Security);

        (f)  relating to breach by Company of Section 11 (Confidentiality);

        (g) relating to breach of any of the covenants in Section 15.2 (Warranties and Additional Covenants by Company);

        (h) arising under applicable employment-related laws;

        (i)  relating to gross negligence, fraud, or willful misconduct of Company; or

        (j)  by WM relating to any breach of the representations and warranties regarding the Services provided by Company pursuant to this Agreement.

    **7.2    Indemnities by WM.** WM will defend, indemnify and hold harmless Company and its affiliates, and their directors, officers, employees, agents, and subcontractors, for loss, damage, liability, claim or expense they incur or to which they are subject arising out of or relating to any claim asserted by a third party:

        (a) that the WM Proprietary Software and WM Third Party Software, or any other resources or items provided to Company by WM infringe upon or misappropriate the proprietary or other rights of any third party, except to the extent such infringement may have been caused by a Software modification by Company;

        (b) relating to duties or obligations of WM owed to a third party;

**Confidential Treatment Requested**

LSI2-0429902

(c) relating to the breach of any representation, warranty, or covenant made by WM in Sections 14.1 (Representations by WM) or 15.1 (Warranties and Additional Covenenats by WM) of this Agreement;

(d) relating to death, bodily injury, or damage to tangible property resulting from WM's acts or omissions;

(e) relating to gross negligence, fraud, or willful misconduct of WM; or

(f) relating to breach by WM of Section 11 (Confidentiality).

**7.3   Indemnification Procedures.**   A Party seeking indemnification under this Section agrees to notify in writing the other Party from whom indemnification is sought of such action, claim, or proceeding and provide the Party from whom indemnification is sought with all information reasonably accessible to it for such Party to defend the action, claim or proceeding as promptly as is practicable.   The indemnified Party will cooperate, at the cost of the indemnifying Party, in all reasonable respects with the indemnifying Party and its attorneys in the investigation, trial and defense of such claim and any appeal arising therefrom; provided, however, that the indemnified Party may, at its own cost and expense, participate, through its attorneys or otherwise, in such investigation, trial and defense of such claim and any appeal arising therefrom.   No settlement of a claim that involves a remedy other than the payment of money by the indemnifying Party will be entered into without the consent of the indemnified Party.   After notice by the indemnifying Party to the indemnified Party of its election to assume full control of the defense of any such claim, the indemnifying Party will not be liable to the indemnified Party for any legal expenses incurred thereafter by such indemnified Party in connection with the defense of that claim.

**8.   Disclaimer and Liability Limitation.**

**8.1   WARRANTY DISCLAIMER.**   BOTH PARTIES DISCLAIM ANY AND ALL WARRANTIES, EXCEPT AS EXPRESSLY SET FORTH IN SECTION 15 (WARRANTIES AND ADDITIONAL COVENANTS) WITH RESPECT TO ANY SERVICES PROVIDED HEREUNDER OR ANY COMPONENT THEREOF, INCLUDING THE CONFORMITY TO ANY REPRESENTATION OR DESCRIPTION OF SERVICES OTHER THAN THOSE REPRESENTATIONS AND DESCRIPTIONS SET FORTH IN THIS AGREEMENT.   BOTH PARTIES EXPRESSLY DISCLAIM ANY IMPLIED WARRANTIES, INCLUDING THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

**8.2   Damage Cap and Limitation of Liability.**

(a) Direct Damages.   Each of the Parties will be liable to the other for any direct damages arising out of or relating to its performance or failure to perform under this Agreement; provided, however, that the liability of a Party to the other Party, whether based on an action or claim in contract, equity, negligence, tort or otherwise, will not in the aggregate exceed the greater of (x) the amount of Fees paid by WM to Company during the twelve (12) months preceding the claim, or (y) if the claim arises less than twelve (12) months after the Effective Date, an amount equal to twelve (12) times the average monthly Fees paid by WM to Company during the period commencing on the Effective Date and ending on the date upon which the claim arose.

**Confidential Treatment Requested**                                    LSI2-0429903

Execution Copy

(b) Consequential Damages. Neither WM nor Company will be liable for, nor will the measure of damages include, any indirect, incidental, special, consequential, punitive, or exemplary damages, including, but not limited to, lost profits, loss of data, lack or loss of productivity, cost of substitute equipment, services, or downtime costs, even if such Party alleged to be liable had knowledge of the possibility of such damages, arising out of or relating to its performance or failure to perform under this Agreement.

(c) Exclusions. The limitations or exculpations of liability set forth in Section 8.2(a) (Direct Damages) and Section 8.2(b) (Consequential Damages) will not apply to:

(i) the failure of WM to pay Fees due under this Agreement;

(ii) indemnification obligations of Company under Sections 7.1(a)-(b), (d)-(f), (h), and (g) [but only with respect to Company's obligations under Section 15.2(a) and (d)];

(iii) indemnification obligations of WM under Sections 7.2(a), (b), (d), (e), or (f).

(iv) breaches of Section 11 (Confidentiality and Use of Data); or

(v) liability resulting from the gross negligence or willful misconduct of a Party.

(d) Appraisal Warranty Cap. The limitations or exculpations of liability set forth in Section 8.2(a) (Direct Damages) will not apply to claims by WM arising from direct damages regarding Original Appraisals as defined in Exhibit B (Appraisal Warranty). Company's liability to WM for claims arising from or related to losses suffered by WM due to direct damages regarding an Original Appraisal shall not exceed the amounts set forth in Exhibit B (Appraisal Warranty) with respect to any individual Original Appraisal. This subsection (d) shall not be read, however, to limit Company's obligations in respect of third parties or indemnity obligations under subsection (c), above.

(e) Interpretation of Cap. In Section 8.2(a) (Direct Damages), a cap based on Fees is calculated as the sum of:

(i) all Fees paid by WM to Company for the performance of the Services;

(ii) all unpaid Fees due to Company for the performance of the Services; and

(iii) all Fees that would have been payable by WM to Company if Company had fully performed its obligations under this Agreement but which have not become payable as a result of Company's failure to fully perform its obligations under this Agreement.

B.   Term and Termination of Agreement.

9.1   Term.   The initial term ("Initial Term") of this Agreement shall commence on the Effective Date and shall terminate on the first anniversary of the Effective Date. Thereafter, WM may choose to renew this Agreement for two (2) additional one (1) year terms (each, a "Renewal Term") by giving Company written notice at least ninety (90) calendar days prior to the

Confidential Treatment Requested

LSI2-0429904

end of the Initial Term or Renewal Term (Initial Term and Renewal Term collectively referred to as "Term").

**9.2     Termination for Convenience.** WM may terminate this Agreement at any time on ninety (90) calendar days notice, provided, however, that upon such termination the rights and obligations of the Parties under this Agreement shall continue with respect to (a) Services that had been provided prior to, or (b) until the completion of any Services in progress commenced prior to, the effective date of such termination.

**9.3     Termination for Breach.** Either Party may terminate this Agreement by written notice to the other Party in the event of any material breach of this Agreement by the other Party if the breaching Party does not cure such breach within thirty (30) calendar days of notice of breach by the non-breaching Party or the breaching Party is not diligently pursuing a cure. Any such notice of termination for cause shall state the cause for termination. In the event that this Agreement is terminated by Company by reason of breach of this Agreement by WM for non-payment or for any other material breach, Company may require prepayment by WM to provide Services or to complete any work in progress prior to the effective date of such termination for cause. Any notice of termination shall be in writing and shall be delivered in accordance with Section 10 (Notices) below.

**9.4     Termination for Adverse Financial Condition.** WM or the Office of Thrift Supervision ("OTS") may terminate this Agreement by giving notice to Company if WM is determined by a Governmental Authority to be troubled pursuant to the Code of Federal Regulations at 12 C.F.R. Part 563.555.

**10.     Notices.** Any notice that is to be given or served by either Party hereto upon the other Party must be in writing and shall be deemed given or served in accordance with the provisions of this Agreement when the notice is hand delivered or delivered by traceable express mail carrier or deposited in the United States mail, postage prepaid, registered or certified mail, return receipt requested, and addressed to the Parties at the respective addresses set forth below, or at such other addresses as may have been theretofore specified by written notice delivered in accordance herewith:

> (a)     **If to Company:**
>
> LSI Appraisal, LLC
> 2550 North Red Hill Avenue
> Santa Ana, CA 92705
> Attn:  President
>
> With a copy to (which shall not constitute notice):
>
> LSI Appraisal, LLC
> 700 Cherrington Parkway
> Coraopolis, PA 15108-4306
> Attn:  Counsel

**Confidential Treatment Requested**

LSI2-0429905

Execution Copy

(b)   If to WM:

Washington Mutual Bank
1301 2nd Ave, Floor 11
Seattle, WA 98101
Attn: Sushuma Bull

With a copy for notices of breach, termination, and all notices pursuant to Sections 11.5 (Disclosure of Confidential Information) and 15.2(i) (Warranties and Additional Covenants by Company), only, to:

Washington Mutual Bank
Attn: General Counsel
1301 Second Avenue, WMC3501
Seattle, WA 98101
Fax: 206-377-2877

## 11.   Confidentiality and Use of Data.

**11.1   Definition.**   "Confidential Information" of a Party means all confidential or proprietary information, including, without limitation, all information not generally known to the public, the terms of this Agreement and WM Data.   "WM Data" shall mean all data and information that is submitted, directly or indirectly, to Company by WM or obtained or learned by Company in connection with the Services provided by Company under this Agreement and any SOW, including, without limitation, information relating to WM's customers, technology, operations, facilities, consumer markets, products, capacities, systems, procedures, security practices, research, development, business affairs, ideas, concepts, innovations, inventions, designs, business methodologies, improvements, trade secrets, copyrightable subject matter and other proprietary information.   All WM Data is and shall remain the property of WM and shall be protected as described in this Section 11.   Without limiting the foregoing, Confidential Information shall include all such information provided to each Party by the other Party both before and after the Effective Date of this Agreement.

**11.2   Use and Disclosure.**   All Confidential Information relating to a Party shall be held in confidence by the other Party to the same extent and with at least the same degree of care as such Party protects its own confidential or proprietary information of like kind and import, but in no event using less than a reasonable degree of care.   Neither Party shall disclose, duplicate, publish, release, transfer or otherwise make available Confidential Information of the other Party in any form to, or for the use or benefit of, any person or entity without the other Party's consent.   Each Party shall, however, be permitted to disclose relevant aspects of the other Party's Confidential Information to its officers, agents, subcontractors and employees to the extent that such disclosure is reasonably necessary for the performance of its duties and obligations under this Agreement and such disclosure is not prohibited by the Gramm-Leach-Bliley Act of 1999 (15 U.S.C. §6801, et seq.), as it may be amended from time to time (the "GLB Act"), the regulations promulgated thereunder or other applicable law.   Each Party shall establish commercially reasonable controls to ensure the confidentiality of the Confidential Information and to ensure that the Confidential Information is not disclosed contrary to the provisions of this Agreement, the GLB Act or any other applicable privacy laws and regulations.   Without limiting the foregoing, each Party shall implement such physical and other security measures as are necessary to (i) ensure the security and confidentiality of the Confidential Information, (ii) protect against any threats or hazards to the security and integrity

Confidential Treatment Requested                                                LSI2-0429906

of the Confidential Information, and (iii) protect against any unauthorized access to or use of the Confidential Information. The Parties shall, at a minimum, establish and maintain such data security program as is necessary to meet the objectives of the Interagency Guidelines Establishing Standards for Safeguarding Customer Information as set forth in the Code of Federal Regulations at 12 C.F.R. Parts 30, 208, 211, 225, 263, 308, 364, 568 and 570. To the extent that a Party hereto delegates any duties and responsibilities under this Agreement to an agent or other subcontractor in accordance with the terms hereof, such Party ensures that such agents and subcontractors will adhere to the same requirements with which such Party is required to comply under this Agreement. Each Party shall have the right, during regular office hours and upon reasonable notice, to audit the other Party to ensure compliance with the terms of the GLB Act and other privacy laws and regulations.

**11.3   Disclosure by Company to Ancillary Providers.**   If Company proposes to disclose WM Data to a third party, including a subcontractor, in order to perform the Services contemplated under this Agreement (an "Ancillary Provider"), Company will remain responsible for any breach of these covenants by such person. Company must enter into an agreement with each Ancillary Provider under which the Ancillary Provider (i) is restricted from disclosing, using or duplicating customer Confidential Information except as consistent with this Section 11, and (ii) agrees to protect the security of all WM Data in its possession.

**11.4   Exceptions.**   The restrictions on use and disclosure set forth in this Section 11 will not restrict any disclosure by either Party when, and to the extent that, the Confidential Information is required to be disclosed pursuant to applicable law or by lawful order or requirement of a court or Governmental Authority having jurisdiction over the Parties, provided that the disclosing Party shall use all reasonable efforts to provide the non-disclosing Party with prior notice of such required disclosure and shall disclose only that portion of the Confidential Information that is legally required to be furnished pursuant to the opinion of legal counsel of the disclosing Party. The restrictions on use and disclosure set forth in this Section 11 shall not apply with respect to Information that (i) is developed by the other Party without violating the disclosing Party's proprietary rights; (ii) is or becomes publicly known (other than through unauthorized disclosure); (iii) is disclosed to, or learned by, the recipient from a third party free of any obligation of confidentiality; or (iv) is already known by such Party without an obligation of confidentiality other than pursuant to this Agreement or any confidentiality agreements entered into before the Effective Date between WM and Company. If the GLB Act, the regulations promulgated thereunder or other applicable law now or hereafter in effect imposes a higher standard of confidentiality to the Confidential Information, such standard shall prevail over the provisions of this Section 11.

**11.5   Disclosure of Confidential Information.**   In the event of a breach of this Section 11 or other compromise of a Party's Confidential Information of which a Party is or should be aware (whether or not resulting from a breach), the Party shall immediately notify the other Party in a writing detailing all information known to the notifying Party about the compromise, the Confidential Information affected, and the steps taken by the Party to prevent the recurrence of such breach and to mitigate the risk to the Party. Such notice shall be sent to the address indicated in the Notice section of this Agreement, including a copy to General Counsel as identified therein. If and to the extent that any compromised WM Confidential Information includes any customer data, Company will also identify the customers and customer information affected. Each Party shall provide the other Party with access to all information related to the security breach as reasonably requested by a Party.

**Confidential Treatment Requested**                                   LSI2-0429907

Execution Copy

**11.6   Return of Materials.** Upon termination of this Agreement for any reason and as requested by WM, Company shall return, or certify to the destruction thereof, any and all records or copies of records relating to WM or its business, including, without limitation, Confidential Information, except for Confidential Information of WM that is rightfully contained in Company's work papers, or is required to be retained pursuant to applicable law, provided Company maintains the confidentiality of such Confidential Information as required herein.

**11.7   Permitted Use of Appraisal Information.** WM agrees that descriptions of the size and value of comparable residences used in a specific appraisal and the appraised value and size of a residence being appraised and the date thereof may be used by both Parties without restriction. No other information obtained by Company while providing the Services to WM may be used for any purpose absent prior express written permission from WM.

**12.   Proprietary Rights.**

**12.1   WM Software.** As between the Parties, WM is the exclusive owner of WM Proprietary Software and Company will have no rights or interest in the WM Proprietary Software except as set forth in this Agreement. WM hereby grants to Company, during the Term and solely to provide the Services, a non-exclusive, limited right to have access to and (1) use the WM Proprietary Software, and (2) use, to the extent permissible under the applicable third party agreements, the WM Third Party Software. Company may sublicense, to the extent permissible under the applicable third party agreements, to Company agents the right to have access to and use the WM Proprietary Software and the WM Third Party Software solely to provide those Services that such Company agents are responsible for providing.

**12.2   Company Software.** As between the Parties, Company is the exclusive owner of the Company Software. WM will have no rights or interests in the Company Software except as set forth in this Agreement.

(a) **Exhibit F** (Company Software) sets forth any Company Software that Company will require WM to access and use to provide the Services as of the Effective Date. WM may withhold its approval in respect of any Software if Company does not have the right to grant the rights described in subsections (b) and (c) of this Section.

(b) During the Term (including any post-termination transition period), Company hereby grants to WM a non-exclusive, non-sublicenseable, non-transferable license to access and use the Company Software.

(c) During the Term (including any post-termination wind down period), Company will provide WM with access to the Company Software as necessary or appropriate to enable WM to perform its responsibilities in respect of the Services.

**12.3   Work Product.** Work Product will be owned by WM. WM will have all right, title and interest, including worldwide ownership of copyright and patent, in and to the Work Product and all copies made from them. Company hereby irrevocably assigns, transfers and conveys, and will cause Company agents to assign, transfer and convey, to WM without further consideration all of its and their right, title and interest in and to such Work Product, including all rights of patent, copyright, trade secret or other proprietary rights in such materials. Company acknowledges, and will cause Company agents to acknowledge, that WM and the successors and permitted assigns of WM will have the right to obtain and hold in their own name any intellectual property rights in and to such Work Product. Company agrees to execute, and will

**Confidential Treatment Requested**

LSI2-0429908

cause Company agents to execute, any documents or take any other actions as may reasonably be necessary, or as WM may reasonably request, to perfect WM's ownership of any such Work Product.

**12.4   Pre-Existing Materials.**   Other than appraisal forms or other document templates related to the delivery of the Services, Company will not incorporate any Pre-Existing Materials in any Work Product without the prior approval of WM. Company hereby grants (and will ensure that Company agents, as applicable, grant) to WM a perpetual, royalty-free, non-exclusive, worldwide, enterprise-wide, license to use, and to grant sublicenses for the use of any Pre-Existing Materials of Company (or Company agents, as applicable) embedded or incorporated in any Work Product.

## 13.   Security and Audit.

**13.1   Information Security.** Company acknowledges that WM has established, and during the Term may amend, minimum appropriate levels of security for information residing on WM systems or for WM Data and other Confidential Information of WM residing on the Company systems. WM's information security policies as of the Effective Date are set forth in Exhibit D (Information Security Requirements). WM will have the right to amend these security policies on thirty (30) calendar days notice to Company or such shorter notice period as required in order to comply with law. Company will, and will cause each member of the Project Staff to, comply with WM's information security policies at all locations, whether WM premises or Company premises, to which they have access in connection with the performance of Services hereunder. In the event Company discovers or is notified of a breach or potential breach of security relating to WM Data, Company will immediately (1) notify the WM Relationship Manager of such breach or potential breach, and (2) if the applicable WM Data was in the possession of Company or Company agents at the time of such breach or potential breach, Company will (a) investigate and remedy the effects of the breach or potential breach, and (b) provide WM with assurance satisfactory to WM that such breach or potential breach will not recur.

In the event Company can demonstrate to WM's reasonable satisfaction that a change in the Information Security Requirements will result in a material adverse impact on Company's operating procedures or costs, the Parties shall mutually agree on the terms for implementing the new Information Security Requirements as well as responsibility for associated costs. WM shall not in any case be responsible for Company's expenses related to implementing information security practices required of Company under applicable law or regulation as an appraisal company or provider of services to the financial services industry.

**13.2   Service Audits.**   Upon prior reasonable written notice from WM, Company will provide WM, WM agents and any regulators of WM ("WM Auditors") with access to and assistance, during normal business hours, that they may require with respect to the Company Services locations and/or Company systems for the purpose of performing audits or inspections of the Services and the business of WM relating to the Services, including operational, security, financial and other audits for the sole and exclusive purpose of confirming compliance with the terms and conditions of this Agreement or applicable law or regulation. If any audit by a WM Auditor results in Company being notified that Company or Company agents are not in compliance with any law, audit requirement or other requirement set forth in this Agreement, Company will, and will cause Company agents to, promptly take actions to comply with such law, audit requirement or other requirement.

**Confidential Treatment Requested**

LSI2-0429909

Execution Copy

**13.3  Fees Audits.**  Upon prior reasonable written notice from WM, Company will provide WM and WM agents with access to such financial records and supporting documentation as may be requested by WM for the sole and exclusive purpose of confirming compliance with the terms and conditions of this Agreement or applicable law or regulation. Any such audit shall occur during normal business hours and shall not unreasonably interfere with the Company's normal business operations. WM and WM agents may audit the fees charged to WM to determine if such fees are accurate and in accordance with this Agreement. If, as a result of such audit, WM determines that Company has overcharged WM, WM will notify Company of the amount of such overcharge and Company will promptly pay to WM the amount of the overcharge, plus reimbursement for WM's costs to research the overcharged transaction to determine if WM's customer(s) is/are entitled to the reimbursement if the transaction was subject to the Real Estate Settlement Procedures Act ("RESPA"). In addition, in the event any such audit reveals an overcharge to WM of three percent (3%) or more of the total amount charged to WM for the Services subject to the audit, Company will reimburse WM for the cost of such audit.

**13.4  Office of Thrift Supervision Audit Requirements.**  By entering into this Agreement, Company agrees that the OTS will have the authority and responsibility provided by Section 5(d)(7)(D) of the Home Owners Loan Act, as amended, 12 U.S.C. §1464(d)(7)(D), relating to services performed by the contract or otherwise. Company will, at no charge, provide the OTS district director of any district designated by WM with one (1) copy, and WM with two (2) copies, of the current Service Auditor's Report (SAS 70), if and when such a review has been performed.

**13.5  Company Audits.**  Company will, as soon as practicable prior to each independent service auditor's report at Company relating to the Services, advise WM of the scope of each such audit and will consider suggestions from WM as to the scope and any other matters raised by WM relating to the proposed audit.

(a) Company will (1) make available to WM the sections of any external independent audit report of Company's or any Company agent's operations directly relating to the Services, except to the extent that any such report deals with Company's costing structures (in which event information about Company's cost structure will be redacted), and (2) promptly take reasonable corrective action to rectify (a) any error identified in any such report that could reasonably be expected to have an adverse material impact on the Services, and (b) any material control deficiencies identified in the report.

(b) At WM's request, Company will, at WM's cost, instruct Company external auditors:

(i) upon completion, to provide each contract year a report which is consistent with Generally Accepted Audit Principles established by the American Institute of Certified Public Accountants on the control procedures used by Company in the performance of the Services, including specifically an assessment of whether (a) the control procedures were suitably designed to provide reasonable assurance that the stated internal control objectives of the system would be achieved if the procedures operated as designed, and (b) the control procedures operated effectively and continuously at all times during the reporting period of such report; and

**Confidential Treatment Requested**

LSI2-0429910

(ii) provide a copy of the auditor's reports to WM.

Without limiting Company's obligations under this subsection (b), if WM believes the cost of compliance is unreasonable, WM may notify Company, and the Parties will discuss what is reasonable in the circumstances. Company will ensure that any audit firm engaged by Company is completely independent. Specifically, the auditor will not provide to Company or any Affiliate of Company any consulting services, including information technology, strategy, process improvement, tax, or human resources related consulting services.

**13.6   Record Retention.** Company will retain records and supporting documentation sufficient to document the Services for seven (7) years after the termination of this Agreement and the fees paid or payable by WM under this Agreement for a period of three (3) years after the termination of this Agreement, or in accordance with WM's then-current record retention procedures, as in effect from time to time and communicated to Company. If requested by a Governmental Authority, or by WM in compliance with a request to WM from a Governmental Authority, Company will provide copies of any or all records related to the provision of the Services hereunder (1) to be delivered to a location as specified by the Governmental Authority or WM, as the case may be, (2) at Company's expenses, and (3) within ten (10) business days after such request or such lesser period as may be specified in any request from such Governmental Authority. WM may obtain copies of past appraisal reports by sending an e-mail request to Bonnie Manz (bmanz@lsi.fnf.com) or Bob Getty (rgetty@lsi.fnf.com) or their successors as designated by Company from time to time. In the event of such request, the report shall be delivered to WM within five (5) business days of receipt of such request.

**14.   Representations.**

**14.1   By WM.** WM represents that as of the Effective Date:

(a) Washington Mutual Bank is a federal savings association, duly organized and in good standing under applicable law;

(b) WM has all requisite corporate power and authority to execute, deliver and perform its obligations under this Agreement;

(c) the execution, delivery and performance of this Agreement by WM (1) has been duly authorized by WM, and (2) will not conflict with, result in a breach of or constitute a default under any other agreement to which WM is a party or by which WM is bound;

(d) WM is duly licensed, authorized or qualified to do business and is in good standing in every jurisdiction in which a license, authorization or qualification is required for the ownership or leasing of its assets or the transaction of business of the character transacted by it, except where the failure to be so licensed, authorized or qualified would not have a material adverse effect on WM's ability to fulfill its obligations under this Agreement; and

(e) there is no outstanding litigation, arbitrated matter or other dispute to which WM is a party which, if decided unfavorably to WM, would reasonably be expected to have a material adverse effect on Company's or WM's ability to fulfill their respective obligations under this Agreement.

Confidential Treatment Requested

LSI2-0429911

Execution Copy

**14.2   By Company.** Company represents that as of the Effective Date:

(a) Company is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware;

(b) Company has all requisite power and authority to execute, deliver and perform its obligations under this Agreement;

(c) the execution, delivery and performance of this Agreement by Company (1) has been duly authorized by Company, and (2) will not conflict with, result in a breach of or constitute a default under any other agreement to which Company is a party or by which Company is bound;

(d) Company is duly licensed, authorized or qualified to do business and is in good standing in every jurisdiction in which a license, authorization or qualification is required for the ownership or leasing of its assets or the transaction of business of the character transacted by it, except where the failure to be so licensed, authorized or qualified would not have a material adverse effect on Company's ability to fulfill its obligations under this Agreement;

(e) Company is the owner of the Company Software, or has rights to use the Company Software, and has the authority to grant the licenses to be granted hereunder, free and clear of any liens, restrictions, claims, charges, security interests or any other encumbrances;

(f) the Company Software complies with all laws applicable to the Company Software;

(g) the Company Software does not infringe upon or misappropriate the proprietary rights of any third party;

(h) there is no claim or proceeding pending or threatened alleging that any of the Company Software infringes or misappropriates the proprietary rights of any third party;

(i) there is no outstanding litigation, arbitrated matter or other dispute to which Company is a party which, if decided unfavorably to Company, would reasonably be expected to have a material adverse effect on WM's or Company's ability to fulfill their respective obligations under this Agreement; and

(j) there is no code in the Company Software that would have the effect of disabling or otherwise shutting down all or any portion of the Services or any such Software.

## 15.   Warranties and Additional Covenants.

**15.1   By WM.** WM warrants to and covenants with Company that during the Term of this Agreement:

(a) WM will comply with all laws applicable to it in connection with its obligations under this Agreement;

**Confidential Treatment Requested**

LSI2-0429912

Execution Copy

(b) WM will be responsible for any fines and penalties arising from any noncompliance by WM with any law relating to WM's use of the Services unless (1) such noncompliance was caused by Company, or (2) such noncompliance was related to a change in such law and Company failed to notify WM in a timely manner of such change in accordance with subsection (c) of Section 15.2 (Warranties and Additional Covenants by Company); and

(c) except as otherwise provided in this Agreement, WM will obtain all applicable permits and licenses, including the WM Governmental Approvals and the WM Consents, required of WM in connection with its obligations under this Agreement.

**15.2   By Company.**   Company warrants to and covenants with WM that during the Term of this Agreement:

(a) Company will comply with all laws and regulations promulgated by any Governmental Authority applicable to Company in its performance of the Services under this Agreement, including, without limitation, FIRREA, the appraisal regulations set forth at 12 C.F.R. § 564, et seq., and related appraisal guidance issued by the OTS as they may be amended from time to time;

(b) Company will monitor changes in law that may have a material impact on Company's performance of the Services or WM's use of the Services or the Company Software and, if they are likely to result in a material change in the Services, provide WM with reasonable notice of same;

(c) if any change in law prevents Company from performing its obligations under this Agreement, Company will develop and, upon WM's approval, implement a reasonable workaround until such time as Company can perform its obligations under this Agreement without such workaround; provided, however, that if such workaround results in an increase in the charges to WM under this Agreement, then WM will have the right to terminate the affected portion of the Services, in which case Section 9.3 (Termination for Breach) (including the default cure period) will not apply, and, upon the implementation of such workaround, the Parties will negotiate and implement an equitable adjustment to the applicable fees;

(d) Company will be responsible for any fines and penalties assessed against Company or WM as a consequence of Company's violation of any law or regulation applicable to Company in its performance of the Services except as set forth in subsection (b) of Section 15.1 (Warranties and Additional Covenants by WM);

(e) Company will obtain, maintain and comply with all applicable permits and licenses, including Company Governmental Approvals and the Company Consents, required of Company in connection with its obligations under this Agreement and will comply with the WM Consents of which it has been informed by WM, and as applicable to Company's performance of the Services;

(f) the Company Software will operate in conformance with the specifications set forth in the related documentation;

(g) none of the Services or the Company Software will infringe upon or misappropriate the proprietary rights of any third party;

**Confidential Treatment Requested**

LSI2-0429913

Execution Copy

(h) In addition to performing the Services in accordance with the Service Levels, all Deliverables delivered pursuant to this Agreement will conform in all material respects to the design specifications or other parameters contained in the relevant documents with respect to any such deliverable, and Company will correct any non-conformance of the relevant deliverable (and redeliver such corrected deliverable) as soon as commercially reasonable under the circumstances using dedicated, appropriate resources, which resources will not be charged to WM, and with no material adverse impact on the performance of other Services;

(i) Company will take reasonable commercial efforts to ensure that no viruses or similar items are coded or introduced into the Company systems, the WM systems, the Work Product, or the Deliverables. Company agrees that, in the event a virus or similar item is found to have been introduced into the Company systems or the WM systems, Company will assist WM in reducing the effects of the virus or similar item and, if the virus or similar item causes a loss of operational efficiency or loss of data or creates a security risk, will assist WM to the same extent to mitigate and restore such losses and mitigate such risk;

(j) without the consent of WM, Company will not insert into the Company Software any code that would have the effect of disabling or otherwise shutting down all or any portion of the Services or any such Software. Company further represents and warrants that, with respect to any disabling code that may be part of (a) the Company Software which WM has the right to access or use, or (b) the Software or tools used to provide the Services, Company will not invoke such disabling code at any time, including upon expiration or termination of this Agreement, without WM's consent;

(k) Company will perform the Services, and develop the Deliverables, in accordance with applicable professional standards in the appraisal management industry;

(l) Company will monitor, evaluate and adjust its information security systems and procedures to comply with WM's Information Security Requirements as set forth in Exhibit D (Information Security Requirements), and will make adjustments to same in response to relevant changes in technology, changes in the sensitivity of WM's Confidential Information, and internal and external threats to information security. Company will notify WM by e-mail and facsimile to the following WM representative: CorpInformationSecurity@wamu.net, and WM's General Counsel, at the addresses set forth in Section 10 (Notices) within twenty-four (24) hours after (1) any security breach of any part of the Services; or material unauthorized possession, use, or knowledge, or attempt thereof, of the WM Data, data processing files, transmission messages or other Confidential Information by any person or entity that is or may become known; (2) the effect of such; and (3) the corrective action taken in response thereto; and

(m) as necessary from time to time and upon request by WM, Company will promptly take, at its expense, all reasonable actions to police compliance with and enforce its agreement with Project Staff, Company agents and other third parties to the extent necessary to prevent or remedy breaches or potential breaches of Company's obligations under this Agreement.

16.    **Insurance.**

**Confidential Treatment Requested**                                        LSI2-0429914

Execution Copy

**16.1   Coverage Requirements.**   Subject to the continued availability of such coverage, during the Term of this Agreement, and for three (3) years thereafter, Company shall maintain the following insurance coverages with insurance carriers with an A.M. Best rating of at least A-VII, or such other insurance carriers approved in writing by WM (i) all insurance coverages required by federal, state or local law, including, without limitation, statutory worker's compensation insurance and employers' liability insurance (and such employers' liability insurance shall provide a limit of at least $500,000 for each person); (ii) comprehensive or commercial general liability insurance, which may include umbrella liability insurance (which shall provide for a minimum combined bodily injury and property damage coverage limits of $5,000,000 per occurrence and shall name WM as an "additional insured"); (iii) comprehensive automobile liability covering all vehicles that Company owns, hires or leases in an amount not less than $1,000,000 (and naming WM as an "additional insured"); (iv) a comprehensive crime policy with a limit of $10,000,000 that shall include employee dishonesty and fidelity coverage for all Company employees, and officers, and "on premises" loss (loss inside the premises) and "in-transit" loss (loss outside the premises); and (v) professional liability (also known as errors and omissions) insurance with combined single limits of not less than $10,000,000.

**16.2   Additional Requirements.**   All Company insurance shall be primary and non-contributing except with respect to the sole negligence of WM. Prior to commencing any Services under this Agreement, Company shall provide certificate(s) of insurance evidencing the coverages described in Section 16.1 above. Such certificates shall include a provision requiring the insurance carrier to provide directly to WM thirty (30) calendar days advance written notice before any cancellation takes effect for policies evidenced on the certificate. The commercial general liability insurance carrier shall waive, and Company hereby waives, all rights of recovery or subrogation against WM which might arise with regard to damage or loss which is insured against under any WM policies in force at the time of the damage or loss. The insurance requirements and coverages set forth in this Section 16 shall not limit Company's liability to WM or third parties under this Agreement.

**17.**   **Relationship Between Parties.**   The Parties acknowledge and agree that Company is retained by WM as an independent contractor, and that nothing in this Agreement shall be deemed or construed as constituting an agency, partnership or joint venture between the Parties. To the extent not inconsistent with this Agreement, Company shall be entitled to devote its entire time, energy and skill in such a manner as it sees fit. Neither Party shall have any right to obligate or bind the other Party in any manner whatsoever.

**18.**   **Non-Exclusivity.**   It is expressly acknowledged and agreed by Parties that Company shall provide Services to WM on a non-exclusive basis, and that nothing herein is intended to prohibit Company from performing Services for, or acting as agent on behalf of, any other party to a residential real estate transaction. Nothing in this Agreement requires WM to purchase the Services from Company. WM may obtain services similar to the Services from a third party or third parties in WM's sole discretion or perform such services internally. During the Term, WM may from time to time increase or decrease volumes within the Services. No change in volume shall be deemed a termination of this Agreement. Notwithstanding the foregoing, the Parties shall exchange, on a monthly basis, non-binding reasonable volume expectations through the Term of this Agreement.

**19.**   **Invalidity.**   The invalidity or unenforceability of any term or condition of this Agreement shall not invalidate, make unenforceable or otherwise affect any other term or condition of this Agreement, which shall remain in full force and effect.

Page 24 of 73

**Confidential Treatment Requested**

LSI2-0429915

Execution Copy

**20.** __Title and Headings.__ Title and headings to sections herein are inserted for convenience of reference only and are not intended to be part of, or to affect the meaning or interpretation of, this Agreement.

**21.** __Governing Law.__ This Agreement shall be construed and governed in accordance with the laws of the State of New York without reference to the conflicts of laws principles thereof.

**22.** __No Assignment.__ Except for assignment by WM to a parent or affiliate entity, neither of the Parties hereto shall, without the written consent of the other Party, assign or transfer their rights or obligations under this Agreement.

**23.** __Binding Nature.__ The obligations of this Agreement shall be binding upon, and the benefits thereunder shall inure to, the respective successors and permitted assigns of the Parties.

**24.** __Force Majeure.__ Notwithstanding anything to the contrary contained herein and subject to the responsibility of both Parties to maintain commercially reasonable disaster recovery and business interruptions plans, systems, policies and procedures, neither Party shall be responsible for any respective failure to perform any obligation under this Agreement or for the breach of any representation or warranty contained in this Agreement if such failure or breach is the result of war, famine, flood, any act of God or nature or is the result of any other event beyond the reasonable control of a Party, as applicable.

**25.** __Attorneys' Fees.__ In the event of any legal action between the Parties arising out of the subject matter of this Agreement or arbitration between the parties as provided for in Section 10 of the Appraisal Warranty set forth in __Exhibit B__ (Appraisal Warranty), the prevailing Party in the action shall be entitled to have and recover from the other Party its reasonable attorneys' fees and other reasonable expenses in connection with the action or proceeding, in addition to its recoverable court costs.

**26.** __Agreement in Entirety.__ This Agreement and the Exhibits hereto represent the entire understanding and agreement between Company and WM with respect to the matters identified herein. Any representations or agreements that may have been made by any Party prior to the execution of this Agreement with respect to such matters are void, and none of the Parties have relied on such prior representations in executing this Agreement.

**27.** __Amendment.__ No modifications or changes in the terms and conditions of this Agreement may be made, except by written amendment to this Agreement duly executed by both Parties.

**28.** __Multiple Counterparts.__ This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

**29.** __Remedies Cumulative.__ No right or remedy herein conferred upon or reserved to either Party is intended to be exclusive of any other right or remedy, and each and every right and remedy will be cumulative and in addition to any other right or remedy under this Agreement, or under applicable law, whether now or hereafter existing.

**30.** __Survival of Terms.__ The terms of Section 1 (Definitions and General Interpretive Rules), Section 6.5 (Taxes), Section 7 (Indemnity), Section 8 (Disclaimer and Liability Limitation),



Confidential Treatment Requested

LSI2-0429916

Execution Copy

Section 10 (Notices), Section 11 (Confidentiality and Use of Data), Section 12 (Proprietary Rights), Section 13.6 (Record Retention) [for the period stated therein], Section 15 (Warranties and Additional Covenants), Section 16 (Insurance) [for the period stated in Section 16.1], and Sections 17-23 and 25-32, inclusive, shall survive the expiration or termination of this Agreement.

31.   **No Third-Party Beneficiaries.**   The Parties intend that this Agreement shall not benefit or create any right or cause of action in or on behalf of any person or entity other than the Parties hereto.

32.   **No Publicity.**   Neither Party shall use the other Party's name or mark in any advertising, written sales promotion, press releases and/or other publicity matters relating to this Agreement without the other Party's written consent.   Company acknowledges that WM has a no publicity policy regarding its vendor relationships.   Notwithstanding the above, during the Term of this Agreement only, Company may list WM's name on a customer list which it provides to prospective buyers of its products or services.

\*      \*      \*

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

**Confidential Treatment Requested**                                             LSI2-0429917

Execution Copy

     **IN WITNESS WHEREOF**, Company and WM have caused this Agreement to be signed and delivered by their duly authorized officers, all as of the date herein below written.

**LSI APPRAISAL, LLC**

By: _____
Name:  RON FRAZIER
Title:  PRESIDENT
Date:  10.18.06

**WASHINGTON MUTUAL BANK**

By: _____
Name: _____
Title: _____
Date: _____

By: _____
Name:  Tom Casey
Title:  CFO
Date:  1-12-07

**Confidential Treatment Requested**

LSI2-0429918

Execution Copy

## EXHIBIT A

## SERVICES

1.   **Appraisal Services.**

Company will provide appraisal Services for residential properties located in the fifty (50) United States and the District of Columbia (the "Service Territory"). The various types of appraisals that Company will provide include the following:

**FNMA 1004 Appraisal without cost approach:** An interior evaluation of property conducted by an appraiser licensed or certified in the state in which the property is located, and conducted in accordance with USPAP guidelines for appraisals on FNMA form 1004.

**FNMA 1004 Appraisal with cost approach:** A full walk-through property valuation conducted by an appraiser licensed or certified in the state in which the property is located and conducted within USPAP guidelines for FNMA form 1004 (URAR).

**FNMA 2055 Exterior Appraisal:** A drive-by evaluation of property exterior conducted by an appraiser licensed or certified in the state in which the property is located and conducted in accordance with USPAP guidelines for appraisals on FNMA form 2055 (exterior).

**2-4 Unit Appraisal (FNMA 1025):** A complete summary appraisal for 2-4 unit residential properties.

**FNMA 2075 Inspection:** The 2075 reports basic property information based on public records, and relies on a visual assessment of the property (drive-by). It does not provide a property value.

**Condo Appraisal Interior (FNMA 1073):** A complete summary appraisal for condominium units, including an interior inspection.

**Condo Appraisal Exterior (FNMA 1075):** A complete summary appraisal for condominium units, limited to an exterior inspections.

**Co-op Appraisal (FNMA 2090):** A complete summary appraisal for cooperative units. (2095 exterior inspection co-op appraisals are currently not used by WM.)

**Manufactured Home Appraisal (FNMA 1004c):** A complete summary appraisal for manufactured homes.

**Reconsideration of value:** Service completed when there is a disagreement with the appraisal value based on supporting evidence (rebuttal). It is complete by either a standard 3 tech review using forms 2000 or 2000a, or by redrafting the appraisal as needed.

**Desk Review (2000 & 2000a):** A service that does not require interior or exterior inspection by the reviewer. Desk reviews should be performed if there is:

**Confidential Treatment Requested**                                                                    LSI2-0429919

Execution Copy

- A minor technical problem in the comparative analysis, usually in the application of the dollar adjustments or a simple math error.

- A minor error found in the original report that does not significantly affect the report acceptability.

- The reviewer disagrees with some adjustment(s) amounts but is in agreement with the comparable selection and conclusion.

**Field Review (2000 & 2000a):** A service that requires the inspection of the subject property and sales comparables (and rental comparables if required) used in the report. The inspection may be an exterior drive by, an exterior on-site inspection, or an interior and exterior on-site inspection. Field reviews should be performed if:

- There is an imminent value change

- The factual data is in question and cannot be resolved without visual inspections or visit.

- The issues can not be resolved using a desk review.

**Appraisal update/completion report (1004D):** *On-site property re-inspection to* ensure that the original requirements and conditions set forth in an appraisal report have been met or completed in a manner conforming to the specifications.

**Appraisal update:** A new appraisal assigned to the original appraiser to make current a recently completed appraisal. The appraisal update is also used to make corrections to appraisals *that have been logged out. Completion of this service may* not require the completion of form 1004D.

**Land Appraisal:** *A complete summary appraisal for a buildable site.*

In all cases, the appraisal shall provide an estimated value of real property based on replacement costs, sales of comparable properties, and future income from income producing properties (where applicable).

All appraisal, inspection, and evaluation services are to conform as applicable to USPAP and to the appraisal standards of FNMA, FHLMC, and other investors, as described in their respective sellers and servicers manuals.

Company will report any inappropriate contacts or requests by WM employees concerning an appraisal or assigning an appraisal through the <u>Exhibit G</u> (Governance Model).

2. **Customer Support.**

Company agrees to provide and manage a customer support center to service WM with respect to the Services under this Agreement. The support center's hours of operation must accommodate operating hours of Washington Mutual Stores (Financial Centers)

**Confidential Treatment Requested**

LSI2-0429920

Execution Copy

and production centers in all geographic locations from 5:00 a.m. – 6:00 p.m. Pacific Time, Monday through Friday.

Company shall maintain a dedicated toll-free number and customer support e-mail boxes for use by WM.

Company shall provide a response to all customer support issues submitted by WM within four (4) business hours or less for the following statuses and queues:

- E-mails (from the Appraisal General Mailbox)
- Accepted with Conditions
- Administrative Review
- Manual Assign
- Exception Manual Assign
- Exception Duplicate
- Has New Message
- Second Signature

Unless otherwise directed by the WM Representative, all issues within each status or queue should be worked in the order in which they were received by Company.

Confidential Treatment Requested

LSI2-0429921

Execution Copy

## EXHIBIT A-1

### SERVICE LEVEL AGREEMENTS

1.    Service Levels

| | |
|---|---|
| 1004 with cost analysis | Each month, no less than eighty percent (80%) of the LSI provided Appraisals will have a turnaround time less than or equal to seven (7) business days |
| 2055 Exterior | Each month, no less than ninety percent (90%) of the LSI provided Appraisals will have a turnaround time less than or equal to five (5) business days |
| 1004 without cost analysis | Each month, no less than eighty percent (80%) of the LSI provided appraisals will have a turnaround time less than or equal to seven (7) business days |
| 1004c Manufactured Home | Each month, no less than eighty percent (80%) of the LSI provided Appraisals will have a turnaround time less than or equal to seven (7) business days |
| 2075 | Each month, no less than ninety percent (90%) of the LSI provided appraisals will have a turnaround time less than or equal to two (2) business days |
| 2-4 units | Each month, no less than eighty percent (80%) of the LSI provided Appraisals will have a turnaround time less than or equal to seven (7) business days |
| 1004D Appraisal update and completion report | Each month, no less than ninety percent (90%) of the LSI provided appraisals will have a turnaround time less than or equal to two (2) business days |
| Condo Interior (1073) | Each month, no less than eighty percent (80%) of the LSI provided appraisals will have a turnaround time less than or equal to seven (7) business days |
| Condo Exterior (1075) | Each month, no less than ninety percent (90%) of the LSI provided appraisals will have a turnaround time less than or equal to five (5) business days |
| Co-op (2090) | Each month, no less than seventy percent (70%) of the LSI provided appraisals will have a turnaround time less than or equal to twelve (12) business days |

Confidential Treatment Requested

LSI2-0429922

Execution Copy

| Desk review | Each month, no less than ninety percent (90%) of the LSI provided appraisals will have a turnaround time less than or equal to two (2) business days |
| Field review | Each month, no less than ninety percent (90%) of the LSI provided appraisals will have a turnaround time less than or equal to four (4) business days |
| Land Appraisal | Each month, no less than eighty percent (80%) of the LSI provided appraisals will have a turnaround time less than or equal to seven (7) business days |
| Reconsideration of value | Each month, no less than ninety percent (90%) of the LSI provided appraisals will have a turnaround time less than or equal to three (3) business days |

Client – delayed orders shall be measured as exceptions to the above grid.   Client – delayed orders shall reflect a Service Level of "delivery within 48 hours of confirmed inspection date".

**2.      Quality Standards and Monitoring.**

Appraisal quality will be monitored by WM based on a variety of testing and monitoring activities.  Appraisal quality will be considered in assigning additional orders.  Company will correct all repairable errors in appraisals discovered by WM at Company's expense if such errors were caused by Company.

All appraisal, inspection, and evaluation services are to conform as applicable to USPAP and to the appraisal standards of FNMA and FHLMC as described in their respective Sellers and Servicers Manuals. Whenever FNMA or FHLMC standards differ, the more comprehensive guideline will apply, unless the product is specified as FNMA or FHMLC, in which case the specified entity's criteria shall prevail.

WM requires Company to communicate and affirm that each appraisal complies with USPAP and all Supplemental Standards to include appraisal standards of FNMA, and FHLMC.

WM has the right to conduct independent reviews of the appraisal ordering controls.

If and to the extent that any Services provided by Company become subject of an OTS audit or finding, Company will participate in such audit, or respond to such finding, as reasonably requested by WM and at Company's expense.

Company's performance will be reported and unacceptable performance levels will require increasing corrective actions to resolve significant issues.  Company will be asked to respond within sixty (60) calendar days of notification with a corrective action plan and implement that plan within an agreed upon time frame based on the facts which gave rise to the unacceptable performance.  If no time frame is stated in the corrective action plan, it will be within ninety (90) calendar days of notification of the issue by WM, unless a shorter period is dictated by legal or regulatory requirements.

Confidential Treatment Requested

LSI2-0429923

Execution Copy

To the extent Company is instructed to use WM's Optis Value system, or a designated successor information technology system thereto, for purposes of transmitting data with respect to the Services, data derived from such designated WM system shall be used to measure Company's Services for purposes of determining adherence to the Service Levels. Reports compiled from data provided by the designated WM system shall, unless Company proves to WM's reasonable satisfaction that such WM system is in error, prevail over reports compiled by Company based on data from any Company system. This paragraph presupposes that WM's reporting mechanisms are operating in a manner reasonably consistent with the measurement processes described within this Agreement. Should material discrepancies exist between any of WM's and Company's reporting results, WM and Company agree to use reasonable efforts to reconcile said discrepancies.

Confidential Treatment Requested

LSI2-0429924

Execution Copy

## EXHIBIT A-2

## REPORTING

Company will provide WM with the following with respect to reports and data:

**1.    General Requirements.**

- Ability to pull data directly from the vendors' reporting and tracking systems

- Ability to use a third party platform for reporting and status information

- All reports are to include a rolling 13 months of data and include appropriate graphing where requested

**2.    Quantities.** Quantities by state, appraisal region, county, service type, and lending channel, or others as defined by WM for the following:

- Ordered

- Cancelled

- Completed

- On Hold

**3.    Service Levels.** Service Level performance – number/percentage completed within SLA, broken down by:

- Service type

- State, appraisal region, or county

    Aging report and graph by service type (completed services)

    Detailed exception report – orders completed outside of SLA by Loan Fulfillment Center and Area

    NOTE: If and to the extent a WaMu-operated information technology system is the system of record with respect to the Services, a report generated by WaMu with respect to Service Levels shall prevail over any contrary report compiled by Company based upon a Company measurement system in the event of any dispute or inconsistency between a Service Level report compiled by WaMu and a Service Level report compiled by Company. This paragraph presupposes that WM's reporting mechanisms are operating in a manner reasonably consistent with the measurement processes described within this Agreement. Should material discrepancies exist between any of WM's and Company's reporting results, WM and Company agree to use reasonable efforts to reconcile said discrepancies.

**4.    Turn Times.** Turn Times – high, low, and average turn times as follows:

**Confidential Treatment Requested**

Execution Copy

- By service type
- By state, and/or appraisal region
- For all completed services
- For all completed services, broken out by state and/or appraisal region
- For all completed services by appraisal resource type
- For all non-AVM completed services
- For all non-AVM completed services, broken out by state and/or appraisal region

5.  **ROV.** ROV reporting by percentage and dollar variance from original value

- Total Submitted
- Total by Outcome

6.  **Fees.** Reporting on Service Costs / Billing to include:

- Total monthly billings
- Total monthly billing by state, appraisal region, or county
- Average billing by service type
- Average billing by state, appraisal region, county, and/or footprint state

7.  **Service Revisions.**

- Quantity/percentage of orders in which an AVM was performed and subsequently another appraisal service was ordered
- Valuation changes for service upgrades (benefits distribution) – property value increases
- Upgrade benefit trend by service type
- Final appraisal service ordered distribution by state, appraisal region, county, and/or footprint state
- Transactions receiving multiple valuation services

8.  **Vendor Management.**

- Company to forward analytical data file to WM on such period basis as specified by WM to enable ad hoc analysis
- Analytical data file should be delivered weekly at a minimum

**Confidential Treatment Requested**

LSI2-0429926

- File content should represent all available data elements from the standard FNMA appraisal forms

- The data file shall contain a unique Identifier for records and associated requests

- The file shall contain data concerning order date, delivery date, hold dates, appraisal as of date, value and identification of the vendor and the appraiser

- The file shall contain any associated quality scores or data for the appraisal or the appraiser.

9.     **Quality.**

- Company's quality ranking on the appraisers or other factors that may help select targeted QA samples as reasonably requested by WM

- Information about quality control weaknesses identified, resolved, or tolerated during appraisal processing, based on available information from the vendor

**Confidential Treatment Requested**                                    LSI2-0429927

Execution Copy

## EXHIBIT B

### APPRAISAL WARRANTY

1. **Appraisal Warranty.** LSI Appraisal, LLC ("Company") warrants that each "Original Appraisal" (which, for purposes of this Exhibit B, includes an Interior Appraisal, Exterior Appraisal, Field Review, or Desk Review (all as defined in USPAP), each prepared on the then-current FNMA form appropriate for such appraisal type) provided by Company shall be (a) prepared in compliance with USPAP and guidelines issued by FNMA and FHLMC, and (b) prepared without fraud or negligence by Company, its agents or employees. For avoidance of ambiguity, if and to the extent WM obtains a reconsideration of value from Company with respect to a particular Loan (as defined below), coverage available under this Appraisal Warranty shall be that applicable to the Original Appraisal obtained with respect to such Loan.

2. **Claim Submission, Timing.** When WM believes that Company has breached the Appraisal Warranty, WM shall notify Company of such belief in writing. WM must submit any such notification to Company within: (a) ninety (90) calendar days after the date WM knew of the events causing the breach of this Appraisal Warranty; or (b) five (5) years following the date of the Original Appraisal, whichever date occurs first.

3. **General Conditions Precedent.** The following conditions precedent must be met with respect to any claim for a breach of this Appraisal Warranty:

   **A.** WM shall have made a loan secured by residential property in reliance upon an Original Appraisal prepared pursuant to this Agreement (a "Loan"), which Loan utilized and conformed to (i) FNMA and FHLMC general guidelines, and (ii) standard industry underwriting practices, which shall be deemed rebuttable presumptions for purposes of this Appraisal Warranty;

   **B.** The Original Appraisal of the subject residential property must have been provided to WM no more than one hundred twenty (120) calendar days prior to the closing of such Loan in the case of retail lending, or three hundred sixty-five (365) calendar days prior to the closing of such Loan in the case of consumer lending, after which an Appraisal Update, as defined in USPAP, shall be required to modernize the market value;

   **C.** WM was not aware of the breach of the Appraisal Warranty prior to the closing of such Loan;

   **D.** WM has suffered Actual Financial Loss (as defined below) arising from either:

   (i) foreclosure or acceptance of a deed in lieu of foreclosure and subsequent sale of the property (for which purpose "Actual Financial Loss" is defined in Section 4(A)(ii) below); or

   (ii) rejection of the Loan by the secondary market and subsequent discounted sale of the Loan (for which purpose "Actual Financial Loss" is defined in Section 5(C)(iv) below); or

   (iii) liability for post-foreclosure recourse by a secondary market investor with respect to a Loan (for which purpose "Actual Financial Loss" is defined in Section 6(C)(iv) below).

   For convenience, claims under (i), above, may be referred to as "Foreclosure/Deed in Lieu Claims;" claims under (ii), above, may be referred to as "Secondary Market Rejection Claims;" and claims under (iii), above, may be referred to as "Secondary Market Recourse Claims." Secondary Market Rejection Claims and Secondary Market Recourse Claims may be referred to collectively as "Secondary Market Claims."

Confidential Treatment Requested

LSI2-0429928

Execution Copy

**4.    Foreclosure/Deed In Lieu Claims**

**A.    Establishing Loss.** In order for WM to establish a claim related to a foreclosure or deed In lieu of foreclosure, WM must satisfy the following conditions precedent:

(i) WM must have acquired the residential property that was subject of the Original Appraisal through foreclosure or deed In lieu of foreclosure and have made commercially reasonable efforts to protect the value of the residential property, Including, without limitation, (a) by preserving the residential property in substantially the same condition it was in at the time of borrower's default under the Loan; and (b) by undertaking commercially reasonable efforts to resell the residential property at the highest price possible within a reasonable time; and

(ii) WM must resell the residential property for a gross sales price (exclusive of any foreclosure costs or expenses, including, but not limited to, attorneys' fees, closing costs and brokers' commissions) which is less than the outstanding principal balance of the Loan (decreased by any sales credits, holdback amounts and escrow balances held by WM) made by WM In reliance on the Original Appraisal as of the date of foreclosure or deed In lieu of foreclosure (such shortfall, an "Actual Financial Loss").

**B.    Notice of Claim.** In the event WM submits a claim for damages as a result of a breach of this Appraisal Warranty, WM's notice to Company shall Include the following documents and information, if reasonably available:

(i) Identification of the mortgagor, mortgagee and secured property;

(ii) Copies of documents evidencing and supporting the Original Appraisal market value supplied by Company;

(iii) Materials In WM's possession supporting that a valuation error exists, including, but not limited to, a retrospective appraisal (as defined in USPAP), of the subject property performed on WM's behalf;

(iv) a closing statement, grant deed, trustee's deed or other documentation establishing that the WM acquired the residential property by foreclosure or deed In lieu of foreclosure;

(v) the name, address and telephone number of any real estate listing agent involved in the resale of the residential property, as well as the listing price;

(vi) the outstanding principal balance of the Loan made by WM as of the foreclosure date or date of acceptance of the deed In lieu of foreclosure; and

(vii) a copy of the sales contract and closing statement for the sale of the residential property by WM showing the gross sales price.

**C.    Second Appraisal.** If Company disputes WM's claim of breach, the Parties shall choose a duly licensed or certified mutually acceptable appraiser whom the Parties deem to be competent to perform a new retrospective appraisal, as defined in USPAP, on the subject property based on historical information available to the Company appraiser at the time the Original Appraisal was made (such new appraisal, the "Second Appraisal"). The appraiser for the Second Appraisal shall not be a person who has previously acted In any capacity for either Party unless, after disclosure of a prior relationship, the Parties agree to allow the Second Appraisal to be performed by said

Page 38 of 73

**Confidential Treatment Requested**

Execution Copy

appraiser (such appraiser, a "Disinterested Appraiser"). If the Parties cannot agree on an appraiser within thirty (30) calendar days, each Party will select an appraiser and the two appraisers shall select a third Disinterested Appraiser who shall perform the Second Appraisal.

If and to the extent that the Second Appraisal demonstrates that the Original Appraisal provided by Company overstated the market value of the subject property as of the date of the Original Appraisal by ten percent (10%) or more, Company shall – subject to the limitations set forth in Sections 8 and 9 hereof - compensate WM for WM's Actual Financial Loss.

5.       Secondary Market Rejection Claims Process.

A.       Notice of Claim. In the event of WM submitting a claim for damages as a result of a Loan being rejected by the secondary market due either to (i) an error (as defined in Section 5 (A)(i) below) in the Original Appraisal documentation, or (ii) to the fact that the market value in the Original Appraisal Report was overstated as evidenced by a retrospective appraisal obtained by the secondary market investor, WM's notice to Company shall include the following documents and information, if reasonably available:

    (i) the reason for rejection of the Loan, which may be either: (a) an error in the Original Appraisal provided by Company (for which purpose an "error" shall be defined as a failure to comply with USPAP standards, FNMA or FHLMC guidelines, or a failure accurately to complete the appropriate appraisal forms for the particular appraisal service at issue), or (b) an overstatement of market value in the Original Appraisal provided by Company, where the secondary market has approved the appraisal type for the Loan submitted;

    (ii) Documents evidencing that a secondary market entity rejected the Loan as a result of an error in the Original Appraisal or an inaccurate market value in the Original Appraisal supplied by Company;

    (iii) Documents evidencing what the secondary market entity rejecting the Loan believed the market value should have been, if applicable;

    (iv) Identification of the mortgagor, mortgagee and secured property;

    (v) Copies of documents evidencing and supporting the Original Appraisal market value supplied by Company; and

    (vi) Any materials in WM's possession supporting that a valuation error exits, including, but not limited to, a retrospective appraisal of the secured property performed on WM's behalf after the date the Loan was rejected by the secondary market.

B.       Cure of Rejection.

    (i) If a Loan is rejected by a secondary market entity due to an error in the Original Appraisal provided by Company, and the secondary market entity provides an opportunity to cure such document error, Company will cure the error if possible.

    (ii) If a Loan is rejected due to an overstatement of market value in an Original Appraisal provided by Company, and WM is given an opportunity by the secondary market entity to oppose such rejection by defending the Original Appraisal, Company will – upon notice, at WM's

Confidential Treatment Requested                                                    LSI2-0429930

Execution Copy

request, and at Company's expense – provide WM with assistance in defending the Original Appraisal to oppose rejection of the Loan.

(iii) In the event that either: (a) Company is unable to cure an Original Appraisal error, or (b) Company and WM are unsuccessful in defending the market value in the Original Appraisal, and WM is obligated to repurchase the Loan from the secondary market entity, Company shall – subject to Section 5 (D) and the limitations set forth in Sections 8 and 9 hereof – compensate WM for WM's Actual Financial Loss (as defined in 5(C)(iv) below).

**C.      Proof of Loss.** WM's proof of loss for a Secondary Market Rejection Claim shall include the following documentation:

(i) Identification of the mortgagor, mortgagee and secured property;

(ii) Documents evidencing the value obtained in the original (rejected) sale of the Loan to the secondary market;

(iii) Documents evidencing the sale of the rejected Loan to the secondary market at a discounted value; and

(iv) Any other documents evidencing the difference between the amount for which the Loan was originally sold in the secondary market and the amount actually received by WM via a discounted sale in the secondary market subsequent to secondary market rejection and WM's repurchase of such Loan (such difference, an "Actual Financial Loss").

NO COVERAGE FOR SECONDARY MARKET REJECTION SHALL BE PROVIDED UNLESS WM HAS SOLD THE LOAN AT A DISCOUNTED RATE TO THE SECONDARY MARKET.

WM shall use commercially reasonable efforts to resell the Loan to the secondary market at the highest price possible within a reasonable time, or shall retain the Loan in its portfolio. In the event WM holds the Loan as an asset, WM may not maintain a Secondary Market Rejection Claim but shall be permitted to assert a Foreclosure/Deed in Lieu Claim under Section 4 if and as applicable.

**D.      Company's Dispute of Secondary Market Rejection Claim.** In the case of a claim arising from secondary market rejection due to overstatement of market value in the Original Appraisal as set forth in 5(A)(i)(b), only (as distinct from claims arising from "errors" as set forth in 5(A)(i)(a)), if Company disputes WM's claim of breach, the Parties shall choose a duly licensed or certified mutually acceptable appraiser, at Company's expense, and such appraiser will conduct a Second Appraisal in the manner set forth in Section 4(C). If and to the extent such Second Appraisal demonstrates that the market value of the subject property as of the date of the Original Appraisal was greater than ninety percent (90%) of the market value stated in the Original Appraisal, Company shall have no liability with respect to the Secondary Market Rejection Claim at issue.

**6.      Secondary Market Recourse Claims Process.**

**A.      Notice of Claim.** In the event of WM submitting a claim for damages as a result of WM's actual or potential liability arising from or related to a secondary market investor's claim for post-foreclosure recourse due to the fact that the market value in the Original Appraisal was overstated based on a retrospective appraisal obtained by such secondary market investor,

**Confidential Treatment Requested**

LSI2-0429931



Execution Copy

WM's notice to Company shall include the following documents and information, if reasonably available:

(i) Documents provided to WM by the secondary market investor claiming an inaccurate market value in the Original Appraisal was the cause of loss to the secondary market investor, where the secondary market has approved the Original Appraisal appraisal type for the Loan submitted;

(ii) Documents evidencing what the secondary market entity rejecting the Loan believed the market value should have been, if applicable;

(iii) Identification of the mortgagor, mortgagee and secured property;

(iv) Copies of documents evidencing and supporting the Original Appraisal market value supplied by Company;

(v) Any materials in WM's possession supporting that a valuation error exists, including, but not limited to, a retrospective appraisal of the secured property performed on WM's behalf after the date the Loan was rejected by the secondary market;

(vi) Documents evidencing the secondary market investor's foreclosure on the subject property, including a closing statement, grant deed, trustee's deed, or other documentation establishing that the secondary market investor acquired the residential property by foreclosure or deed in lieu of foreclosure;

(vii) the outstanding principal balance of the Loan as of the foreclosure date or date of acceptance of a deed in lieu of foreclosure; and

(viii) Documents evidencing the gross sales price for the sale of the residential property by the secondary market investor.

**B.    Defense of Secondary Market Recourse Claim.**

(i) If a secondary market investor seeks recourse due to an alleged overstatement of market value in an Original Appraisal provided by Company, Company will – upon notice, at WM's request, and at Company's expense – provide WM with assistance in defending the Original Appraisal to oppose the Secondary Market Recourse Claim.

(ii) In the event that Company and WM are unsuccessful in defending the market value in the Original Appraisal, and WM is obligated to pay sums to the secondary market investor to settle the Secondary Market Recourse Claim asserted by such secondary market investor, Company shall – subject to the limitations set forth in Sections 8 and 9 hereof – compensate WM for WM's Actual Financial Loss (as defined in 6(C)(iv) below).

**C.    Proof of Loss.** WM's proof of loss for a Secondary Market Recourse Claim shall include the following:

(i) Identification of the mortgagor, mortgagee and secured property;

(ii) Documents evidencing the market value in the Original Appraisal;

Confidential Treatment Requested

LSI2-0429932

(iii) Documents evidencing the market value in the retrospective appraisal obtained by the secondary market investor; and

(iv) Documents evidencing WM's payment to the secondary market investor in settlement of the Secondary Market Recourse Claim (such amount, an "Actual Financial Loss.")

## 7.    Cooperation.

**A.**    WM will provide reasonable cooperation with any investigation conducted by Company and made pursuant to a notice of breach by WM, and will provide Company with information reasonably requested by Company in order to resolve or settle the matter relating to the Original Appraisal.

## 8.    Limitation of Liability.

**8.1    Subjective Nature of Appraisals.**    WM acknowledges that the performance of appraisal services and any opinion of value is inherently subjective in nature and that different appraisers, acting reasonably and competently, may reach disparate conclusions on the value of a parcel of real property.  WM agrees that (in addition to the other limitations provided herein) Company shall not be liable under this Appraisal Warranty to WM for WM's direct damages attributable to Original Appraisals in the case of a claim related to or arising from a Foreclosure/Deed In Lieu Claim or Secondary Market Recourse Claim unless the market value of the residential property as set forth in the Second Appraisal is less than the market value of said residential property as set forth in the Original Appraisal multiplied by ninety percent (90%).

**8.2    Limitation on Loss – Foreclosure/Deed In Lieu Claim.**    In the case of a Foreclosure/Deed In Lieu Claim recovery by WM for WM's damages attributable to breach of the Appraisal Warranty shall be limited to the lesser of the following amounts:

**A.**    The difference between the outstanding principal balance of the Loan as of the date WM takes title to the subject property (or in the case of a Loan factored under negative amortization or reverse mortgage criteria, the original principal balance of such Loan) and the resale price actually realized by WM (inclusive of all expenses that would have been incurred notwithstanding the Original Appraisal, including, without limitation, foreclosure/legal fees, eviction fees, reasonable selling costs and delinquent taxes, less any sales credits, insurance claim payments, holdback amounts and escrow balances held by the lender); OR

**B.**    The difference between (i) the market value of the residential property as set forth in the Original Appraisal multiplied by ninety percent (90%) and (ii) the market value of the property as established by the Second Appraisal; OR

**C.**    Thirty percent (30%) of the outstanding principal balance of the Loan as of the date WM takes title to the subject property.

**8.3    Limitation on Loss – Secondary Market Rejection Claim.**    In the case of a Secondary Market Rejection Claim, recovery by WM for breach of this Appraisal Warranty shall be limited to the lesser of the following amounts:

**A.**    The difference between the amount for which WM originally sold the Loan in the secondary market and the amount for which WM sold the Loan in the secondary market subsequent to secondary market rejection and WM's repurchase of such Loan; OR

**Confidential Treatment Requested**                                    LSI2-0429933

Execution Copy

B.      Thirty percent (30%) of the market value in the Original Appraisal.

**8.4     Limitation on Loss – Secondary Market Recourse Claim.**  In the case of a Secondary Market Recourse Claim, recovery by WM for breach of this Appraisal Warranty shall be limited to the lesser of the following amounts:

A.      The amount actually paid by WM to the secondary market investor to settle such investor's claim for post-foreclosure recourse; OR

B.      The difference between the market value in the Original Appraisal multiplied by ninety percent (90%) and the greater of (x) the market value in the retrospective appraisal obtained by the secondary market investor seeking recourse, or (y) the market value as agreed by the parties subsequent to any   proceeding to defend the secondary market investor's claim as described in Section 6(B) above, or (z) the market value as established by the Second Appraisal (as described in Section 4(C)), provided however, that in the case of this Section 8.4(B) a Second Appraisal shall only be performed if invoked by Company and at Company's sole cost and expense; OR

C.      Fifteen percent (15%) of the market value in the Original Appraisal.

**8.5.    Limitation on Loss – Desk Review and Field Review.**  Notwithstanding the foregoing limitations, in the case of a Foreclosure/Deed in Lieu Claim or Secondary Market Claim arising from or related to  either a Desk Review or Field Review, recovery by WM for breach of the Appraisal Warranty (a) shall not exceed  ten thousand dollars ($10,000.00) in the circumstance where a Desk Review or Field Review is the only Original Appraisal obtained by WM from Company as in, e.g., a circumstance in which Company reviews an appraisal obtained by WM from a third party appraiser unaffiliated with Company; and (b) shall be limited to the recovery available with respect to the Interior Appraisal or Exterior Appraisal pertaining to the subject property in the circumstance where WM has obtained from Company both (x) a Desk or Field Appraisal and (y) an Interior or Exterior Appraisal.  To illustrate, if WM obtains an Interior Appraisal in which the market value of the subject property is stated to be $200,000.00 and subsequently obtains a Field Review in which the market value of the subject property is stated to be $210,000.00, any subsequent claim by WM under this Appraisal Warranty shall be subject to the limitations which would have been applicable hereunder to claims arising from or related to the Interior Appraisal without regard to the subsequent Field Review.

**8.6     Option to Purchase Property.**   In lieu of paying WM for a claim under this Appraisal Warranty, Company shall, in its sole discretion and with obligation, have the option of purchasing the subject property from WM as set forth in this Section 8.6.

A.      **Option Exercise.**  Company may exercise its option to purchase by delivering written notice to WM no later than ninety (90) calendar days following Company's receipt of a notice of breach hereunder.  The transfer of the property shall occur on the later of thirty (30) calendar days after the date; (i) Company exercises its option, or (ii) the date WM acquires fee title to the subject property.  This option shall not exist if and to the extent WM has already resold the property following foreclosure as of the date notice is provided to Company or if the secondary market investor has already resold the property as of the date a Secondary Market Recourse Claim is asserted against WM.

B.      **Purchase Price.**  In the event Company elects to exercise the purchase option, the purchase price to be paid shall be: (i) the unpaid principal balance of WM's loan, plus (ii) all accrued

**Confidential Treatment Requested**                                                                LSI2-0429934

and unpaid interest owing on said loan through the date Company acquires the subject property (at the regular and not default interest rate specified in the applicable loan documents with the borrower).

**C.    Application of Damage Cap.** In the event Company elects to exercise the purchase option under this Section, amounts paid by Company to purchase the property shall not apply to the damages cap set forth in Section 9(B), below.

**9.    ADDITIONAL LIMITATIONS AND MISCELLANEOUS PROVISIONS.**

**A.**    COMPANY SHALL NOT BE LIABLE FOR, AND THIS APPRAISAL WARRANTY WILL NOT APPLY TO, EXTEND TO, OR COVER THE FOLLOWING:

(i)    LOSSES CAUSED BY THE PARTIAL OR COMPLETE DESTRUCTION OR ENVIRONMENTAL CONTAMINATION OF THE SUBJECT PROPERTY SUBSEQUENT TO THE DATE OF THE ORIGINAL APPRAISAL;

(ii)    LOSSES RESULTING FROM RIGHTS OF EMINENT DOMAIN OR FROM ANY LAW, ORDINANCE, OR GOVERNMENTAL REGULATIONS RELATED, BUT NOT LIMITED TO, USE OR OCCUPANCY OF THE SUBJECT PROPERTY SUBSEQUENT TO THE DATE OF THE ORIGINAL APPRAISAL;

(iii)    ANY LOSS CAUSED SOLELY BY ANY DISHONEST OR FRAUDULENT ACT OR OMISSION, OR ANY CRIMINAL ACT OR OMISSION BY ANY DIRECTOR, OFFICER, AGENT, OR EMPLOYEE OF WM; OR

(iv)    ANY LOSS RESULTING SOLELY FROM THE FAILURE OF WM TO COMPLY WITH APPLICABLE LAWS OR REGULATIONS, INCLUDING, BUT NOT LIMITED TO USURY, CONSUMER CREDIT PROTECTION, OR TRUTH-IN-LENDING LAWS.

**B.**    WM AGREES THAT IN NO EVENT SHALL COMPANY'S LIABILITY FOR WM'S DAMAGES ARISING AS A RESULT OF BREACH OF THE APPRAISAL WARRANTY EXCEED THE GREATER OF (i) THE TOTAL AMOUNT PAID BY WM TO COMPANY UNDER THE AGREEMENT DURING THE TWELVE (12) MONTHS PRECEDING THE CLAIM (LESS ANY WARRANTY CLAIMS ALREADY PAID BY COMPANY DURING SUCH PERIOD); OR (ii) $1,000,000.00.    THIS LIMIT IS CUMULATIVE AND ALL PAYMENTS UNDER THE AGREEMENT WILL BE AGGREGATED TO CALCULATE SATISFACTION OF THE LIMIT. THE EXISTENCE OF MULTIPLE CLAIMS WILL NOT ENLARGE THE LIMIT.

**C.**    FOR AVOIDANCE OF AMBIGUITY, LIMITATIONS SET FORTH IN THIS EXHIBIT B APPLY TO WM'S RECOVERY FOR DIRECT DAMAGES ATTRIBUTABLE TO BREACH OF THE APPRAISAL WARRANTY ONLY, AND SHALL NOT HAVE ANY EFFECT ON COMPANY'S OBLIGATIONS IN RESPECT OF THIRD PARTIES UNDER THIS AGREEMENT, INCLUDING WITHOUT LIMITATION COMPANY'S OBLIGATIONS TO INDEMNIFY WM IN RESPECT OF THIRD PARTY CLAIMS AS SET FORTH IN THE AGREEMENT.

**D.**    If and to the extent that WM obtains any recovery from private mortgage or other insurance related to a Loan upon which WM has previously obtained relief from Company under this Appraisal Warranty, WM shall issue a credit to Company in an amount sufficient to eliminate any double recovery by WM on losses attributable to such Loan.

Confidential Treatment Requested

LSI2-0429935

Execution Copy

**E.**   Company shall not be liable under the Appraisal Warranty to the extent losses are attributable to use of the Original Appraisal outside the scope of work as defined in each Original Appraisal (solely for illustrative purposes only and not by way of limitation, e.g., interior damage in the case of an exterior only appraisal, or non-existence of the subject property in the case of a desk review).

**10.   DISPUTE RESOLUTION.**

Any controversy or claim arising out of or relating to this Exhibit B, Appraisal Warranty, or the breach thereof, shall be settled via binding arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. Any proceeding under this Section 10 shall be held before a single arbitrator in Seattle, Washington. The prevailing party shall be entitled to an award of its reasonable expenses (including attorney fees and its share of arbitration fees) incurred in connection with the arbitration.

The arbitrator shall employ comparative fault principles as set forth in the Revised Code of Washington (RCW 4.22.070) if and to the extent that the fault of (a) both WM and Company, or (b) Company and third parties for which it is not responsible under the Agreement, are the proximate cause of a loss to WM which becomes subject of a claim by WM under this Appraisal Warranty.

**Confidential Treatment Requested**                LSI2-0429936

Execution Copy

## EXHIBIT C

## FEE SCHEDULES

a.  Appraisal Fees. Appraisal Fees shall be as follows:

*See Attachment A to Exhibit C, attached, pages 48-51.*

NOTE: The costs of reconsiderations of value are included in the fees paid for Services reflected in the table above.

Corrections of errors in appraisals are included in the Services at no additional cost to WM provided Company has caused such errors.

b.  Additional Appraisal Fees. Company shall be able to request additional Fees for Appraisals from WM, only for properties that meet one or more of the following criteria:

1.  Hard to reach properties: Properties that require special transportation to reach, which include: properties where a 4-wheel drive vehicle must be used, and properties which require a ride on a water ferry.

2.  Complex properties: Properties that are considered by industry standards and the inspecting appraiser to be complex and which WM agrees are complex.

3.  Non-standard addenda are required: WM requests from Company the inclusion of a non-standard addendum (e.g. rent schedule, property operating income statement) to be included with the appraisal.

All requests for additional appraisal fees shall be submitted to WM in writing and WM will respond to such requests (e.g., acceptance or non-acceptance) in writing, through WM's appraisal systems. Acceptance of any additional appraisal fees is at the complete discretion of WM. common additional fees that WM will not pay for include, but are not limited to:

1.  Trip fees including fees for when the borrow does not show up for appointments;

2.  Distance fees for properties that are within Company's listed coverage area, as set forth in Exhibit A;

3.  Cancellation fees that do not include documentation of work to date; and

4.  Reconsiderations of appraisal values.

If additional fees are not approved by WM, the service will be completed in accordance with the established Fee Schedule.

Page 46 of 73

**Confidential Treatment Requested**

LSI2-0429937

Execution Copy

c.  <u>Upgrading Appraisal Orders</u>. In the event that WM requests an upgrade to an appraisal Order, Company shall be entitled to the following compensation:

The greater of (i) the fee difference between the upgraded appraisal Order and the original appraisal Order, or (ii) one hundred dollars ($100.00). Example: The original appraisal Order is a 2055 Exterior appraisal at a fee of $200. The upgraded appraisal Order is a 1004 without cost analysis appraisal at a fee of $250. In such case, Company shall then be compensated $100.00 for the upgraded order, since the difference between the upgraded order and the original order is $50.00.

d.  <u>Cancelled Appraisal Orders</u>. In the event that WM cancels an appraisal Order, Company shall cease work immediately, and submit all documentation to WM. Company shall receive compensation for appraisal work completed to date. Fees shall be determined based on completion of appraisal milestone and shall be as follows:

1.  <u>No work completed</u>: 0% of appraisal fees

2.  <u>Property Inspection Completed</u>: 50% of appraisal fees

3.  <u>Appraisal Forms Completed</u>: 100% of appraisal fees

Company shall only receive fees for cancelled Orders, if Company provides documentation sufficient for WM to confirm work to date.

Confidential Treatment Requested

LSI2-0429938

Attachment A to Exhibit C
**Appraisal Fees**

Execution Copy

| State | LAND | 1004 Upgrade from 2055 Exterior | APPRAISAL UPDATE | COMPLETION REPORT 1004D | FIELD REVIEW | DESK REVIEW | CO-OP 2090 | CONDO EXTERIOR 1075 | CONDO INTERIOR 1073 | 2075 INSPECTION | 2-4 UNITS | 2055 EXTERIOR | 1004d MANUFACTURED HOME | 1004 without COST ANALYSIS | 1004 with COST ANALYSIS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AK | 242 | Quote | Quote | Quote | Quote | Quote | Quote | Quote | Quote | 124 | Quote | Quote | Quote | Quote | Quote |
| AL | 195 | 171 | 147 | 100 | 290 | 195 | 314 | 266 | 385 | 124 | 480 | 268 | 361 | 361 | 385 |
| AR | 185 | 171 | 147 | 100 | 242 | 195 | 314 | 290 | 385 | 124 | 480 | 290 | 361 | 361 | 385 |
| AZ | 219 | 195 | 242 | 100 | 266 | 195 | 337 | 286 | 337 | 124 | 575 | 286 | 385 | 314 | 327 |
| CA | 385 | 171 | 195 | 100 | 290 | 171 | 361 | 290 | 385 | 124 | 622 | 290 | 409 | 361 | 385 |
| CO | 280 | 195 | 242 | 100 | 290 | 171 | 337 | 271 | 314 | 124 | 575 | 271 | 337 | 314 | 337 |
| CT | 242 | 138 | 147 | 138 | 266 | 195 | 375 | 276 | 337 | 124 | 527 | 266 | 337 | 314 | 337 |
| DC | 290 | 147 | 147 | 100 | 242 | 242 | 361 | 290 | 337 | 124 | 575 | 276 | 337 | 337 | 337 |
| DE | 195 | 124 | 147 | 114 | 242 | 219 | 314 | 219 | 314 | 124 | 527 | 228 | 337 | 290 | 318 |
| FL | 195 | 100 | 147 | 100 | 266 | Quote | 337 | 290 | 337 | 124 | 480 | 290 | 337 | 361 | 385 |
| GA | 195 | 171 | 147 | 100 | 337 | 195 | 337 | 290 | 385 | 100 | 480 | 271 | 385 | 318 | 381 |
| HI | 290 | Quote | Quote | Quote | 266 | 242 | Quote | Quote | Quote | 100 | Quote | Quote | Quote | Quote | Quote |
| IA | | 195 | 242 | 100 | Quote | 195 | 290 | 255 | 314 | 124 | 504 | 266 | 337 | 314 | 337 |
| ID | 385 | 195 | 195 | 100 | 242 | 242 | - | 290 | 385 | 124 | 622 | 290 | 432 | 337 | 385 |
| IL | 242 | 147 | 147 | 124 | 314 | 195 | 337 | 252 | 290 | 124 | 480 | 252 | 337 | 290 | 314 |
| IN | 242 | 195 | 242 | 100 | 242 | 185 | 290 | 266 | 314 | 124 | 504 | 266 | 337 | 314 | 337 |
| KS | | 195 | 242 | 100 | 242 | 195 | 290 | 266 | 314 | 147 | 504 | 266 | 337 | 314 | 337 |
| KY | 242 | 195 | 242 | 100 | 242 | 171 | 290 | 266 | 314 | 124 | 504 | 286 | 337 | 314 | 337 |
| LA | 266 | 124 | 147 | 100 | 242 | 195 | 385 | 290 | 337 | 124 | 480 | 266 | 458 | 314 | 337 |
| MA | 329 | 124 | 147 | 100 | 266 | 195 | 337 | 290 | 314 | 234 | 527 | 266 | 337 | 314 | 337 |

Confidential Treatment Requested

LSI2-0429939

Execution Copy

Page 49 of 78

| MD | 337 | 337 | 337 | 278 | 575 | 124 | 337 | 330 | 361 | 171 | 242 | 100 | 147 | 147 | 242 |
|----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| ME | 365 | 385 | 337 | 361 | 527 | 124 | 361 | 361 | 385 | 176 | 290 | 100 | 147 | 124 | 219 |

Confidential Treatment Requested

LSI2-0429940

Execution Copy

| State | LAND | 1004 Upgrade from 2055 Exterior | APPRAISAL UPDATE | COMPLETION REPORT 1004D | FIELD REVIEW | DESK REVIEW | CO-OP 2090 | CONDO EXTERIOR 1075 | CONDO INTERIOR 1073 | 2075 INSPECTION | 2-4 UNITS | 2055 EXTERIOR | 1004d MANUFACTURED HOME | 1004 without COST ANALYSIS | 1004 with COST ANALYSIS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MI | 242 | 195 | 242 | 100 | 242 | 185 | 290 | 266 | 314 | 124 | 504 | 266 | 337 | 314 | 337 |
| MN | 242 | 171 | 171 | 100 | 266 | 176 | 361 | 266 | 337 | 124 | 456 | 266 | 337 | 314 | 337 |
| MO | 242 | 195 | 242 | 100 | 242 | 195 | 290 | 266 | 314 | 124 | 504 | 266 | 337 | 314 | 337 |
| MT | 385 | 195 | 242 | 100 | 242 | 195 | 290 | 266 | 314 | 124 | 504 | 266 | 337 | 314 | 337 |
| NC | 195 | 171 | 147 | 100 | 266 | 171 | 480 | 266 | 337 | 124 | 527 | 266 | 361 | 361 | 385 |
| ND | - | 195 | 242 | 100 | 242 | 195 | 290 | 266 | 314 | 124 | 504 | 266 | 337 | 314 | 337 |
| NE | - | 195 | 242 | 100 | 242 | 195 | 290 | 266 | 314 | 124 | 504 | 266 | 337 | 314 | 337 |
| NH | 219 | 124 | 147 | 100 | 266 | 171 | 314 | 266 | 314 | 124 | 527 | 266 | 337 | 342 | 361 |
| NJ | 242 | 138 | 147 | 100 | 276 | 204 | 361 | 290 | 337 | 124 | 622 | 290 | 409 | 328 | 385 |
| NM | 280 | 171 | 195 | 147 | 290 | 186 | 385 | 290 | 385 | 124 | 622 | 271 | 385 | 409 | 385 |
| NV | 219 | 195 | 195 | 100 | 337 | 242 | 361 | 290 | 337 | 124 | 551 | 286 | 337 | 337 | 361 |
| NY | 231 | 171 | 242 | 138 | 280 | 185 | 385 | 266 | 314 | 124 | 504 | 242 | 337 | 328 | 337 |
| OH | 242 | 195 | 147 | 100 | 242 | 195 | 290 | 286 | 337 | 147 | 527 | 286 | 361 | 314 | 337 |
| OK | 242 | 124 | 242 | 100 | 266 | 176 | 480 | 242 | 314 | 124 | 622 | 290 | 432 | 290 | 432 |
| OR | 266 | 195 | 242 | 128 | 290 | 195 | 337 | 361 | 432 | 137 | 527 | 280 | 337 | 385 | 337 |
| PA | 385 | 138 | 147 | 100 | 252 | 171 | 385 | 280 | 314 | 124 | 527 | 286 | 337 | 328 | 328 |
| RI | 242 | 124 | 147 | 100 | 242 | 176 | 385 | 266 | 290 | 124 | 480 | 266 | 361 | 290 | 337 |
| SC | 219 | 124 | 147 | 100 | 266 | 195 | 280 | 266 | 314 | 171 | 504 | 266 | 337 | 314 | 337 |
| SD | 195 | 195 | 242 | 100 | 242 | 178 | 385 | 266 | 314 | 124 | 480 | 266 | 361 | 314 | 361 |
| TN | - | 124 | 147 | 100 | 242 | 171 | 290 | 290 | 337 | 124 | 480 | 266 | 337 | 337 | 361 |
| TX | 195 | 124 | 242 | 100 | 242 | 195 | 337 | 290 | 361 | 100 | 622 | 266 | 456 | 314 | 337 |
| UT | 266 | 185 | 242 | 100 | 266 | 195 | 337 | 285 | 361 | 124 | 575 | 288 | 385 | 337 | 361 |
| VA | 230 | 147 | 147 | 100 | 242 | 171 | 361 | 290 | 337 | 124 | 575 | 276 | 337 | 337 | 337 |

Confidential Treatment Requested

LSI2-0429941

Execution Copy

|    |     |     |     |     |     |     |     |     |     |     |     |     |     |     |     |
|----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| VT | 337 | 290 | 337 | 266 | 527 | 124 | 314 | 290 | -   | 195 | 290 | 147 | 147 | 124 | 219 |
| WA | 432 | 385 | 480 | 290 | 670 | 124 | 432 | 290 | 504 | 195 | 337 | 100 | 247 | 195 | 242 |
| WI | 314 | 290 | 337 | 286 | 458 | 124 | 314 | 266 | 314 | 195 | 266 | 100 | 147 | 124 | 195 |
| WV | 337 | 337 | 337 | 276 | 575 | 124 | 337 | 290 | 361 | 171 | 242 | 100 | 147 | 147 | -   |
| WY | 337 | 314 | 337 | 266 | 504 | 124 | 314 | 266 | 290 | 195 | 242 | 100 | 242 | 195 | 385 |

Manhattan and CA Co-ops

1.5 - 3 million    $800
3-5 Million        $950

Confidential Treatment Requested

LSI2-0429942

## EXHIBIT D

### INFORMATION SECURITY REQUIREMENTS

#### 1. Security Management

1.a.    Company acknowledges and agrees that it is obligated to comply with the Confidentiality provisions in the Agreement to which these Information Security Requirements ("ISRs") are attached (the "Agreement"), or such higher standard as required by law.

1.b.    WM employees will be responsible for determining and specifying all levels of security for information residing on WM owned and managed systems as well as the classification and corresponding security controls over WM Information Assets that are processed and/or stored by Company and that are more fully described in these ISRs.

1.c.    **WM Information Assets:** "WM Information Assets " shall mean all data and information that is submitted directly or indirectly to Company for and/or by WM, or obtained, or learned by Company in connection with the Services provided by Company under the Agreement. WM Information Assets are, and shall at all times remain, the property of WM and shall be protected as prescribed by the Agreement, these ISRs, and all applicable laws.   WM Information Assets shall be deemed to be the Confidential Information of WM as that term is defined in the Agreement or Non-Disclosure Agreement.

1.d.    Company shall maintain full responsibility for ensuring that WM Information Assets are protected in accordance with the WM requirements described in these ISRs. If assigned as permitted in accordance with the Agreement, the Company must be able to determine that any delegated roles and responsibilities have been discharged correctly. Company also agrees to maintain policies or standards appropriate to govern the handling of Confidential Information, which policies and standards must be provided to and approved by WM Corporate Information Security. All WM Information Assets will be treated as Confidential Information under this Agreement.

1.e.    Company acknowledges and agrees that security requirements will be incrementally implemented as access to production data by Company becomes more imminent. Company agrees that such connectivity requires that its security standards meet or exceed those of WM and that WM Information Assets may only reside within a secure environment.    Company further agrees to allow WM or a mutually agreed upon independent third party to perform security assessments based on a schedule reasonably required by WM. Company understands that should an assessment reveal inappropriate or inadequate security, a remediation schedule will be developed, and appropriate actions will be taken to address and resolve all findings. WM may, at its sole discretion, disconnect Company from the WM network and require that all WM information currently stored by Company be surrendered or destroyed by an independent document destruction party, or require some other solution, whichever WM deems as appropriate, until Company satisfactorily complies with the defined security requirements.

1.f.    WM Information Assets may not be stored at Company's facilities (including any offsite facilities under its control) until WM's Chief Information Security Officer or his or her designee has determined to his or her reasonable satisfaction that (i) Company's

Confidential Treatment Requested                                    LSI2-0429943

Execution Copy

policies and standards sufficiently protect such information and, (ii) that Company is in compliance with Company's own security policies and standards.

1.g.    Company shall maintain a security alert process either through the employment of a third party service or by assigning personnel to be responsible for (i) monitoring the development of new threats related to any identified vulnerabilities and, (ii) taking effective corrective action to remediate those threats.  During the implementation of security patches or corrective actions to remediate security risks, WM will be informed of any potential risk to WM Information Assets at the earliest opportunity through the Security Operations Services (SOS) at 888-497-3287 and notified when the threat is removed through remediation measures. For the purposes of these ISRs, "personnel" means employees and independent contractors.

1.h.    For the purposes of these ISRs, an "Incident" includes but is not limited to any of (i) an act which violates an explicit or implied security policy, (ii) an unplanned service outage that prevents the normal operation of business, or (iii) unauthorized access to WM Information Assets or any data held by Company that would be required by law to be disclosed.

During the Term of the Agreement, Company shall maintain an incident response function with the capabilities to perform activities such as prevention, planning, detection, analysis, containment, investigation, eradication, recovery, and follow-up of incidents such as root cause analysis and forensic research. In the event of an incident, Company shall (i) notify WM at CorpInformationSecurity@wamu.net within twenty-four (24) hours and (ii) if a security deficiency has been identified with any information system, coordinate with WM Corporate Information Security through the Security Operations Services (SOS) at 888-497-3287 in the conduct of an investigation within twenty-four (24) hours, (iii) provide a written report within three (3) days of any such notice, and (iv) respond promptly to any reasonable request from WM for detailed information pertaining to any incident.  Any such notice and report must contain a description of the nature of the incident, its impact, and any investigative, corrective, or remedial actions taken or planned.  Company further agrees to permit WM, upon request, to review and verify relevant logs and data pertaining to any investigation performed by the Company regarding any incident for the purposes of protecting WM and its customers' and employees' information. Upon the conclusion of all investigative, corrective, and remedial actions, WM will receive a final report that includes the extent of the incident; a description of WM Information Assets disclosed, destroyed, or otherwise compromised or altered; all supporting evidence, including system, network, and application logs; a description of all corrective and remedial actions; and an assessment of the security impact to WM.

1.i.    If an incident occurs, Company will promptly take all necessary steps to prevent any further damage to/exposure of WM Information Assets as well as any future incidents and will provide WM with the relevant details of the steps taken to remediate against any further incidents within three (3) business days. Further, Company will, within the time period prescribed by law, take all actions required by law to notify the affected WM customers, that an incident involving a breach of security may have caused their personal information to be disclosed to unauthorized persons, provided, however, that any notification must first be approved by WM's Chief Information Security Officer or his or her designee.

Confidential Treatment Requested                                      LSI2-0429944

Execution Copy

1.j.     Company acknowledges and agrees that WM Information Assets may only be used in connection with the provision of Services to WM as contemplated in the Agreement. Company also acknowledges that relevant governing or regulatory agencies may, according to their respective charter and/or as required by law, request an audit of Company's business practices when WM's or its customer's non-public information is held or protected by Company as though it were an extension of WM.

## 2.  Personnel Security

2.a.    Company certifies that its employees, independent contractors and subcontractors are of good standing and trustworthy and that Company has no knowledge of any person employed by it in connection with any Services under the Agreement who has a prior felony charge or conviction for embezzlement, fraud, antitrust, breach of trust or fiduciary duties, securities or financial related crime, perjury, breach of trust, money laundering, or larceny.   If Company's employees, independent contractors or subcontractors are convicted of a felony, or Company learns of a prior conviction during the term of the Agreement, it will inform WM of the conviction and remove the employee, independent contractor, or subcontractor from performing any Services for WM if requested by WM.

2.b.    Company certifies that its employees, independent contractors, and subcontractors are insured.

2.c.    Company certifies that its employees, independent contractors, and subcontractors have been provided with a clear understanding of the necessary procedures and controls to comply with the security requirements set forth in these ISRs.  Company also agrees to maintain a vendor security process that ensures appropriate due diligence is conducted prior to utilizing other vendors or subcontractors to provide any Services in support of the Agreement, and that the security capabilities of any such vendors or subcontractors are monitored on an ongoing basis.  The due diligence and monitoring elements of this process must provide for the identification and resolution of significant security issues prior to engaging a vendor or subcontractor, and for the continuous identification and resolution of additional security issues over the term of the Agreement.

## 3.  Physical Security

The physical security processes in this section apply to all primary and secondary facilities used to provide the services, or facilities used by Company (the "Company Premises") to operate, store, maintain or protect any and all WM Information Assets and physical connections, equipment and any other materials owned by WM that are used by Company to provide the Services (collectively, the "WM Properties").

3.a.    Company shall restrict, control, and monitor all physical areas in Company's Premises that contain WM Information Assets, including any servers, switches, or other equipment that processes or stores WM Information Assets (the "Secure Area").  Access to any equipment used to deliver Services will be secured and monitored on a 24 hours per day, 7 days per week ("24/7") basis.

3.b.    Company will develop a documented authorization process for all those Company personnel maintaining or viewing WM's Properties. Company's card access program will address documentation and logging of all persons whose duties require them to enter or

Confidential Treatment Requested

LSI2-0429945

Execution Copy

support space storing the aforementioned WM Properties. This process should also include details addressing site visitor protocol including the following:

    i. Company will provide WM, upon request, badge reports detailing all access to areas storing WM Information Assets and Properties.

    ii. Company will regularly test its physical protection methods. Reports of tests will be made available for WM's review upon request.

    iii. Upon request, and when applicable, Company will provide WM with access to facility log-in records on WM's personnel and any other persons having access to each Secure Area with their identities and dates and times of access.

    iv. Company will not allow outside support services personnel to access WM Secure Areas unless accompanied by authorized Company personnel.

    v. Company Access Systems will be capable of monitoring and logging door alarms.

    vi. Company will maintain active service agreements with card access and close-circuit television (CCTV) support vendors.

    vii. Company CCTV equipment and processes will support the following, unless otherwise approved by WM: all images will be recorded at "real time" settings; all image records will be retained for a minimum of one hundred twenty (120) days; and all images related to questionable activity or known incidents or investigations will be retained indefinitely or until Company receives notification from WM that the information is no longer needed.

    viii. Company will maintain 24/7 physical security presence at all WM Properties.

    ix. Company will control all access to Company areas or cabinets that house phone and other "data transmission lines" or equipment as follows: access must be controlled by badge reader at one or more entrance points; doors used only as exit points must have "one-way" doorknobs or crash bar exit devices installed; all doors must be equipped with door alarms contacts; all exit doors will have CCTV coverage; and all Card Access and CCTV systems will be tied into generator or UPS back-up systems.

    x. Company will not allow outside support-services personnel to access secure areas unless accompanied at all times by Company's pre-approved staff.

## 4. Access Control

4.a. Company certifies that its employs access control mechanisms to prevent unauthorized access to WM Information Assets and to limit access to authorized personnel with a business need-to-know. Such mechanisms shall have the capability of detecting, logging, and reporting attempts to breach security. Additionally, all elements of Company's implementation that allow end user access must be capable of distinguishing access privileges, at a minimum, to the following separate categories:

Confidential Treatment Requested

LSI2-0429946

Execution Copy

- End user of services;

    - WM employees and independent contractors; and

    - Company employees, independent contractors, and subcontractors.

4.b.   Company security systems will be configured and maintained to provide reasonable and effective levels of security pursuant to the sensitivity of the data being held, which levels may be determined by WM and in accordance with all applicable laws including laws pertaining to WM's obligations.

4.c.   Company will limit systems access and use of resources solely to those of its employees, independent contractors, and subcontractors needed to perform specific responsibilities or functions in support of the services under the Agreement. Each person must have an individual account that authenticates that individual's access to WM Information Assets.

4.d.   Company will maintain a process to review access controls regularly, but at least quarterly, for all systems containing WM's Information Assets including any system that can connect to a system on which WM Information Assets are stored via any form of communication interface. This process shall at all times during the Term of the Agreement (i) be in compliance with Company's Policies and Standards as provided to WM, and (ii) include documenting all systems access authorizations, which include procedures to disable or delete accounts following employment transfers, terminations, and account inactivity. Such reviews may be audited by WM or its third party auditor upon request and with reasonable notice.

## 5. Systems Development & Maintenance

5.a.   Company agrees that there will be no access from platforms or use of protocols other than those in the current configuration presented to WM by Company.

5.b.   Company shall establish and maintain all application and system logs under its domain and further agrees that a copy of all logs shall be provided to WM upon request in the event a security incident occurs or is believed to have occurred.

5.c.   Company shall employ an effective, documented change management program with respect to the services under the Agreement as an integral part of its security profile. WM reserves the right to review the change management reports upon reasonable notice and may require remedial action if any deficiencies are identified.

## 6. Telecommunication & Network Security

6.a.   Company shall employ security practices and equipment sufficient to ensure that its end of the telecommunications connection will not allow unauthorized traffic to pass into WM networks through the common Internet connection. WM reserves the right to disconnect the Company service without notice if unauthorized access is discovered. Such disconnection, if it occurs, will not, however, relieve Company of its commitment to perform under the Agreement. Company will be obligated to provide either onsite servicing or another workaround acceptable to WM until the inappropriate access can be investigated and resolved to WM's satisfaction.

Page 66 of 73

Confidential Treatment Requested

LSI2-0429947

Execution Copy

6.b.    Company shall notify WM in writing as to the identity of each employee, independent contractor, or subcontractor (including name and purpose(s) of access) for whom access is requested for connectivity to WM networks or systems, and shall notify WM within one (1) business day of any status change, including new hire, termination, or transfer.

6.c.    Company agrees to review and update (for accuracy and any status changes) WM network and system access reports supplied by WM, and to return the reports to WM with any changes or updates within five (5) business days.

6.d.    Company agrees that any remote server access required by the Company will be in a READ only mode, without prior written approval of a security plan for more intrusive access.

## 7. Storage, Handling, and Disposal

Company shall separate and segregate WM Information Assets from other client data. Company shall encrypt WM Confidential Information that is in electronic form while In-Transit (also known as "in-motion" or "en-route"). "In-Transit" means information moving over wired and wireless local and/or wide area networks and the Internet. Company shall ensure all WM Confidential Information while In-Storage (also known as "at-rest") is placed in secure areas with commercially reasonable controls to prevent unauthorized access (which shall include encryption not later than one (1) year after the Effective Date). "In-Storage" means information stored in databases, file systems, and on various forms of online and offline media (DASD, tape, etc.). Unless directed otherwise by WM, Confidential Information should be properly disposed of in accordance with federal and state requirements or as mandated by WM, provided that such destruction occurs only on the date specified by WM or requested in writing by WM. At WM's request, Company will certify in writing that all WM Information Assets have been returned or destroyed as required in this subsection. Company shall comply with any security requirements of WM regarding the storage, handling and disposal of WM Confidential Information that is in physical form.

## 8. Disaster Recovery and Business Continuity

Company shall provide WM with documentation of its disaster recovery strategy and/or capability. The description will address actions to be taken in the event of an extended outage of service. (Such an outage could be caused by a number of events ranging from technical hardware/software/network related malfunctions to a catastrophic disaster.)   Prior to the Effective Date of the Agreement, Company will deliver to WM a copy of its disaster recovery and business continuity plan (the "Plan") dated not more than twelve (12) months old. Company will use commercially reasonable efforts to ensure that the Plan will address the following requirements:

8.a.    <u>Content</u> - Company will describe in the Plan the actions and resources required to provide for the continuous operation, and, in the event of an interruption, the recovery of the functions required in the Agreement, including all Agreement-required systems, hardware, software and data that support these functions, within a recovery time objective sufficient to sustain contracted levels of service.   If WM raises issues or concerns regarding the Plan, Company will use reasonable efforts in good faith to address them.

Confidential Treatment Requested

LSI2-0429948

Execution Copy

8.b.   Updates - Company will update and resubmit the Plan to WM whenever there are significant or material changes in the Agreement-required systems, recovery strategies, recovery resources, actions described in the Plan, or other information affecting the recovery of Agreement-required functions, but at least once in every twelve (12) month period starting with the Effective Date.

8.c.   Resources - Company will ensure that all continuity and recovery resources, including without limitation systems, facilities, equipment, and personnel as described in the Plan and as needed to perform the Agreement-required services or functions, remain available in sufficient quantities throughout the term of this Agreement.

8.d.   Disaster Reporting - Within two (2) hours of an interruption of an Agreement-required function, Company will provide to the WM designated representative an initial report that includes the nature of the interruption and an estimate of the time it will take to return to Agreement-required service levels.

8.e.   Recovery - Following restoration of Agreement-required functions to normal, Company will provide to the WM designated representative a complete report within ten (10) days of such restoration, including a description of each Agreement-required function interrupted, the time required for recovery and return to Agreement-required service levels, Agreement-required products or services that were not provided or only partially provided as a result of the interruption, the specific corrective action taken, the material effect, if any, on WM and whether or not the Plan was adhered to and, if not, what changes will be made to the Plan.

8.f.   Continuity - Company will continue to meet the terms and requirements of this Agreement through alternative means until the Agreement-required functions are recovered.

8.g.   Plan Testing - Company will test the Plan each time the Plan is revised, but not less than once every twelve (12) months, by using any of several industry-standard testing methods.

8.h.   Reporting - Company will report in writing the results of each Plan test and deliver the test results, certified by Company's authorized officer, to WM within thirty (30) days following completion of the test. The report must include all errors, omissions, inaccuracies, and outdated information discovered in the Plan, corrective action planned for these errors, omissions, inaccuracies, and outdated information and the date by which corrective actions will be completed.

8.i.   WM's Participation - Company will notify WM at least thirty (30) days in advance of any Plan testing that requires WM's participation. WM will have the option to decide upon the nature and extent of its participation, including the opportunity to participate in the planning and scope of the test.

**Confidential Treatment Requested**                                    LSI2-0429949

Execution Copy

EXHIBIT E

KEY PERSONNEL

| Last Name | First Name | Phone Number | Cell Phone | Email Address | Dept/Title | Level of Dedication to WM |
|-----------|-----------|--------------|-----------|---------------|-----------|---------------------------|
| Getty | Bob | 412-299-4294 | | rgetty@lsi.fnf.com | Business Development | 100% |
| Janicki | Pat | 412-299-4646 | | pjanicki@lsi.fnf.com | Client Service Mgr | 100% |
| Lemashane | Diane | 412-299-4000 | | dlemashane@lsi.fnf.com | Appraisal Supervisor | 100% |
| Manz | Bonnie | 412-299-4383 | 412-716-7439 | bmanz@lsi.fnf.com | Appraisal Ops | 100% |
| McSheehy | Brian | 412-299-4000 | | bmcsheehy@lsi.fnf.com | Client Service Supervisor | 100% |
| McVay | Suzy | 412-299-4000 | | smcvay@lsi.fnf.com | Appraisal Manager | 100% |
| Prosser | Rick | 412-299-4000 | | rprosser@lsi.fnf.com | Appraisal Trainer | 100% |
| Schneider | Leslie | 412-299-4000 | | lschneider@lsi.fnf.com | Appraisal Team Lead | 100% |
| Jackie | Carlucci | 412-299-4517 | | jcarlucci@lsi.fnf.com | QA Ops Manager | 100% |
| Borowski | Keri | 412-299-4616 | 518-980-5642 | kborowski@lsi.fnf.com | Appraiser Liaison | 80% |
| Alcorn | Bethany | 412-299-4062 | | balcorn@lsi.fnf.com | IT Integration | 50% |
| Cranton | Shane | 949-422-3582 | 714-366-6424 | scranton@lsi.fnf.com | Project Manager | 50% |
| Greve | Joe | 216-328-2055 | 216-374-1886 | jgreve@lsi.fnf.com | Sales Exec | 40% |
| Java | Donna | 412-299-4522 | 828-255-1309 | djava@lsi.fnf.com | Project Manager | 50% |
| Johnson | Mark | 949-622-4640 | | mjohnson@lsi.fnf.com | COO | 20% |
| Meier | ML | 412-299-4212 | | mlmeier@lsi.fnf.com | Quality Assurance | 20% |
| Rice | Kate | 412-299-4312 | 412-716-1279 | krice@lsi.fnf.com | Appraisal Ops | 20% |
| Sanderson | Jeff | 949-622-4614 | | jsanderson@lsi.fnf.com | CTO | 20% |
| Vann | George | 412-299-4000 | 412-716-1534 | gvann@lsi.fnf.com | Chief Appraiser | 20% |
| Pizga | Greg | 412-299-4146 | 412-716-9029 | gpizga@lsi.fnf.com | Legal Counsel | 20% |
| Reid | Bill | 800-756-3524 | | breid@lsi.fnf.com | Accounting | 20% |

Page 59 of 73

Confidential Treatment Requested

LSI2-0429950

Execution Copy

Priority Service Providers

| Last Name | First Name | Phone Number | Cell Phone | Email Address | Dept/Title | Level of Dedication to WM |
|-----------|-----------|--------------|-----------|---------------|-----------|----------------------------|
| Chmielewski | Marci | 412-299-4789 | | machmielewski@lsi.fnf.com | Client Service Supervisor | 100% |
| DelBianco | Sharon | 412-299-4000 | | sdelbianco@lsi.fnf.com | Performance Engineer | 100% |
| Hollick | Dave | 412-299-4000 | | dhollick@lsi.fnf.com | Performance Engineer | 100% |
| Irion | Heather | 412-299-4000 | | hirion@lsi.fnf.com | Client Service Supervisor | 100% |

Page 80 of 73

Confidential Treatment Requested

LSI2-0429951

Execution Copy

## EXHIBIT F

## COMPANY SOFTWARE

As of the Effective Date, there is no Company Software to which WM will be provided access.

**Confidential Treatment Requested**                                    LSI2-0429952

Execution Copy

## EXHIBIT G

## GOVERNANCE

No term of this Exhibit G shall relieve the Parties of any obligations under this Agreement. For purposes of this Exhibit G, a subcontractor of Company is not considered another "service provider" of WM separate and apart from Company.

1.    **Purpose of the Governance Model**

The purpose of the Governance Model is to provide Company and WM with a governing document to guide management of the day-to-day relationship between Company and WM with regard to the Services under this Agreement and to encourage Company and WM to work together effectively. However, neither the provisions of the Governance Model, nor the duties of any of the teams created herein, will limit or in any way preclude WM or Company from exercising any of the rights or remedies granted to either of them under this Agreement or at law or in equity, or excuse either Party from performing its other obligations under this Agreement.

2.    **Teams**

The following three teams will operate the Governance Model:

   **Delivery Management Team** (the "DMT", whose roles and responsibilities are detailed in Section 3)

   **Relationship Management Team** (the "RMT", whose roles and responsibilities are detailed in Section 4)

   **Executive Review Team** (the "ERT", whose roles and responsibilities are detailed in Section 5).

3.    **Delivery Management Team**

   3.1 **DMT Members** - The Delivery Management Team ("DMT") will be comprised of the following Operations Managers and their successors as appointed from time to time by written notice from the Party replacing its Operations Manager.

   **WM** – Bruce Marshak – FVP, Loan Servicing Strategic Support

   **LSI** –  Bonnie Manz – VP Appraisal Operations

   3.2 **Specialist Teams** - If Company utilizes Specialist Teams (e.g. during transition periods or as part of a particular Project or New Service Implementation by WM) (the "Specialist Teams"), such Specialist Teams will report to the DMT.

   3.3 **DMT Objectives** – The DMT will actively encourage operations and Specialist Team personnel at both the Company and WM to take responsibility for all aspects of the Company's delivery, and WM's efficient use, of the Service(s) assigned to the DMT and to operate as a single operations team. WM's Service needs will be their highest priority. DMT members and operations personnel at both the Company and WM will cooperate to this end.

**Confidential Treatment Requested**                                     LSI2-0429953

Execution Copy

3.4 **DMT Responsibilities** - Each DMT member will refer any relationship or contractual issue to their respective organization's Relationship Manager, and will not attempt to resolve such issue within the DMT.  The DMT is responsible for the following:

A. Manage all operational aspects of Service delivery and supervise Company's delivery of the Services in accordance with this Agreement, including day-to-day responsibility for monitoring compliance with contractual obligations (e.g., compliance with Service Levels, procedures manuals and WM Policies).

B. Monitor the progress of each Specialist Team and provide guidance when necessary.

C. Identify, from a technical and business delivery perspective, Projects within the scope of Services, potential or actual changes to the Services or New Services being planned or considered by the RMT.  Ensure that all issues relating to any such change are identified and fully addressed (e.g., transition issues and additional management needed to manage Projects) in a manner protective of WM's operations, and WM's financial and business interests.

D. Integrate Services with services provided by WM or third-party suppliers.

E. Review all incident reports in which Service availability and compliance with Service Levels are implicated or concerned.  Determine when a root cause analysis of a Service failure is appropriate.  Perform any root cause analysis, including any analysis involving another service provider when appropriate in accordance with <u>Attachment B</u> of this Exhibit, and supervise Company's remediation of all failures involving a Service or that result in/implicate Company's failure to meet the Service Levels.

F. Consider any advisable (and feasible) change (including a change) to the Services, or any people, process or technology used to deliver the Services, as a result of, and to address problems or concerns identified through, a root cause analysis, and advise the RMT of same.

G. Prioritize remedial actions based on the importance of affected WM operations and operational impact of lost functionality within the WM environment or any Company environment.

H. Develop rectification and maintain plans and disaster recovery plans and ensure that they are implemented in accordance with the terms of this Agreement.

I. Prioritize the identification, resolution, and escalation of Service Level defaults.

J. Review Company's performance of the Services and prepare reports as directed by the RMT for the RMT quarterly meetings.

K. Escalate major operational and technical problems, issues and risks that cannot be resolved promptly at the DMT level.

4. **Relationship Management Team**

**Confidential Treatment Requested**

LSI2-0429954

Execution Copy

4.1 Members - The Relationship Management Team (RMT) will be comprised of the following individuals, representing WM and Company, respectively:

> WM – Sushuma Bull – FVP, Home Loans Risk Management

> LSI – Kate Rice - SVP, Title and Appraisal Operations

4.2 **Responsibilities** - The RMT will be principally responsible for the following:

A. Ensure that the actual relationship between the Parties reflects as closely as possible each Party's intentions and achieves the business objectives.

B. Manage the process for changes to the Services, this Agreement, Projects and New Services and any changes to the Governance Model.

C. Review, on at least a quarterly basis, Company's performance, compliance with WM's audit, security and business recovery requirements; all performance reports; and overall customer satisfaction.

D. Supervise any fault analysis, taking into account the results of any root cause analysis (see Attachment B), including any multi-party analysis required for multi-party issues. However, all Company affiliates and any other service providers associated with the issue must agree to first attempt to resolve any issues between themselves without WM's involvement so that WM is not expected to adjudicate between its service providers in the case of a dispute.

E. Ensure compliance with all procedures for changing the Services, or any part of the environment used to deliver the Services, including as a result of any root cause or fault analysis.

F. Resolve any relationship and contractual issues escalated to the RMT, and only escalate any such issue to the ERT after all realistic avenues for resolving the issue have been thoroughly and cooperatively exhausted.

G. Ensure Company is informed of, and understands, the evolving needs of WM's business and keep WM advised of developments in the areas of the outsourced services and technology applicable thereto.

H. Ensure that each Party complies with the Governance Model and does not attempt to manage around it.

5. **Executive Review Team**

5.1 – ERT Members - The Executive Review Team (ERT) will be comprised of the following individuals:

> WM – Joe Healan – SVP, Home Loans Strategic Operations

> LSI – Mark R. Johnson – COO LSI Appraisal, LLC

Confidential Treatment Requested

LSI2-0429955

Execution Copy

**5.2 – ERT Responsibilities** – The ERT will be principally responsible for the following:

**A.** Create a forum that will enable Company to understand WM's business strategy evolving business needs and give Company an opportunity to contribute to that strategy by providing high-level insight on emerging business trends relevant to WM. Ensure that each Party complies with Governance Model and does not attempt to manage around it.

**B.** Meet at least semi-annually for the first twelve (12) months of this Agreement and at least annually thereafter.

**C.** Provide guidance and leadership to the relationship as a whole.

**D.** Provide the final escalation level on technical, contractual and relationship issues from the DMT and RMT.

## 6.   Appointment and Removal of Team Members

As the output, vigor and usefulness of the teams will largely be determined by the commitment, ability and availability of their members, appointment and removal of Company's team members will be governed by the following requirements:

**A.** Company will consider the appointment of each Company team member carefully.

**B.** Company will maintain similar executive level positions within each team to ensure an appropriate focus and direction is provided to the other.

**C.** WM will be entitled to approve (and require removal and replacement of) Company team members. WM will, whenever reasonably practicable, give Company one (1) month written notice in the event it wishes to change a Company team member, unless Company team member violates the WM Code of Conduct whereby removal of the Company team member may be, at WM's discretion, immediate.

## 7.   Decisions of Teams

All team decisions will be made in accordance with this Agreement. If this Agreement specifies that an issue will only take effect if agreed between the Parties, then the resolution will only be passed if representatives of both Parties agree. If this Agreement specifies that WM has an approval right or the discretion or this Agreement is silent on a matter, then Company representatives can make suggestions but cannot prevent WM from making a particular decision or force WM to make a particular decision.

## 8.   Change Control Procedures

Within seventy-five (75) calendar days after the Effective Date, Company will deliver to WM, in the form and scope agreed upon by WM and Company, a draft of the change control procedures ("Change Control Procedures"), which will be finalized, including by obtaining WM's approval, no later than one hundred twenty (120) calendar days after the Effective Date. On an ongoing basis throughout the Term, Company will update the Change Control Procedures as appropriate or upon WM's request, with WM's review and right to approve any updates to the Change Control Procedures. Company will adhere to the Change Control Procedures in effect

Confidential Treatment Requested

LSI2-0429956

Execution Copy

and documented at the time. WM and Company agree that the Change Control Procedures shall provide, at a minimum, that:

A. no operational change shall be implemented without WM's prior written approval unless otherwise expressly provided in the Change Control Procedures;

B. with respect to all operational changes, Company shall: (i) schedule operational changes so as not to unreasonably interrupt WM's business operations, (ii) each month, prepare and deliver to WM a rolling schedule for ongoing and planned operational changes for the next 90-day period, (iii) promptly notify WM of any schedule or impact to the operational changes, and (iv) monitor the status of operational changes against the applicable schedule; and

C. Company shall update the Change Control Procedures as necessary and shall provide such updated Change Control Procedures to WM for its approval.

## 9. Attachments to the Governance Model

There are several exhibits to this Governance Model. Each Party agrees that it will comply with each of the following Attachments:

Attachment A – Project Managers' Scope

Attachment B – Root Cause and Fault Analysis Procedure

Attachment C – Approvals Procedure

## 10. Dispute Resolution

10.1 In accordance with this Agreement, the Parties shall use commercially reasonable efforts to resolve, promptly and in good faith, any and all disputes that may arise under, or in the course of the administration of, this Agreement.

10.2 It is the intent of WM and Company to resolve disputes and other issues in a constructive manner that reflects the concerns and commercial interests of each Party. Each team or committee shall work in good faith to promptly and fully resolve all disputes or issues submitted for their review. It is also the Parties' intention to have the disputes or issues resolved by the appropriate levels of authority without the need for escalation. From time to time, however, disputes may arise that cannot be resolved despite the best efforts of the members of the applicable team or committee. In such cases, the following steps are to be followed in escalating disputes between the Parties.

10.3 Either Party may decide that escalation is appropriate when resolution of an issue appears unachievable within two (2) business days at the operational level or at the DMT or RMT level if the problem originates at the DMT or RMT level.

10.4 **Escalation Mechanics:** If a resolution is not reached in accordance with Section 10.3 above, the issue will be escalated. If an issue is escalated:

Confidential Treatment Requested

Execution Copy

    A. **Documentation.** The Parties will jointly develop a short briefing document called 'Statement of Issue for Escalation' that describes the dispute, relevant impact of the dispute, and the position of each Party.

    B. **DMT Authority.** If the issue arises at the operation level, the DMT shall be the initial point of escalation if the dispute involves or relates to Service quality, Deliverable quality, timely performance or other performance-related matters.

    C. **RMT Authority.** If the issue arises at the operational level, the RMT shall be the initial point of escalation if the dispute involves or relates to the Parties' business relationship, such as disputes regarding the scope of Services, billing or payment or personnel.

10.5 **Escalation.**

    A. If the issue is escalated from the operational level, a meeting will be scheduled with the DMT or RMT, as applicable within two (2) business days. Such meeting may be carried out by telephone or video conference. The Statement of Issue for Escalation will be sent in advance to the participants. If, for any reason, including the failure to meet or communicate, the DMT or RMT, as applicable, is not able to resolve the dispute or issue within five (5) business days after initial escalation to such team, the dispute or issue shall be escalated to the ERT.

    B. If the issue arises at the DMT or RMT level and is not resolved in accordance with Subsection 10.4 above, the issue shall be escalated directly to the ERT.

10.6 **Final Resolution.** A meeting will be scheduled with the ERT as promptly as possible. The Statement of Issue for Escalation will be sent in advance to the ERT. If, for any reason, including failure to meet or communicate, the members of the ERT (or any other representatives of the Parties) are unable to resolve a dispute within ten (10) business days after the dispute is first escalated; either Party may proceed to pursue any rights and remedies not prohibited by this Agreement.

10.7 **Documentation.** Upon the resolution of a dispute at any level of escalation, the Parties' decision or resolution thereof shall be documented and the documentation provided to the Relationship Managers of both Parties.

## 11. Withheld Fees

If a dispute arises regarding fees, such dispute shall be immediately referred to the DMT for resolution in accordance with Section 10 of this Exhibit G above.

**Confidential Treatment Requested**

LSI2-0429958

Execution Copy

### Attachment A to Exhibit G
### Project Managers' Scope

**Monitoring Compliance with Agreement**

The Project Managers are the delegates of each of Company and WM representatives on the RMT.  They are responsible for monitoring day to day compliance with the Agreement.  Those issues include the following (and will be updated to reflect any changes to this Agreement):

1.  **Performance measurement**

    - Reviewing compliance with the performance requirements

    - Reviewing compliance with cost reduction and efficiency improvement obligations

    - Reviewing status of individual existing or planned Projects

    - Benchmarking

    - Reviewing customer satisfaction survey results

2.  **Financial**

    - Reviewing compliance including reviewing invoices against backup documentation

    - Approving Projects and managing adherence to project documents

    - Evaluation and approval of New Services requests

    - Business development monitoring

    - Approve business proposals.

3.  **Approvals**

    - Ensuring compliance with approval requirements and facilitating approvals where necessary

    - Implementing processes to ensure approvals are obtained in a timely manner

4.  **Reporting and auditing**

    - Reviewing Company compliance with reporting requirements as set out in this Agreement including audit and benchmarking activities

5.  **Issue Management**

    - Approving rectification plans and reviewing compliance with those plans

**Confidential Treatment Requested**

LSI2-0429959

Execution Copy

- Identifying and raising issues of concern under this Agreement
- Managing Root Cause and Fault Analysis (see Exhibit B)
- Supervising performance credit regime
- Supervising disaster recovery
- Initiating the dispute resolution process

**Confidential Treatment Requested**                                    LSI2-0429960

Execution Copy

## Attachment B to Exhibit G
## Root Cause and Fault Analysis

1. This procedure describes how the Parties will address any problems and faults affecting Company's performance of the Services in the WM environment, including any failure by Company to provide the Services in conformance with applicable Service Levels ("Problems"). Company agrees to comply fully with this procedure and to deal with issues as they arise.

2. The key principle is that LSI must first work to fix the Problem and only conduct any root cause or fault analysis once the Problem is fixed. Company will utilize the "Management By Fact" process ("MBF") when identifying root causes and implementing countermeasures. With the MBF, the data is researched and analyzed, the performance deficiencies are identified, scoped out, compared to previous months and the Service Levels. After identifying the root causes, procedural changes are implemented centered on the identified countermeasures.

3. As soon as Company becomes aware of a Problem (either because the WM team notifies Company, or as a result of Company monitoring its environment), Company must take responsibility for diagnosing and rectifying the Problem by utilizing the MBF document or other Six Sigma tools.

4. Company will have fulfilled its responsibility to fix the Problem if:

    a. another organization (including possibly WM) that Company reasonably believes will be able to fix the Problem to Company's satisfaction has taken responsibility for the issue ('Third Party Fixer'); and

    b. the Third Party Fixer has undertaken to fix the Problem within a period of time that does not result in any additional material adverse effect on WM and to report regularly to Company on progress for fixing the Problem.

5. However, if at any stage it becomes apparent that the Third Party Fixer will not be able to fix the Problem as required under point 4, Company will again assume responsibility for fixing the Problem from the time at which that becomes apparent.

6. The DMT, with the RMT's supervision, will conduct a root cause analysis, utilizing the MBF document, and procedural changes will be implemented based upon the corresponding countermeasures.

7. If the root cause analysis does not result in a clear picture of the party responsible for the root cause(s), and more than one third-party supplier is involved, the suppliers must agree to first attempt to resolve the issue between them without WM's involvement. WM will not adjudicate between its suppliers in the case of a dispute.

8. If (and only if) the suppliers are not able to resolve the issue under paragraph 7, or if the only parties involved are one supplier and WM, the RMT will conduct fault analysis to determine to what extent each supplier to WM (and possibly WM itself) is or are contractually responsible for the root cause(s). If the parties involved in the root cause analysis or fault analysis do not agree on its outcome, WM's determination will be final.

Confidential Treatment Requested

LSI2-0429961

Execution Copy

9. If Company spends time working on the Problem but the root cause analysis (or fault analysis if conducted) shows that Company was not responsible for the Problem, then:

   a. Company can charge the party who was responsible for the Problem (to the extent of that party's responsibility determined by root cause or fault analysis);

   b. The rate at which Company can charge that party will be based on the skill level of the person or people who worked on the Problem and at the applicable rates for that skill level determined in accordance with this Agreement;

   c. Company will be excused from any resulting breach of Service Levels; and

   d. WM will reimburse Company's charges on behalf of the other party.

10. This same procedure will be contained in WM's agreements with its telecommunications supplier and any other supplier that will provide key services to WM that need to work seamlessly with Company's Services to WM ("Key Supplier"), so that Company can count on those suppliers also being bound to work on fixing Problems first and dealing with root cause and fault analysis later.

11. Company agrees that if any root cause or fault analysis results in Company being responsible for a Problem that another Key Supplier has worked on fixing, then to the extent of Company's responsibility for that Problem, it must pay that Key Supplier for work completing in fixing the Problem.

12. The DMT and /or RMT may look at steps that can be taken to minimize the likelihood of the Problem occurring again.

13. If root cause analysis determines that Company was responsible for the Problem, Company must take any reasonable steps determined during the root cause analysis or as a result of any subsequent recommendation by the DMT or RMT to prevent any recurrence of the Problem occurring again.

Confidential Treatment Requested

LSI2-0429962

Execution Copy

## Attachment C to Exhibit G
## Approvals Procedure

A.   If Company is required to obtain WM's approval in relation to any matter, it must comply with the following procedure:

   (1)   **Approving Officer** – If this Agreement or any Exhibit or Attachment to it (such as the procedures manual or scope of Services) specifies the WM person who is authorized to give the approval, Company must obtain that person's approval. In any other case, Company must obtain the consent of the, SVP, Loan Services Support. That person may delegate that approval right to other WM Management from time to time as deemed appropriate.

   (2)   **Escalation** - If Company has used reasonable efforts to seek WM's approval and the approving officer has not responded within the time specified in this Agreement (or, if no time is specified, a reasonable time given the nature and urgency of the matter that requires approval), Company must escalate the matter and seek approval from the SVP, Loan Services Support.

   (3)   **Action** - If, having escalated the matter for approval as required above, Company has not received a response from WM, Company must:

   •   make an assessment of whether acting as if the approval has been given or rejected would be in WM's better interest;

   •   take the action determined above to be in WM's better interest;

   •   use its commercially reasonable efforts to mitigate any loss to WM arising as a result of Company taking the action referred to above; and

   •   notify the WM Senior Vice President, immediately of the action taken.

   Provided Company complies with the procedure set out above, Company will not be liable to WM for any breach of any performance requirement or other breach of this Agreement caused solely by the fact that WM did not give the approval sought by Company.

**Confidential Treatment Requested**                                        LSI2-0429963

*Execution Copy*

## EXHIBIT H

## WM POLICIES AND PROCEDURES

This Exhibit H consists of the following two WM policies: Vendor Code of Conduct; and Working with WaMu, provided as separate documents and incorporated by this reference.

**Confidential Treatment Requested**

LSI2-0429964



First Amendment to Appraisal Outsourcing Services Agreement
between
WaMu
and
LSI Appraisal, LLC

This First Amendment (this "First Amendment") to the Appraisal Outsourcing Services Agreement is entered into by and between WaMu (as defined in the signature block below) and LSI Appraisal, LLC ("Company") effective as of June 29, 2007 (the "First Amendment Effective Date").

## BACKGROUND

A.     The Parties have entered into the Agreement having an effective date of October 16, 2006 (the "Agreement") pursuant to which Company performs certain services, for and on behalf of WaMu in connection with residential mortgage loans made by WaMu.

B.     The Parties now desire to amend the Agreement to provide for correcting the Initial Term.

Now, therefore, in consideration of the mutual promises and covenants contained in this Amendment, the Parties hereby agree to amend the Agreement as follows:

## TERMS AND CONDITIONS

1.     In Section 9.1, in the second line, change the word "first" to "second".

2.     All capitalized terms used in this First Amendment that are not defined herein shall have the meaning given to them in the Agreement. Except as expressly set forth above, all terms of the Agreement remain unmodified and in full force and effect. In the event of a conflict between the terms and conditions of the Agreement and this First Amendment, the terms and conditions of this First Amendment shall govern. The Agreement, as amended by this [First] Amendment, constitutes the complete and entire understanding of the Parties with respect to the subject matter hereof.

Each of the Parties has executed this First Amendment by its duly authorized representative.

**WaMu**
Washington Mutual Bank, a federal savings
association

By: _____
Name: _____
Title: _____

**Company**
LSI Appraisal, LLC

By: _____
Name: _____
Title: _____

Confidential Treatment Requested                                        LSI2-0406630

# EXHIBIT

# "B"

EXHIBIT B

Execution Copy

## PERFORMANCE GUARANTY AGREEMENT

THIS **PERFORMANCE GUARANTY AGREEMENT** is made and entered into as of the 16th day of October, 2006 ("Effective Date"), by and between **FIDELITY NATIONAL TAX SERVICE, INC.,** a California corporation ("Guarantor"), and **WASHINGTON MUTUAL BANK,** a federal savings association ("WM").

## W I T N E S S E T H:

**WHEREAS,** WM and LSI Appraisal, LLC ("LSI") are entering into that certain Appraisal Outsourcing Services Agreement of even date herewith (the "Agreement") for LSI to provide certain services to WM. The defined term "Agreement" shall include any amendments, modifications, change orders, statements of work, extensions of time, supplements, and exhibits (along with all documents of like type or effect and all documents referenced therein) to the Agreement;

**WHEREAS,** Guarantor is the corporate parent company of LSI;

**WHEREAS,** as a condition to the execution of the Agreement, WM has required that Guarantor execute this Performance Guaranty Agreement; and

**WHEREAS,** Guarantor is willing to guarantee to WM the performance of LSI to include all obligations and undertakings by LSI as the same may be amended from time to time under the Agreement.

**NOW, THEREFORE,** in consideration of the foregoing premises, the mutual covenants contained herein, and other good and valuable consideration, the receipt, adequacy, and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereby agree as follows:

1.      Guarantor hereby unconditionally and irrevocably guarantees to WM due performance of all obligations undertaken by LSI in connection with the Agreement, and all obligations undertaken by LSI in the Agreement are incorporated herein by reference, the same as if set forth herein in full.

2.      This Performance Guaranty Agreement shall continue in full force and effect until the Agreement has been fully performed and shall include all obligations under the Agreement.

3.      This Performance Guaranty Agreement shall be one of guaranty as well as one of performance.  WM shall be required to first pursue remedies against LSI before involving the benefits of this Performance Guaranty Agreement.

4.      This Performance Guaranty Agreement shall be a continuing guaranty and (whether or not Guarantor shall have notice or knowledge of any of the following, notice of such being hereby expressly waived) the liability and obligation of Guarantor hereunder shall be absolute and unconditional and shall remain in full force and effect

DOCSSEA/141347.3A

1

**Confidential Treatment Requested**

LSI2-0429889

without regard to, and shall not be released, discharged, diminished, limited, or in any way impaired by:

(a)     any amendment, modification, change order, extension of time, or supplement to the Agreement duly executed by LSI, unless LSI is no longer owned by Guarantor, or one of its affiliates, at the time of the amendment, modification, change order, extension of time, or supplement to the Agreement;

(b)     any exercise or nonexercise of any right, power, remedy, or privilege under or in respect of the Agreement or other contract documents or this Performance Guaranty Agreement or any other indulgences, forbearances, or extensions of time for performance or observance allowed to LSI except that, to the extent such is a defense for LSI, such shall also be a defense for Guarantor; or

(c)     any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation, or similar proceeding relating to LSI or its properties or creditors.

5.     This Performance Guaranty Agreement shall be binding upon Guarantor, its successors and assigns, and shall inure to the benefit of WM and its respective successors and assigns.  Guarantor may not assign its obligations under this Performance Guaranty Agreement, by operation of law or otherwise, without the advance written consent of WM.

6.     Notwithstanding anything contained herein to the contrary, the obligations of Guarantor hereunder shall not be construed to be broader than the obligations of LSI pursuant to the Agreement, and all defenses, excuses, and limitations, including, but not limited to, limitations of liability and damages, and other rights of LSI with respect to LSI's obligations available to LSI under the Agreement, shall also be available to the Guarantor, except for bankruptcy or insolvency of LSI.  All payments made by LSI to WM under the Agreement and by Guarantor under this Performance Guaranty Agreement shall be aggregated for purposes of liability limitations applicable to LSI under the Agreement.

7.     This writing is intended by the parties as the final, complete, and exclusive statement of the terms of this Performance Guaranty Agreement. No course of dealing between the parties, no usage of the trade, and no parol or extrinsic evidence of any nature shall be used or be relevant to supplement, explain, or modify any term used herein. If any provision of this Performance Guaranty Agreement to any extent be held invalid or unenforceable, then only such provision shall be deemed ineffective and the remainder of this Performance Guaranty Agreement shall not be affected.

8.     This Performance Guaranty Agreement may not be amended, changed, or discharged without the written approval, expressly referring to this Performance Guaranty Agreement, of both WM and Guarantor, and no such amendment, change, or discharge shall extend to, affect, or impair any right with respect to any liability or obligation that is not expressly dealt with therein. The terms and conditions of this

2

**Confidential Treatment Requested**

LSI2-0429890

Execution Copy

Performance Guaranty Agreement shall be effective only and automatically upon the Effective Date.

9.      This Performance Guaranty Agreement shall be construed and governed in accordance with the laws of the State of New York without reference to the conflicts of laws principles thereof.

10.      **GUARANTOR AND WM IRREVOCABLY WAIVE ALL RIGHT TO A TRIAL BY JURY IN ANY PROCEEDING HEREAFTER INSTITUTED BY OR AGAINST GUARANTOR OR WM IN RESPECT OF THIS PERFORMANCE GUARANTY AGREEMENT OR ARISING OUT THE LIABILITIES GUARANTIED BY THIS PERFORMANCE GUARANTY AGREEMENT.**

**IN WITNESS WHEREOF,** Guarantor and WM have caused this Performance Guaranty Agreement to be signed and delivered by their duly authorized officers, all as of the Effective Date.

**FIDELITY NATIONAL TAX SERVICE, INC.**

By: _____
Name: RON FRAZIER
Title: SVP

**WASHINGTON MUTUAL BANK**

By: _____
Name: _____
Title: _____

DOCSSEA/141347.3A                                                     3

**Confidential Treatment Requested**                                   LSI2-0429891

# EXHIBIT

# "C"

| ID NUMBER | ORIG LOAN AMT | LOSS AMOUNT | LOAN DATE | PROPERTY ADDRESS | CITY NAME | ST | Appraiser |
|---|---|---|---|---|---|---|---|
| 3062776079 | $2,475,000.00 | $542,957.48 | 7/11/2006 | 23768 DARKHORSE DR | AUBURN | CA | Martin B. Curie |
| 3061501908 | $685,000.00 | $406,417.11 | 7/31/2006 | 89 SHORELINE DR | RANCHO MIRAGE | CA | David Brinkman Bernard J Crawford |
| 3011093666 | $1,880,000.00 | $1,530,626.05 | 9/15/2006 | 1331 BRICKELL BAY DR | MIAMI | FL | Guillermo Pina |
| 651844201 | $420,000.00 | $412,665.68 | 9/15/2006 | 6741 E MOCKINGBIRD LN | PARADISE VALLEY | AZ | Nathan D Bennett |
| 3010595886 | $1,680,000.00 | $524,791.56 | 9/18/2006 | 1190 TERRACE CT | GLENCOE | IL | Alan E Gross |
| 3010372292 | $2,940,000.00 | $1,133,186.96 | 9/21/2006 | 845 UNITED NATIONS PLAZA | NEW YORK | NY | Robert Fuller |
| 688161181 | $496,800.00 | $497,403.53 | 9/26/2006 | 11239 SKYVIEW LN | RANCHO CUCAMONGA | CA | John Bocock |
| 3010613390 | $2,000,000.00/ $125,000.00 | $1,203,669.72 | 9/27/2006 | 471 BAYSHORE DR | NOKOMIS | FL | Thomas D. Mullins Naji Hakim |
| 729550525 | $596,000.00/ $149,000.00 | $267,795.12 | 9/27/2006 | 444 ARLINGTON HEIGHTS RD | ARLINGTON HEIGHTS | IL | Vlad Shneyderman |
| 752132597 | $470,503.00 | $468,848.94 | 9/29/2006 | 5724 TAMPA AVE | TARZANA | CA | Christopher C. Sotere |
| 3011107855 | $1,425,000.00 | $617,342.75 | 9/29/2006 | 312 BONAIR WAY | LA JOLLA | CA | Judy E. Vieira-Rea |
| 713046027 | $750,000.00 | $744,603.86 | 10/10/2006 | 61 SUMMER HOUSE | IRVINE | CA | John French |
| 3011331521 | $1,500,000.00 | $545,256.44 | 10/18/2006 | 4601 CIRCLE LAKE TRAIL | FARIBAULT | MN | Gerald M Otre |
| 670638303 | $725,000.00 | $725,000.00 | 10/20/2006 | 4221 CHABOYA HILLS CT | San Jose | CA | Jack A. LaVerde |
| 3011682857 | $2,020,000.00 | $841,860.40 | 10/23/2006 | 5831 MARINER ST | TAMPA | FL | Colleen E Millett |
| 3011612219 | $1,312,500.00 | $550,749.76 | 10/26/2006 | 17874 LAKE AZURE WAY | BOCA RATON | FL | George A.Sanchez St. |
| 3010971046 | $2,360,000.00 | $1,014,467.69 | 10/27/2006 | 14895 MAIN ST | EAST MARION | NY | Sumit Raipal |
| 3011873928 | $1,464,500.00 | $883,914.73 | 10/31/2006 | 10140E SCENIC HWY 30A | SANTA ROSA BEACH | FL | Marcia Croom Robert |
| 3011615345 | $1,150,000.00 | $537,245.63 | 11/1/2006 | 12830 TRAVILAH RD | POTOMAC | MD | Kuldeep S Gill |
| 728950783 | $700,000.00 | $688,212.57 | 11/2/2006 | 808 BRICKELL KEY DR APT 304 | MIAMI | FL | Anthony Chang |
| 729677948 | $960,000.00/ $240,000.00 | $223,651.19 | 11/3/2006 | 2651 REDLANDS DR | COSTA MESA | CA | Edward Ptacek Elspeth Eisele |
| 3011789256 | $1,440,000.00 | $592,766.78 | 11/6/2006 | 1824 CLEVELAND RD | MIAMI BEACH | FL | Gonzalo G. Ruiz Suyin Deacastro |
| 3011682626 | $1,680,000.00/ $207,900.00 | $682,996.39 | 11/6/2006 | 6044 KINGSMILL TERRACE | DUBLIN | CA | Robert Mitchell |
| 3011792755 | $997,500.00/ $186,250.00 | $470,343.08 | 11/7/2006 | 3467 COLLONADE DR | WELLINGTON | FL | Guillermo Pina |
| 729684191 | $1,024,000.00 | $318,875.87 | 11/8/2006 | 6891 SUNSET DR | SOUTH MIAMI | FL | Diego R. Lopez |
| 3011731167 | $1,520,000.00 | $803,045.35 | 11/8/2006 | 7820 HAWTHORNE AVE | MIAMI BEACH | FL | Gonzalo G. Ruiz |
| 3011244815 | $1,650,000.00 | $1,050,776.95 | 11/8/2006 | 1200 MASANABO LN | FORT MYERS | FL | Michael A. Long |
| 3011460783 | $645,000.00 | $239,278.59 | 11/13/2006 | 4912 99TH ST | CORONA | NY | Margaret Young |
| 3011101577 | $2,080,000.00 | $902,926.66 | 11/13/2006 | 6948 WOODROW WILSON DR | LOS ANGELES | CA | Sean R. Copeland |
| 742675309 | $490,000.00 | $474,767.03 | 11/17/2006 | 515 ACACIA AVE | CORONA DEL MAR | CA | Paul H. Ghaffari |
| 3011356544 | $920,000.00 | $584,903.75 | 11/20/2006 | 9427 HIGHLAND CT | DAVISON | MI | David B. Juhl |
| 3010952749 | $1,722,500.00 | $587,007.69 | 11/20/2006 | 25 FOUR COLUMNS DR | MARLBORO | NJ | Barry McBriar |

Exhibit C

| Account | Street Address | Date | Amount A | Amount B | City | State | Name |
|---|---|---|---|---|---|---|---|
| 3011875584 | 796 REEF RD | 11/22/2006 | $2,853,725.43 | $3,750,000.00 | VERO BEACH | FL | Michael Bottalico |
| 3012208991 | 74 BLACK ROCK TURNPIKE | 11/27/2006 | $746,329.49 | $1,575,000.00 | REDDING | CT | Ronald McInerney Jr |
| 664255122 | 14 LANDMARK DR | 11/28/2006 | $486,255.40 | $365,000.00 | BRIDGEWATER | CT | Arthur Parrish |
| 743050692 | 11435 NW 18TH CT | 11/28/2006 | $478,242.08 | $500,000.00 | PLANTATION | FL | M. Scott Dooley |
| 3012254185 | 1331 BRICKELL BAY DR | 11/29/2006 | $1,112,856.94 | $2,512,500.00 | MIAMI | FL | Bryan Regueira |
| 3011878711 | 213 WATER WAY | 11/29/2006 | $1,150,945.26 | $2,640,000.00 | MIAMI BEACH | FL | Johnathan M Tejada |
| 736654443 | 1489 SAN PASQUAL | 11/30/2006 | $2,353,960.64 | $3,000,000.00 | PASADENA | CA | Shawn Rose |
| 703639138 | 335 S VAN NESS AVE | 12/7/2006 | $497,608.15 | $497,000.00 | LOS ANGELES | CA | Paul Roy |
| 735504219 | 41 STOWE | 12/8/2006 | $432,171.51 | $250,000.00 | IRVINE | CA | Deena Clem |
| 691478010 | 901 PALACIO DE AVILA | 12/8/2006 | $716,710.49 | $720,000.00 | TAMPA | FL | Karen Jay |
| 3011730607 | 2579 BRIDLE PATH DR | 12/12/2006 | $696,663.05 | $1,980,000.00 | GILROY | CA | Merdad Sanjideh Kian Sanjideh |
| 3011394370 | 9212 NIGHTINGALE DR | 12/13/2006 | $1,750,468.51 | $4,000,000.00 | LOS ANGELES | CA | Ed Schaar Jr. |
| 3010805435 | 12540 LONGACRE AVE | 12/15/2006 | $470,726.32 | $1,519,823.00 | LOS ANGELES | CA | Frederick Rohde Michael Paleno |
| 736500232 | 4063 W 7TH ST | 12/19/2006 | $493,798.51 | $500,000.00 | LOS ANGELES | CA | William Ippoliti |
| 3011889965 | 1155 BRICKELL BAY DR 1211 | 12/28/2006 | $332,375.67 | $747,000.00 | MIAMI | FL | Carlos A. Perez |
| 3012275008 | 835 MURRAY DR | 1/4/2007 | $405,608.77 | $1,000,000.00 | EL CAJON | CA | Alberto Gonzalez |
| 3011333823 | 840 CHESTNUT ST | 1/8/2007 | $640,763.56 | $1,350,000.00 | HINSDALE | IL | Hasan Elmaz |
| 3013145390 | 1955 WESTLAKE CT | 1/8/2007 | $590,690.06 | $1,750,000.00 | BLOOMFIELD HILLS | MI | Walter W Williams |
| 708287552 | 167 N POINSETTIA PL | 1/12/2007 | $491,063.70 | $500,000.00 | LOS ANGELES | CA | Steve M Madrid |
| 737163717 | 1126 GOLDENROD AVE | 1/17/2007 | $757,318.67 | $750,000.00 | CORONA DEL MAR | CA | Rebecca Stubblefield |
| 3013172436 | 12341 BAYPOINT TERRACE | 1/22/2007 | $1,110,957.55 | $3,750,000.00 | BRADENTON | FL | Lydia J Luna |
| 3012662189 | 1111 N VENETIAN DR | 1/23/2007 | $1,359,833.73 | $4,012,500.00 | MIAMI BEACH | FL | Magda Michelle Hernandez |
| 667463120 | 509 VAN BEUREN RD | 1/25/2007 | $726,087.16 | $750,000.00 | MORRISTOWN | NJ | Roy Williams |
| 738015338 | 3201 MOUNTAIN VIEW AVE | 1/29/2007 | $490,798.60 | $499,500.00 | SACRAMENTO | CA | D. Michael Riffle |
| 3013234574 | 500 VOLTZ RD | 1/31/2007 | $1,038,779.57 | $3,825,000.00 | NORTHBROOK | IL | Steve Novakovsky |
| 3013091065 | 5196 ISLEWORTH COUNTRY CL | 2/8/2007 | $1,022,930.97 | $4,380,000.00 | WINDERMERE | FL | Vaughn Fakess |
| 762013456 | 6980 NW 66TH ST | 2/9/2007 | $468,855.76 | $465,000.00 | PARKLAND | FL | Joe Maimone |
| 709269286 | 3720 S OCEAN BLVD APT 1606 | 2/14/2007 | $736,707.75 | $750,000.00 | HIGHLAND BEACH | FL | David Aucamp |
| 764627212 | 24 GREGOIRE NECK ROAD | 2/16/2007 | $437,501.84 | $417,000.00 | OKATIE | SC | Billy E. Dilsaver |
| 763353750 | 1801 RED HAWK LN | 2/23/2007 | $694,134.00 | $700,000.00 | PARK CITY | UT | Ashley Huntington |
| 751770918 | 119 N MERIDITH AVE | 3/5/2007 | $408,751.52 | $400,000.00 | PASADENA | CA | Mark Morton |
| 3012746578 | 875 SUNSET RIDGE PL | 3/5/2007 | $448,408.27 | $928,000.00/ $114,840.00 | CHULA VISTA | CA | DeAnna Rahena |
| 3013350149 | 3311 YUPON ST UNIT | 3/12/2007 | $404,687.47 | $467,200.00 | HOUSTON | TX | Lyle D. Street |
| 747133726 | 484 S GOODMAN RD | 3/13/2007 | $499,122.84 | $350,000.00 | KISSIMMEE | FL | John Tucci |
| 737316679 | 1086 TILLER DRIVE | 3/15/2007 | $575,731.68 | $569,500.00 | INCLINE VILLAGE | NV | William J Schilling |
| 737308007 | 681 MAJESTIC RIDGE CT | 3/19/2007 | $488,077.64 | $484,500.00 | HENDERSON | NV | Don Nowak |
| 762247054 | 1244 SANDY LN | 3/20/2007 | $446,604.07 | $455,118.00 | ST. GEORGE ISLAND | FL | Craig A Robertson |
| 3013495100 | 7744 TILLINGHAST DR | 3/28/2007 | $656,161.52 | $1,120,000.00 | DUBLIN | OH | Ralph Aygabright |
| 3017418330 | 5146 KUKUNA RD | 4/2/2007 | $3,022,733.09 | $4,600,000.00 | ANAHOLA | HI | Tom Hegarty |

Exhibit C

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 3017378765 | $4,280,000.00 | $2,429,697.55 | 1590 VILLA RICA DR | 4/2/2007 | HENDERSON | NV | Carole D. Holden / Sheri N. Flanaburg |
| 768176414 | $590,000.00 | $505,575.59 | 5724 BRANFORD DR | 4/10/2007 | WEST BLOOMFIELD | MI | Timothy McClatchey |
| 769046111 | $450,000.00 | $450,090.11 | 42109 LUPIN WAY | 4/12/2007 | LANCASTER | CA | Thomas L Holland |
| 747439974 | $750,000.00 | $750,914.47 | 10 CRYSTAL SPRINGS TER | 4/13/2007 | HILLSBOROUGH | CA | John G. Barnes |
| 3017070529 | $1,100,000.00/ $137,362.00 | $417,378.63 | 1328 SOUZA DR | 4/18/2007 | EL DORADO HILLS | CA | James R. Fugate |
| 744723651 | $750,000.00 | $737,234.13 | 30854 LOLITA RD | 4/19/2007 | TEMECULA | CA | Matthew Roderigues |
| 756692372 | $242,700.00 | $482,690.00 | 315 S HARVARD BLVD APT 205 | 4/23/2007 | LOS ANGELES | CA | Robert Carpenter |
| 768737942 | $460,000.00 | $455,947.52 | 755 123RD AVE | 4/27/2007 | TREASURE ISLAND | FL | Michael Douberley |
| 716203088 | $500,000.00 | $489,940.94 | 43902 APPALOOSA DR | 4/30/2007 | LANCASTER | CA | Karin B. Wells |
| 3013576297 | $3,597,000.00 | $710,381.52 | 5177 ISLEWORTH COUNTRY | 5/1/2007 | WINDERMERE | FL | Douglas Alan Burton |
| 767394646 | $479,760.00 | $488,055.74 | 1747 ENSLEY AVE | 5/7/2007 | LOS ANGELES | CA | Nacer Naciri |
| 691389050 | $1,000,000.00 | $662,674.88 | 34 LISMORE RD | 5/7/2007 | LAWRENCE | NY | Domenico Antonelli |
| 770395788 | $480,000.00 | $471,375.84 | 2725 VISTA DEL PIEDRA | 5/8/2007 | JAMUL | CA | Roger H. Wynott |
| 3017271011 | $1,425,000.00 | $875,354.12 | 1331 BRICKELL BAY DR | 5/8/2007 | MIAMI | FL | Bryan Regueira / Abiel Ballesteros |
| 736686445 | $500,000.00 | $500,629.49 | 9309 NW FINZER CT | 5/9/2007 | PORTLAND | OR | Amber Frock |
| 750110660 | $750,000.00 | $750,900.91 | 15 CRYSTAL SPRINGS TER | 5/14/2007 | HILLSBOROUGH | CA | Peter K. Ngua / John G. Barnes |
| 766847685 | $434,000.00 | $434,489.73 | 1386 CASA VALLECITA | 5/15/2007 | ALAMO | CA | Richard Duong |
| 3017474630 | $3,000,000.00 | $1,699,634.92 | 2641 HEIGHTS VIEW CT | 5/15/2007 | ROCHESTER | MI | Ronald Keller |
| 737310854 | $500,000.00 | $491,073.06 | 700 ELDER CIR | 5/15/2007 | AUSTIN | TX | Diana Bratton |
| 752230763 | $491,000.00 | $491,780.27 | 24 SHADY LN | 5/16/2007 | IRVINE | CA | Donald J. Mosich |
| 730194222 | $748,000.00 | $419,126.03 | 3307 SW 26TH AVE | 5/17/2007 | CAPE CORAL | FL | Alyson Washington / Travis Hard |
| 730187036 | $630,000.00 | $239,920.32 | 5278    SW 183RD AVE | 5/17/2007 | MIRAMAR | FL | Mark Adler |
| 3017685607 | $1,280,000.00 | $403,542.53 | 4030 FLOWERWOOD LN | 5/21/2007 | FALLBROOK | CA | Matt McIntyre |
| 3017633313 | $944,000.00 | $410,378.61 | 10975 SW 36 ST | 5/21/2007 | MIAMI | FL | Magda Michelle Hernandez |
| 764905972 | $425,000.00 | $429,533.35 | 14308 NW DUNBAR LN | 5/21/2007 | PORTLAND | OR | Traynor Daline |
| 3017621024 | $999,900.00 | $356,597.99 | 9046 RED TULIP COVE | 5/21/2007 | CORDOVA | TN | Duane Ross |
| 3017828942 | $1,830,784.00 | $584,841.72 | 123 EL LEVANTE | 5/23/2007 | SAN CLEMENTE | CA | Jeffrey S Stutz |
| 3017726229 | $960,000.00 | $303,194.61 | 10225 SW 130 LN | 5/23/2007 | MIAMI | FL | Ariel Blanco |
| 769784778 | $500,000.00 | $500,804.54 | 5053 WEBBER COURT | 5/24/2007 | ANTIOCH | CA | Claudia R. Crow |
| 730219896 | $636,500.00 | $349,288.86 | 6347 NEWHAVEN LN | 5/25/2007 | VALLEJO | CA | Abdul Lecky |
| 3013809722 | $1,192,500.00/ $238,341.00 | $538,503.58 | 5046 MCCLURE LN | 5/29/2007 | CASTLE ROCK | CO | Mark K. Young |
| 3017740832 | $1,424,000.00 | $950,617.43 | 43 FIELDSTONE RUN | 5/29/2007 | FARMINGTON | CT | Sharon L. Deming |
| 3013820060 | $880,000.00 | $435,797.36 | 4011 BRADDOCK AVE N | 5/30/2007 | BUFFALO | MN | Kent Lageson |
| 744677451 | $1,960,000.00 | $694,401.22 | 895   CARMONA CT | 5/30/2007 | CHULA VISTA | CA | Gregory Shobe |
| 3017808365 | $1,832,000.00/ $226,710.00 | $873,114.64 | 3925   BLUE CANYON DR | 5/31/2007 | STUDIO CITY | CA | Richard A Royce |

Exhibit C

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 3011904897 | $1,990,000.00 | $942,579.06 | 6/4/2007 | 511 BALLANTYNE RD | GROSSE POINTE SHORES | MI | James William Cuneo |
| 763232394 | $1,560,000.00/ $599,760.00 | $600,657.17 | 6/5/2007 | 2302 N CAMINO CASCABEL | TUCSON | AZ | Ronald A. Keeler |
| 3013857242 | $1,119,200.00 | $421,588.02 | 6/5/2007 | 222 1/2 30TH STREET | NEWPORT BEACH | CA | Brenda S. Tucker |
| 3013817592 | $1,440,000.00 | $903,784.84 | 6/7/2007 | 125 W GLACIER LILLY DR | ALPINE | UT | Golden J Meier |
| 3013847664 | $1,360,000.00 | $495,934.43 | 6/12/2007 | 11539 WILLOW SPRINGS DR | ZIONSVILLE | IN | Brian E. Woodall |
| 747106383 | $1,999,999.00/ $563,201.00 | $430,704.45 | 6/12/2007 | 1877 VIA DI SALERNO | PLEASANTON | CA | Neil Smith |
| 5304422230 | $770,000.00 | $545,765.58 | 6/12/2007 | 115 MIRROR CT | PATTERSON | CA | Robert A. Smolke |
| 3013912781 | $816,000.00 | $580,531.07 | 6/14/2007 | 4184 STRATHDALE LN | WEST BLOOMFIELD | MI | Sloan M Hoagan |
| 3017678020 | $2,560,000.00 | $1,687,498.08 | 6/14/2007 | 759 LAKE SHORE RD | GROSSE POINTE SHORES | MI | Carl G. Williams |
| 3013877261 | $1,000,000.00 | $389,176.57 | 6/15/2007 | 26500 ARBOR CREEK LN | SHOREWOOD | MN | Mary J. Hila |
| 3013885664 | $1,890,000.00 | $583,356.67 | 6/18/2007 | 35 FORT ROYAL ISLE | FORT LAUDERDALE | FL | Iris Cherry Kenneth Swenson |
| 3013920545 | $756,000.00 | $494,494.93 | 6/18/2007 | 500 SOUTHFIELD RD | BIRMINGHAM | MI | James B. Wolter |
| 3011763988 | $708,000.00 | $400,258.33 | 6/19/2007 | 2021 SUPERIOR CT | TRACY | CA | Vicki Amerson |
| 3017869243 | $1,760,000.00 | $1,323,475.15 | 6/19/2007 | 76 BASS AVE | KEY LARGO | FL | David Ruz |
| 770390755 | $375,000.00 | $679,288.95 | 6/19/2007 | 3016 HENDERSON MILL RD | ATLANTA | GA | Daryl Syphoe |
| 3013878933 | $1,350,000.00/ $267,994.21 | $631,802.40 | 6/20/2007 | 4335 SW 60 PL | MIAMI | FL | Miguel A. Febles |
| 3017931100 | $496,000.00/ $61,380.00 | $263,294.47 | 6/20/2007 | 323 E CHESTNUT AVE | SANTA ANA | CA | Jean Hsiuhui Su |
| 3013868405 | $1,585,000.00/ $349,785.00 | $861,744.31 | 6/21/2007 | 2233 KEYSTONE BLVD | NORTH MIAMI | FL | Carlos Garcia Victor Gracia |
| 3013740505 | $1,000,000.00/ $240,000.00 | $446,189.35 | 6/22/2007 | 44950 NW ELK MOUNTAIN RD | BANKS | OR | Don Leader |
| 3013883974 | $1,380,000.00/ $275,875.00 | $662,479.12 | 6/22/2007 | 4459 SHERIDAN AVE | MIAMI BEACH | FL | Victor Garcia Carlos Gracia |
| 3014020980 | $2,368,000.00 | $1,107,564.81 | 6/22/2007 | 252 OTIS RD | BARRINGTON | IL | Brian Benson |
| 3014028553 | $1,360,000.00 | $946,455.05 | 6/25/2007 | 74 A ST | PANAMA CITY BEACH | FL | Carvel Good John Ridley |
| 3014029783 | $1,080,000.00 | $796,515.69 | 6/27/2007 | 1954 BISSELL ST | CHICAGO | IL | Robert Fabis |
| 3017856717 | $2,925,000.00 | $404,830.60 | 6/27/2007 | 3718 HAYVENHURST | LOS ANGELES | CA | Lance Thomas |
| 3017902135 | $4,155,000.00 | $1,391,500.15 | 6/29/2007 | 29416 MALIBU VIEW CT | AGOURA | CA | John Henke |
| 775539729 | $750,000.00 | $759,006.98 | 7/3/2007 | 8 RUE GRIMALDI WAY | HENDERSON | NV | Marvin L Cole |
| 3018002539 | $1,425,000.00/ $284,810.00 | $578,760.13 | 7/6/2007 | 4 SOL BRAE WAY | ORINDA | CA | Rod Hammersley |
| 773367172 | $500,000.00 | $502,224.53 | 7/9/2007 | 245 46th Ave | St Pete Beach | FL | Michael Douberley |
| 3017972401 | $2,197,000.00/ $500,000.00 | $1,187,887.00 | 7/10/2007 | 301 SERENITY WAY | WATSONVILLE | CA | Keith J. Balch |
| 772409355 | $1,250,000.00 | $521,160.00 | 7/12/2007 | 1514 EUSTON DR | REUNION | FL | Stephanie A. Bauer |
| 3014021723 | $3,356,000.00 | $1,566,766.12 | 7/13/2007 | 5141 GULF DR | PANAMA CITY | FL | Michael A Gunn |

Exhibit C

| Account | Amount | Refund | Date | Street | City | State | Name |
|---|---|---|---|---|---|---|---|
| 3013904275 | $2,180,000.00/ $250,000.00 | $975,153.59 | 7/16/2007 | 78 BARKERS POINT RD | PORT WASHINGTON | NY | Joan Rutherford |
| 3014057230 | $1,875,000.00 | $564,940.46 | 7/16/2007 | 10  VINTAGE RIDGE DR | LAS VEGAS | NV | Thomas Mirkovich |
| 3014068674 | $1,345,000.00 | $536,482.55 | 7/17/2007 | 11375 DONA LISA DR | LOS ANGELES | CA | Robert Rodriguez |
| 3017989991 | $1,040,000.00/ $129,900.00 | $618,554.77 | 7/18/2007 | 140 SPANISH MARSH DR | ST AUGUSTINE | FL | Jama Lichtenwalter |
| 3014098135 | $1,400,000.00 | $921,594.54 | 7/18/2007 | 6257  BRANFORD DR | WEST BLOOMFIELD | MI | James L. Valiquett |
| 3014116671 | $2,400,000.00 | $989,105.13 | 7/24/2007 | 576 NEAPOLITAN LN | NAPLES | FL | Kathleen Coar |
| 3014203073 | $1,500,000.00/ $299,900.00 | $873,625.58 | 7/25/2007 | 36011  CALLE DE LOBO | MURRIETA | CA | Kimberly J. Mendell |
| 775719784 | $2,400,000.00/ $479,680.00 | $479,680.00 | 7/27/2007 | 768 TOZZETTI LANE | HENDERSON | NV | Eugenia Mueller |
| 3014149425 | $2,850,000.00 | $1,029,552.31 | 7/27/2007 | 24059  N 113TH WAY | SCOTTSDALE | AZ | Rodney R Smith |
| 3018027676 | $452,000.00/ $56,400.00 | $271,422.17 | 7/27/2007 | 26885 WINTER PARK PL | MORENO VALLEY | CA | Joseph Wong |
| 3018119762 | $479,000.00 | $819,209.33 | 7/27/2007 | 1062  LOWRY RANCH | CORONA | CA | Jason D. Stout |
| 3018161913 | $1,040,000.00 | $435,286.50 | 7/27/2007 | 144 SPANISH MARSH DR | SAINT AUGUSTINE | FL | Jama Lichtenwalter |
| 3018818566 | $1,200,000.00 | $414,374.04 | 7/27/2007 | 101  KING SAGO CT | PONTE VEDRA BEACH | FL | Jama Lichtenwalter |
| 3018142426 | $6,750,000.00 | $898,738.99 | 7/27/2007 | 5800  HARDSCRABBLE CIRCLE | MINNETRISTA | MN | John Bader |
| 3017949763 | $1,715,000.00 | $905,183.04 | 7/27/2007 | 183 OCEAN VIEW DR | KEY LARGO | FL | Mark J. MacLaughlin |
| 689457059 | $500,000.00 | $500,980.48 | 7/27/2007 | 10 HIDDEN PASS | NEWPORT COAST | CA | Sara Martin / Judith Hunter |
| 3014274884 | $2,720,000.00 | $1,948,111.06 | 7/30/2007 | 12040  LANDOVER LN | FISHERS | IN | Jeffrey L. DeBruler |
| 3017437710 | $900,000.00 | $461,536.20 | 7/30/2007 | 1057 and 1059 E Main St | SIMI VALLEY | CA | Sherry Carlson / Steven T. Cody |
| 3014076260 | $1,436,850.00/ $255,000.00 | $438,640.29 | 7/30/2007 | 511 WINDWARD PASSAGE | CLEARWATER BEACH | FL | A.A. Little |
| 3013989003 | $1,190,000.00/ $255,000.00 | $627,724.91 | 7/31/2007 | 2582  S SYCAMORE VILLAGE | APACHE JUNCTION | AZ | Tommy Trout |
| 3013849918 | $2,625,000.00 | $911,067.70 | 7/31/2007 | 211 ARI WAY | MIAMI BEACH | FL | Rolando Lazaro Rodriguez / Nelson A. Ruiz |
| 3018113559 | $2,992,265.00 | $436,503.26 | 7/31/2007 | 14390  DOUGLASS LN | SARATOGA | CA | William E Reese |
| 730250016 | $535,500.00 | $354,492.55 | 8/3/2007 | 1010 - 1010 1/2 S WASHBURN | CORONA | CA | Craig M. Bellinger |
| 3014148559 | $1,350,000.00 | $542,809.45 | 8/3/2007 | 4444  ALTON RD | MIAMI BEACH | FL | Francisco Ares |
| 767809836 | $500,000.00 | $503,416.60 | 8/8/2007 | 895 BAJA STREET | Laguna Beach | CA | Michael H. Nguyen |
| 3014260164 | $2,025,000.00 | $562,748.16 | 8/10/2007 | 1723  CASTELLANA RD | LA JOLLA | CA | Cliff Bourland |
| 3018282784 | $2,480,000.00 | $452,319.85 | 8/10/2007 | 19201  BRIARFIELD WAY | TARZANA | CA | Armen Khrlobyan |
| 3018153332 | $880,000.00/ $107,900.00 | $280,430.16 | 8/13/2007 | 10601 VIA MILANO DR | FORT MYERS | FL | Ashley Law McCann / John McCann |
| 3014016434 | $1,347,500.00 | $496,044.99 | 8/13/2007 | 1738 HERON RIDGE DR | BLOOMFIELD HILLS | MI | Stephanie M Schulez |
| 3018248934 | $960,000.00 | $448,917.95 | 8/13/2007 | 2969 VALLEY ST | CARLSBAD | CA | Jan M Brownell |
| 3014227940 | $1,430,000.00 | $978,680.54 | 8/14/2007 | 5683  BRANFORD DR | WEST BLOOMFIELD | MI | Kathleen A. Alan |
| 3011838509 | $3,700,000.00 | $1,564,353.28 | 8/15/2007 | 4720 RIVERVIEW BLVD | BRADENTON | FL | Jay A Whitham |

Exhibit C

| ID | Amount 1 | Amount 2 | Date | Address | City | State | Name |
|---|---|---|---|---|---|---|---|
| 3014201879 | $992,250.00 | $617,613.40 | 8/15/2007 | 6486 WYNDHAM DR | WEST BLOOMFIELD | MI | Edward E. Bowen II |
| 3014340628 | $5780,000.00 | $243,124.71 | 8/16/2007 | 8631 GULLANE CT | WEST PALM BEACH | FL | Perry B. Orbino |
| 3014333396 | $1,137,500.00 | $407,882.72 | 8/16/2007 | 808 E CORRIE DR | ST GEORGE ISLAND | FL | John Schrader |
| 3014250868 | est.$496,000.00/ $124,000.00 | $241,830.58 | 8/20/2007 | 28906 W VISTA GRANDE DR | SANTA NELLA | CA | Daniel Burtea |
| 3011838277 | $1,298,397.00 | $456,280.21 | 8/21/2007 | 8282 EMERALD AVE | PARKLAND | FL | Dominick Ali |
| 3018260236 | $2,400,000.00 | $660,918.49 | 8/24/2007 | 142 OASIS LN | MOORESVILLE | NC | Barry Hilton |
| 747650463 | $496,000.00 | $496,673.90 | 8/27/2007 | 897 ADAMSGROVE AVE | WALNUT | CA | Nancy Gregory |
| 3018214159 | $1,920,000.00 | $1,262,338.20 | 8/31/2007 | 2176 CAIRO HOLLOW RD | ATHENS | AL | Teddy R. Mullins |
| 3014373561 | $1,087,500.00/ $217,490.00 | $419,697.27 | 8/31/2007 | 22881 NOLA CT | AUBURN | CA | Edward F Burke |
| 756044036 | $500,000.00 | $448,110.65 | 8/31/2007 | 4220 W JACARANDA AVE | BURBANK | CA | Arnold Placencio |
| 748987948 | $480,000.00 | $481,004.90 | 9/7/2007 | 4830 ANGELES VISTA BLVD | LOS ANGELES | CA | Michael A. Rizzotti |
| 3014472504 | $990,000.00 | $341,494.01 | 9/10/2007 | 8267 E DIXIE HWY | MIAMI | FL | Frank Figarola / Andre Lageyre |
| 3014479731 | $1,820,000.00 | $1,056,579.37 | 9/10/2007 | 3370 HIDDEN BAY DR | AVENTURA | FL | Michael Bermudez |
| 3018285506 | $472,000.00/ $57,000.00 | $264,012.53 | 9/12/2007 | 364 RAINIER DR | SALINAS | CA | Eugene F. Ulrich. |
| 3014409571 | $1,610,000.00 | $1,233,159.10 | 9/13/2007 | 5535 HAMPSHIRE DR | WEST BLOOMFIELD | MI | James L. Valquett |
| 3018303291 | est.$1,056,000.00/ $131,000.00 | $418,590.81 | 9/13/2007 | 12643 COLLINS ST | LOS ANGELES | CA | Mark St George |
| 768925877 | $500,000.00 | $498,350.71 | 9/14/2007 | 1616 RIO FLORIDA DR | WHITTIER | CA | Nancy Gregory |
| 3011837774 | $708,000.00 | $1,386,553.02 | 9/18/2007 | 203 18TH ST NW | BRADENTON | FL | Diana Pearl |
| 3018487409 | $852,000.00/ $105,000.00 | $316,339.26 | 9/20/2007 | 1800 S OCEAN DR | HALLANDALE BEACH | FL | Val Tyshevich |
| 781396585 | $400,000.00 | $401,364.23 | 9/20/2007 | 11833 DAVID LN | SUN VALLEY | CA | Howard Hack |
| 3018491617 | $1,840,000.00/ $227,700.00 | $1,033,020.16 | 9/21/2007 | 19448 LASSEN ST | LOS ANGELES | CA | Norman H Bragar |
| 3014557890 | $1,600,000.00 | $1,066,860.70 | 9/26/2007 | 2105 BIG HORN DR | AUSTIN | TX | John Deeocco |
| 3018178057 | $880,000.00/ $220,000.00 | $261,805.36 | 9/26/2007 | 11633 SPY GLASS DR | NORTHRIDGE | CA | Rodney Gresko |
| 3018429955 | $1,590,000.00 | $472,345.83 | 9/27/2007 | 820 SHILOH OAKS | SANTA ROSA | CA | Christian M. Dunn |
| 3018328900 | $2,880,000.00 | $2,483,947.87 | 9/27/2007 | 1475 N BUNDY DR | LOS ANGELES | CA | Harold Paul Vaughan |
| 3018235790 | $970,000.00 | $499,171.12 | 9/28/2007 | 7915 SW 131 ST | MIAMI | FL | Miguel A Febles |
| 3014682920 | $3,150,000.00 | $1,281,836.58 | 10/4/2007 | 9106 LEESBURG PIKE | VIENNA | VA | Sampson Winfield |
| 3014178499 | $2,250,000.00 | $479,741.29 | 10/5/2007 | 6107 LAGUNA DR W | MIAMI BEACH | FL | Giles Hofacer |
| 3014591808 | $2,680,000.00 | $852,030.78 | 10/5/2007 | 87 FOREST AVE | NEWTON | MA | Sis Oliver |
| 3018484778 | $996,000.00 | $415,034.66 | 10/10/2007 | 1253 W LEXINGTON ST | WASHINGTON | UT | David J. Messer |
| 3014797637 | $3,000,000.00 | $2,322,091.65 | 10/18/2007 | 2105 WOODSTOCK RD | GATES MILLS | OH | William Werner |
| 3018465132 | $2,450,000.00 | $1,721,582.20 | 10/26/2007 | 5345 WINLANE DR | BLOOMFIELD HILLS | MI | Terry W. Hanning |
| 3018552475 | $560,000.00 | $349,636.42 | 10/29/2007 | 19661 MARINO LAKE CIRCLE | FORT MYERS | FL | Dan Mahoney |
| 3011837766 | $2,250,000.00 | $818,309.24 | 10/29/2007 | 418 ANCHORAGE DR | NOKOMIS | FL | Randall R. Fairchild |
| 3014764280 | $1,000,000.00 | $481,684.16 | 10/29/2007 | 26010 KAYWOOD DR | ESCONDIDO | CA | Gregory Shobe |
| 3014762375 | $1,480,000.00 | $543,996.18 | 10/30/2007 | 3320 NE 37 ST | FORT LAUDERDALE | FL | Samuel Dominguez |

Exhibit C

| | | | | | | |
|---|---|---|---|---|---|---|
| 3018806806 | $2,450,000.00 | $598,975.11 | 11/13/2007 | 7841 W 81ST ST | PLAYA DEL REY | CA | Terry J Toman |
| 3014884690 | $2,030,000.00 | $715,660.53 | 11/14/2007 | 5409 W ONYX CIR | COEUR D ALENE | ID | Gary L Cook |
| 3014866911 | $1,350,000.00 | $420,954.22 | 11/16/2007 | 80500 VIA TALAVERA | LA QUINTA | CA | Abdi Rahgoshay |
| 3018795264 | $948,800.00/ $118,481.00 | $305,860.46 | 11/19/2007 | 14280 N SANTA FE ST | WESTMINSTER | CO | Marc P. Wyman |
| 3018733380 | $1,000,000.00 | $294,273.15 | 11/21/2007 | 10716 MIRASOL DR | FORT MYERS | FL | Dan Mahoney |
| 3018791438 | $2,340,000.00 | $939,901.34 | 11/29/2007 | 4508 NOELINE AVE | ENCINO | CA | Lance S. Thomas |
| 3014887750 | $1,722,500.00 | $770,133.68 | 11/30/2007 | 280 LOWER MATECUMBE RD | KEY LARGO | FL | Gayle Gottfried |
| 3014922995 | $1,340,000.00 | $525,397.16 | 12/6/2007 | 738 S HIGHLAND AVE | LOS ANGELES | CA | Jim Brandt |
| 3018364798 | $1,500,000.00 | $528,067.21 | 12/7/2007 | 3667 W SELLA CT | EAGLE | ID | Michael W Louie |
| 3018892228 | $1,188,750.00 | $546,543.72 | 12/13/2007 | 5045 MCCLURE LN | CASTLE ROCK | CO | Frank (Francisco) Alberti |
| 3018812424 | $1,440,000.00 | $344,130.68 | 12/18/2007 | 9861 EDEN MANOR | PARKLAND | FL | Idael L. Bolano |
| 3014891422 | $2,135,000.00 | $730,688.19 | 12/21/2007 | 8001 PALM LAKE DR | ORLANDO | FL | John H. Baldwin |
| 3015038551 | $1,379,000.00 | $436,943.41 | 12/27/2007 | 9420 OAK LEAF DR | CHATSWORTH | CA | David M. Murray |
| 3015215787 | $1,680,000.00 | $467,517.89 | 1/9/2008 | 3531 N 80TH ST | MESA | AZ | Michael S. Mason |
| 791081879 | $250,000.00 | $503,073.78 | 1/11/2008 | 625 S BERENDO ST APT 305 | LOS ANGELES | CA | John R Hooks |
| | | $154,519,071.10 | | | | |

Exhibit C

# EXHIBIT

# "D"

EXHIBIT D

## Key for List of Major Appraisal Deficiencies

1: Appraisal contains an inadequate analysis of subject contract or inadequate analysis or reporting of prior listings.

2: Appraiser fails to report sales of the subject property within the last 3 years or fails to explain large value increase in subject appraisal from previous sales.

3: Appraiser uses poor or improper comparables and/or avoids better comparables.

4: Appraiser makes improper or inconsistent adjustments to comparables, i.e. per square foot differences not reasonable, large unsupported adjustments for intangibles such as view, etc.

5: Appraiser lacks proper level of certification for value of property appraised.

6: Appraiser does not investigate deficiencies in subdivision where property is located, i.e. lack of utilities or lack of amenities promised to buyers.

7: Appraiser omits or misrepresents significant physical or locational characteristics of the property.

8: Appraiser does not use cost approach; uses the cost approach incorrect, often without support for site value; or fails to reconcile the cost approach with the sales comparison approach.

9: Appraiser has been sanctioned, suspended, or had their license revoked, or was under investigation while performing work.

10: Flip transactions one day apart with appraisal supporting much higher sales price, not noting lower priced contract on subject.

11: Appraiser checks block that states market is stable, or otherwise indicates a stable or thriving market, while the market is known to be in decline.

12: Appraiser finds no recent sales (market is in decline, sales are few), so appraiser reaches back in time to find comps at high prices under market conditions that no longer exist.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Josephine Tucker and the assigned discovery Magistrate Judge is Marc Goldman.

The case number on all documents filed with the Court should read as follows:

## SACV11- 706 JST (MLGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division** | [X] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of Washington Mutual Bank,<br><br>PLAINTIFF(S)<br><br>v.<br><br>LSI APPRAISAL, LLC; FIDELITY NATIONAL INFORMATION SERVICES, INC., - CONTINUED ON ATTACHMENT "A"<br><br>DEFENDANT(S). | CASE NUMBER<br><br>**SACV11-706 JST(MLGx)**<br><br><br>**SUMMONS** |

TO:   DEFENDANT(S): _____  _____

A lawsuit has been filed against you.

Within **21** days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, Steven Jay Katzman_____, whose address is 903 Calle Amanecer, Suite 350, San Clemente, California 92673_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Dated: **MAY  9  2011**

Clerk, U.S. District Court

By: _____
NANCY CASTRO   SEAL
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

## SUMMONS ATTACHMENT "A"

### DEFENDANTS

LENDER PROCESSING SERVICES, INC.

LENDER PROCESSING SERVICES, LLC

LPS PROPERTY TAX SOLUTIONS, INC., f/k/a FIDELITY NATIONAL TAX SERVICE, INC.

LSI TITLE COMPANY

LSI TITLE AGENCY, INC.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

CIVIL COVER SHEET

**I (a) PLAINTIFFS**   (Check box if you are representing yourself ☐ )

FEDERAL DEPOSIT INSURANCE CORPORATION,
as Receiver of Washington Mutual Bank

**DEFENDANTS**

LSI APPRAISAL, LLC; FIDELITY NATIONAL
INFORMATION SERVICES, INC., - CONTINUED
ON ATTACHMENT "A"

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
SEE ATTACHMENT "B"

Attorneys (If Known)

---

**II.   BASIS OF JURISDICTION** (Place an X in one box only.)

☒ 1 U.S. Government Plaintiff

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III.   CITIZENSHIP OF PRINCIPAL PARTIES** – For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV.   ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify):

☐ 6 Multi-District Litigation

☐ 7 Appeal to District Judge from Magistrate Judge

**V.   REQUESTED IN COMPLAINT:   JURY DEMAND:** ☒ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No    ☒ MONEY DEMANDED IN COMPLAINT: $ 154,519,071

**VI.   CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Negligence, Breach of Contract, Alter Ego per Authority of 12 U.S.C. Section 1821, et seq.

**VII.   NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE/PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☒ 190 Other Contract | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco- mmodations | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | IMMIGRATION | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety/Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus- Alien Detainee | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS - Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:**   Case Number;   **SACV11-706 JST(MLGx)**

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71

Page 1 of 2

CCD-JS44

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? [X] No  [ ] Yes

If yes, list case number(s):

**VIII(b).  RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  [ ] No  [X] Yes

If yes, list case number(s): FDIC v. Corelogic Valuation Services, LLC, et al., concurrently filed with this action.

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  [ ]  A.  Arise from the same or closely related transactions, happenings, or events; or

[X]  B.  Call for determination of the same or substantially related or similar questions of law and fact; or

[ ]  C.  For other reasons would entail substantial duplication of labor if heard by different judges; or

[ ]  D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX.  VENUE:**  (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.

[X]  Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  |  |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.

[ ]  Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange - LSI Appraisal, LLC | Georgia - Fidelity National Infromation Services, Inc.; Illinois - LSI Title Agency, Inc.; Delaware - All Other Defendants |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.

Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange | Multiple States |

\* **Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**

Note: In land condemnation cases, use the location of the tract of land involved

**X.  SIGNATURE OF ATTORNEY (OR PRO PER):** _Steven J. Katzman_  Date May 9, 2011

Steven J. Katzman

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

## CIVIL COVER SHEET ATTACHMENT "A"

### DEFENDANTS

LENDER PROCESSING SERVICES, INC.

LENDER PROCESSING SERVICES, LLC

LPS PROPERTY TAX SOLUTIONS, INC., f/k/a FIDELITY NATIONAL TAX
SERVICE, INC.

LSI TITLE COMPANY

LSI TITLE AGENCY, INC.

# ATTACHMENT "B"

## ATTORNEYS FOR PLAINTIFF

Steven L. Hoard (Texas Bar No. 09736600)
shoard@mhba.com
John Mozola (Texas Bar No. 14615500)
jmozola@mhba.com
Greg Dimmick (Texas Bar No. 24028303)
gdimmick@mhba.com
Sarah D. Pelley (Texas Bar No. 24058036)
spelley@mhba.com
MULLIN HOARD & BROWN, L.L.P.
P. O. Box 31656
Amarillo, Texas 79120-1656
Tel: (806) 372-5050/Fax: (806) 372-5086

Steven Jay Katzman (California Bar No. 132755)
skatzman@bmkattorneys.com
Luis A. Feldstein (California Bar No.184824)
lfeldstein@bmkattorneys.com
Susann K. Narholm (California Bar No. 231521)
snarholm@bmkattorneys.com
BIENERT, MILLER & KATZMAN, PLC
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Tel: (949) 369-3700/Fax: (949) 369-3701

Leonard J. De Pasquale (Rhode Island Bar No. 4753)
ldepasquale@FDIC.gov
Counsel, Legal Division - FDIC
3501 North Fairfax Drive, VS-B-7058
Arlington, VA  22226
Tel: (703) 562-2063