ORIGINAL

Steven L. Hoard (Texas Bar No. 09736600)
shoard@mhba.com
MULLIN HOARD & BROWN, L.L.P.
P. O. Box 31656
Amarillo, Texas 79120-1656
Tel: (806) 372-5050/Fax: (806) 372-5086

Steven Jay Katzman (California Bar No. 132755)
skatzman@bmkattorneys.com
BIENERT, MILLER & KATZMAN, PLC
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Tel: (949) 369-3700/Fax: (949) 369-3701

Attorneys for Plaintiff
FEDERAL DEPOSIT INSURANCE CORPORATION,
as Receiver of Washington Mutual Bank

FILED
2012 SEP 11 PM 12: 35
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA
BY

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of Washington Mutual Bank,<br><br>Plaintiff,<br><br>v.<br><br>LSI APPRAISAL, LLC, and LPS PROPERTY TAX SOLUTIONS, INC., f/k/a FIDELITY NATIONAL TAX SERVICE, INC.,<br><br>Defendants. | Case No. SACV11-706 DOC (ANx)<br><br>**THIRD AMENDED COMPLAINT FOR:**<br>**(1) BREACH OF CONTRACT WITH RESPECT TO APPRAISAL SERVICES PROVIDED BEFORE OCTOBER 16, 2006 (Against LSI);**<br>**(2) BREACH OF CONTRACT WITH RESPECT TO APPRAISAL SERVICES PROVIDED AFTER OCTOBER 16, 2006 (Against LSI); and**<br>**(3) BREACH OF CONTRACT (Against FNTS).**<br><br>**JURY TRIAL DEMANDED** |

J/S
No
FEE

Plaintiff, the Federal Deposit Insurance Corporation ("FDIC"), as Receiver of Washington Mutual Bank, files the following Third Amended Complaint against LSI

Appraisal, LLC ("LSI") and LPS Property Tax Solutions, Inc., f/k/a Fidelity National Tax Service, Inc. ("FNTS").

## I. INTRODUCTION

1. The FDIC brings this case in its capacity as Receiver of Washington Mutual Bank ("WaMu" or the "Bank") pursuant to its authority granted by 12 U.S.C. § 1821. The FDIC seeks to recover (a) losses of at least $8,350,308.76 that WaMu suffered as a direct and proximate result of LSI's breaches of appraisal sales contracts with respect to 12 appraisal services provided by LSI to WaMu prior to October 16, 2006, and (b) losses of at least $149,380,306.04 that WaMu suffered as the direct and proximate result of LSI's breach of the Appraisal Outsourcing Services Agreement dated October 16, 2006 (the "LSI Agreement"), a true and correct copy of which is attached hereto as Exhibit A and incorporated herein for all purposes. In addition, the FDIC seeks damages against FNTS for breach of the Performance Guaranty Agreement dated October 16, 2006, between FNTS and WaMu (the "Guaranty Agreement"), pursuant to which FNTS contractually guaranteed any damages caused by LSI's failure to perform its obligations under the LSI Agreement. A true and correct copy of the Guaranty Agreement is attached hereto as Exhibit B and incorporated herein for all purposes.

2. In July 2006, WaMu hired LSI to provide appraisal services for residential properties in all fifty states and the District of Columbia. Both before and after the LSI Agreement was executed, LSI represented and warranted that each and every appraisal service it provided would conform to federal and state law, regulatory guidelines, and all applicable industry standards, specifically including the Uniform Standards of Professional Appraisal Practice ("USPAP"). LSI also agreed to serve as the "gatekeeper" with respect to the appraisal services it provided for WaMu. LSI agreed to insure the competency and qualifications of its appraisers, to conduct a meaningful quality control review of the appraisals, and to police WaMu's loan staff and act as an intermediary between WaMu's loan originators and LSI's appraisers. In the LSI Agreement, LSI specifically promised to inform WaMu of any inappropriate contacts or requests by

WaMu employees concerning an appraisal or the assignment of an appraisal. *See* LSI Agreement at 29.

3. Despite these representations and promises, at least 225 of the appraisal services provided by LSI failed to comply with federal and state law, regulatory guidelines, and USPAP. Twelve of the appraisal services were performed prior to the LSI Agreement, and the remaining 213 appraisal services were performed after the parties entered into the LSI Agreement. A list of the 225 loans that WaMu made in reliance on LSI's grossly negligent appraisal services that have so far been identified by the FDIC is attached hereto as Exhibit C and incorporated herein for all purposes. The list sets forth the basic information for each of the 225 loans, identifies the appraiser or appraisers who provided the grossly deficient appraisal, and sets forth the damages suffered by WaMu with respect to each loan. The list also identifies by code number the primary deficiencies in each of the 225 appraisals. The "key" explaining the code numbers is attached hereto as Exhibit D and incorporated herein for all purposes. The list of appraisal deficiencies is not intended to be exhaustive.

4. LSI used appraisers who lacked the skill, experience, and qualifications necessary to perform the appraisals requested. LSI's "quality control" of the appraisals it provided to WaMu was severely inadequate. Consequently, LSI delivered appraisal services to WaMu that were conducted and prepared in a grossly negligent manner and which contained substantially inflated appraised values. But for the inflated values in the appraisal services provided by LSI, WaMu would not have made the residential mortgage loans at issue and would not have suffered losses on those loans. The losses that WaMu incurred on loans made in reliance on the inflated appraisals provided or approved by LSI were clearly foreseeable. Each of the 225 loans made by WaMu in reliance on LSI's appraisal services was held by WaMu for investment and not sold into the secondary market.

## II. PARTIES

### A. Plaintiff

5. Plaintiff is the Federal Deposit Insurance Corporation, acting as Receiver of WaMu, pursuant to 12 U.S.C. § 1811, *et seq*. The FDIC was appointed Receiver on September 25, 2008, following the closure of the Bank by the Office of Thrift Supervision ("OTS"). As Receiver, the FDIC has the right to pursue all of WaMu's claims, including its claims against each of the Defendants named herein.

### B. Defendants

6. Defendant LSI Appraisal, LLC, is a Delaware limited liability company, with its principal place of business located in Santa Ana, California. LSI Appraisal, LLC, may be served with process through its registered agent: CT Corporation, 818 W. 7th Street, Los Angeles, California 90017.

7. Defendant LPS Property Tax Solutions, Inc., f/k/a Fidelity National Tax Service, is a Delaware corporation, with its principal place of business at 601 Riverside Avenue, Jacksonville, Florida 32204. LPS Property Tax Solutions, Inc. may be served with process through its registered agent: CT Corporation, 818 W. 7th Street, Los Angeles, California 90017.

## III. JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this case under 12 U.S.C. § 1819(b)(2) and 28 U.S.C. §§ 1331 and 1345.

9. The Court has personal jurisdiction over the Defendants because each of the Defendants engages in substantial business activities in the State of California. Also, LSI Appraisal, LLC, has its headquarters in Santa Ana, California.

10. Venue is proper in this District under 28 U.S.C. § 1391(b).

## IV. FACTUAL BACKGROUND

### A. The Importance of Appraisals to WaMu

11. During the relevant time period, WaMu was one of the largest mortgage lenders in the United States. Accurate appraisals were critical to WaMu's financial

success. WaMu depended on appraisers to fairly, accurately, and competently assess the residential property values that served as collateral for its loans. WaMu was required by its primary banking regulator, the OTS, to maintain an appropriate real estate appraisal program for all of its lending functions. The independence and competence of the real estate appraisers who determine the value of home loan collateral is of enormous importance in the mortgage industry. Real estate appraisals are intended to provide borrowers and lenders with an independent and accurate assessment of the market value of a home. This ensures that a mortgage or home equity loan is not under-collateralized, which in turn protects borrowers from being over-extended financially and protects lenders and investors from losses in the event the borrower defaults on the loan.

12. Because of the importance of appraisals in the home lending market, state and federal statutes and regulations require that appraisals be accurate and be prepared independently. In order to achieve these goals, federal statutes and regulations, and most state statutes and regulations, implement all or portions of USPAP to standardize how appraisals should be properly prepared. USPAP is formulated by the Appraisal Standards Board of The Appraisal Foundation, which "develops, publishes, interprets, and amends USPAP on behalf of appraisers and users of appraisal services." USPAP, Foreword (2006).

13. The USPAP includes the following standards, among others:

1. Ethics

- an appraiser must perform assignments ethically and competently, in accordance with USPAP and any supplemental standards agreed to by the appraiser in accepting the assignment. … An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interest.
- an appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions.

2. Standards Rule 1-1(c). The appraiser must not render appraisal services in a careless or negligent manner, such as by making a series of errors, that, although individually might not significantly affect the results of an appraisal, in the aggregate affects the credibility of those results.

3. Standards Rule 1-4. Based on the type of valuation method used, the appraiser must collect, verify, and analyze all information necessary for credible assignment results.

4. Standard 3. In performing an appraisal review assignment, an appraiser acting as reviewer must develop and report a credible opinion as to the quality of another appraiser's work and clearly disclose the scope of work performed.

5. Standards Rule 3-1(d)-(g). In developing an appraisal review, the reviewer: (d) must develop an opinion as to the completeness of the material under review given the reviewer's scope of work; (e) develop an opinion as to the apparent adequacy and relevance of the data and the propriety of any adjustments to the data given the reviewer's scope of work; (f) develop an opinion as to the appropriateness of the appraisal methods and techniques used and develop reasons for any disagreement given the reviewer's scope of work; and (g) develop an opinion as to whether the analyses, opinions, and conclusions are appropriate and reasonable and develop reasons for any disagreement.

14. Many federal statutes and regulations incorporate USPAP directly. For example, 12 C.F.R. § 564.4(a) requires that all appraisals conform to generally accepted appraisal standards as evidenced by USPAP. Section 1110 of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") (12 U.S.C. § 3339) likewise requires that real estate appraisals be performed according to certain minimum standards, which include those identified under 12 C.F.R. § 564.4. *See also* 61 Fla. Admin. Code 61J1-9.001 and Cal. Code Regs., tit. 10, § 3701.

15. In addition to standards established in USPAP, the Freddie Mac Single-Family Seller/Servicer Guide ("Freddie Mac Guide") identifies unacceptable appraisal practices. Some of the unacceptable practices in the Freddie Mac Guide are:

1) It is unacceptable to include inaccurate or incomplete data about the subject property, the neighborhood or any comparable sale used in the appraisal analysis.

2) It is unacceptable to rely on inappropriate comparable sales or to fail to use comparable sales that are more similar to or nearer to the subject property with adequate explanation.

3) It is unacceptable to use inordinate adjustments for differences between the subject property and the comparable sales that do not reflect the market's reaction to such differences, or the

failure to make proper adjustments when they are clearly necessary.

In addition to identifying these specific unacceptable practices, the Freddie Mac Guide also requires compliance with USPAP.

16. Each of the appraisals provided or approved by LSI, including the 12 provided prior to entering into the LSI Agreement, contains specific representations regarding compliance with these standards, including the following representations:

(a) The appraiser, at a minimum, developed and reported the appraisal in accordance with the scope of work requirements stated in the appraisal report;

(b) The appraiser performed a complete visual inspection of the interior and exterior areas of the subject property. The appraiser reported the condition of the improvements in factual, specific terms. The appraiser identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property;

(c) The appraiser performed this appraisal in accordance with the requirements of USPAP;

(d) The appraiser developed his opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. The appraiser used adequate comparable market data to develop a reliable sales comparison approach for this assignment;

(e) The appraiser researched, verified, analyzed, and reported the prior sales of the comparables sales for the minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in the report;

(f) The appraiser selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property;

(g) The appraiser reported adjustments to the comparable sales that reflect the market's reaction to the difference between the subject property and the comparable sales;

(h) The appraiser verified, from a disinterested source, all

information in this report that was provided by the parties;

(i) The appraiser represented that he was aware of, and had access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area where the property is located;

(j) The appraiser has taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of his opinion of market value. The appraiser has noted in this appraisal report any adverse conditions observed during the inspection of the subject property or that the appraiser became aware of during the research involved in performing this appraisal. The appraiser has considered these adverse conditions in the analysis of the property value, and has reported the effect of the conditions on the value and marketability of the subject property; and

(k) The appraiser represented that any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, *et seq.*, or similar state laws.

## B. WaMu Outsourced Its Appraisals to LSI

17. Prior to July 2006, WaMu managed its own appraisal services with in-house appraisers and appraisal managers. In late 2005 and early 2006, WaMu re-evaluated its appraisal practices and ultimately decided to outsource its appraisal management services. WaMu solicited detailed bid proposals from several national companies in the business of providing appraisals and appraisal management services. The bids were solicited by means of a written Request for Proposal (the "RFP") dated December 22, 2005. WaMu specifically sought vendors who could ensure that the appraisals WaMu relied upon complied with USPAP, and who could also mitigate the potential for loan officers to exert pressure on appraisers. LSI submitted a written response to the RFP (the "RFP

Response") dated January 16, 2006, a true and correct copy of which is attached hereto as Exhibit E and incorporated herein for all purposes. In July 2006, after careful consideration of the responses to the RFP that were submitted, WaMu retained two outside appraisal management companies – LSI and one of its competitors, CoreLogic Valuation Services, LLC, f/k/a eAppraiseIT, LLC ("EA"). These two companies both agreed to provide high quality and accurate appraisal services and to act as a structural buffer between the WaMu loan consultants and the appraisers to eliminate potential pressure or conflicts of interest.

**C. The Pre-October 16, 2006 Appraisal Services**

18. LSI and WaMu entered into a separate contract with regard to each of the 12 appraisal services that LSI provided to WaMu prior to entering into the LSI Agreement on October 16, 2006. These are the first 12 appraisal services listed on Exhibit C hereto. These 12 sales contracts are founded upon an instrument in writing, namely the RFP Response attached hereto as Exhibit E. The RFP Response provides that although WaMu was not obligated to purchase any appraisal services from LSI, any services that were purchased were to be governed by the terms set forth in the RFP Response. Exhibit E at 6. The RFP Response covers both original appraisals and desk and field reviews. Exhibit E at 14. Pursuant to the terms set forth in the RFP Response, LSI offered to sell, and did in fact sell, appraisal services to WaMu in return for an agreed-upon fee. In the RFP Response, LSI represented and agreed that its appraisal services would conform to USPAP and all applicable industry standards. Exhibit E at 21 and 43. These standards are set forth in summary form in paragraphs 13-15 above. LSI also represented and agreed in the RFP Response that the individual appraisers selected by LSI to perform the appraisal services would be experienced, qualified, and properly licensed. Exhibit E at 22 and 55-56. The representations and agreements made by LSI in the RFP Response with regard to the quality of the appraisal services and the qualifications of the appraisers were essentially the same as the representations and warranties on those matters that were subsequently included in the LSI Agreement. In addition, as noted above in paragraph 16,

each of the appraisals and desk and field reviews provided by LSI to WaMu with respect to the 12 sales contracts reiterated in writing the representations and certifications regarding compliance with USPAP and the industry standards and the experience, qualifications, and proper licensing of the individual appraisers selected by LSI. As specifically contemplated by the parties in the RFP and the RFP Response, WaMu accepted LSI's offer to sell appraisal services in conformance with the representations and agreements set forth in the RFP Response by placing an electronic order for the appraisal service, thereby creating a contract between the parties for each of the 12 appraisals provided by LSI prior to October 16, 2006. The terms of each of the sales contracts are set forth in the RFP Response. WaMu performed its obligations under the sales contracts by paying LSI the agreed-upon price for the services, as reflected in the invoices that were submitted to and paid by WaMu.

**D. The LSI Agreement**

19. In the LSI Agreement, which governs the 213 appraisal services provided by LSI after the LSI Agreement was entered into on October 16, 2006, LSI agreed broadly to "provide Appraisal Services for residential properties located in the fifty (50) United States and the District of Columbia." "Services" included 15 different types of "Appraisals," including standard "full appraisals" (known as 1004 appraisals because they are performed on Fannie Mae 1004 forms) which examined the interior and exterior of a residence, reconsiderations of value (services provided when there is a disagreement of the appraisal value based on supporting evidence), and desk and field reviews (performed to "review" the underlying appraisal for accuracy). *See* LSI Agreement at sections 1(a)(15), 2.1(a) and (d) and Exhibit A. "In all cases, the Appraisal shall provide an estimated value of the real property based on replacement costs, sales of comparable properties, and future income from income producing properties (where applicable)." LSI Agreement at Exhibit A. In addition to the Services LSI agreed to perform, LSI also agreed to act as the "gatekeeper" between WaMu loan staff and the actual appraisers, and LSI was to "report any inappropriate contacts or requests by [WaMu] employees

concerning an appraisal or assigning an appraisal." *Id.* WaMu agreed to pay and did pay LSI the agreed upon fees for these services. LSI Agreement at section 6.

20. All the Services, including the ancillary services related to the performance of those Services, were to be provided by LSI in accordance with specific standards set out in the LSI Agreement. Specifically, Services were to "conform as applicable to USPAP and to Appraisal Standards of FNMA, FHLMC, and other investors." *Id.* at Exhibit A. Additional references to the USPAP standards are found in the respective provisions of the LSI Agreement under "Warranties and Additional Covenants," requiring compliance not only with USPAP, but also with FIRREA, all appraisal regulations set forth in 12 C.F.R. § 564, *et seq.* (which includes USPAP), and related appraisal guidance from the OTS. *See* LSI Agreement at section 15.2(a) and Exhibit A. LSI also warranted and covenanted to "perform the Services, and develop the Deliverables, in accordance with applicable professional standards in the appraisal management industry." *Id.* at section 15.2(k).

21. LSI also promised to ensure the qualifications of its appraisers and to stand behind the work of its appraisers. Any appraisers LSI employed or contracted to perform appraisal services had to possess the appropriate license or certificate needed to perform the appraisal and also had to have the experience and competence necessary to complete the assignment. *See* LSI Agreement at section 4.3. Ensuring such qualifications should have been equally important to LSI because LSI stood behind those appraisers, as it stood behind any subcontractor it hired to perform Services under the LSI Agreement, and remained "responsible and liable for a subcontractor's compliance with [the LSI Agreement] and performance hereunder." *See Id.* at section 4.4.

22. Finally, under section 7.1(j) of the LSI Agreement, LSI agreed to indemnify and hold WaMu harmless for loss, damage, claim, or expense arising out of or relating to any claim "by WaMu relating to any breach of the representations and warranties regarding the Services provided by [LSI] pursuant to this Agreement." *See* LSI Agreement at section 7.1(j) and Exhibit A.

**E. LSI's Breach of Contract**

23. LSI provided appraisal services to WaMu from July 2006 through November 2007. During this period, LSI provided or approved more than 386,000 appraisals for residential loans that WaMu originated or purchased. WaMu quickly became LSI's largest client. WaMu paid LSI over $127 million for its services.

24. During all relevant times with regard to the appraisal services provided by LSI, WaMu would request an appraisal service from LSI electronically. LSI would then select one of its individual licensed appraisers to perform the appraisal service. The individual appraisers who performed the appraisal services provided by LSI, including original appraisals and review appraisals, were selected by LSI. Time was always of the essence, and WaMu required that the appraisal services be completed in a timely manner – usually within just a matter of days after the order was placed. When LSI's appraiser completed the appraisal service, he or she would send it electronically to LSI. At least with respect to original appraisals, LSI's Quality Assurance Group would then process the appraisal by running it through a computerized rules-based appraisal underwriting system that was supposed to determine whether the appraisal complied with approximately 100 appraisal underwriting rules. Notwithstanding the existence of the quality control system, LSI did not, for the most part, conduct any meaningful, substantive review of the 225 appraisal services provided to WaMu.

25. To date, the FDIC and its experts have reviewed in depth only 298 of the many thousands of appraisals provided or approved by LSI for WaMu. Based on expert analysis of these appraisals, only 10 of the 298 appraisals, which is less than four percent of the appraisals reviewed, were found to be fully compliant with the applicable professional standards. On the other hand, 226[1] of the 298 appraisals, more than 75 percent of appraisals reviewed, were found to contain multiple egregious violations of

[1] Subsequent to the filing of the original complaint, the FDIC settled with the appraiser on one of the 226 grossly negligent appraisals and has elected not to pursue any claims against Defendants herein with respect to that appraisal. Thus, the total number of grossly negligent appraisals on which the FDIC is suing is now 225.

USPAP and applicable industry standards. These violations are not mere mistakes; they constitute a degree of carelessness that rises to the level of at least gross negligence and in some instances, intentional wrongdoing. The LSI appraisers, most likely deliberately, but in any event as the result of gross incompetence, cherry-picked allegedly comparable sales that were in fact not comparable, ignored sales that actually were comparable, and ignored the sales and listing history of the subject properties – all for the purpose of supporting the inflated values set forth in the appraisals. WaMu relied on these appraisal services in making residential loans to its borrowers, and LSI knew that WaMu was relying on its appraisal services in making the residential mortgage loans. WaMu would not have made these residential loans but for the inflated appraisals provided or approved by LSI. The remaining 62 appraisal services out of the 298 reviewed were found to contain violations of USPAP, but not to the same degree as the grossly negligent appraisals.

26. Out of the 225 grossly negligent appraisals, 12 were relied upon by WaMu in making loans before the LSI Agreement was entered into on October 16, 2006. The damages on those 12 loans total $8,350,308.76. These damages are the subject of Count I of the FDIC's Third Amended Complaint. The remaining 213 grossly negligent appraisals were relied upon by WaMu in making loans after the LSI Agreement was entered into. The damages on those 213 loans total $149,380,306.04 and are the subject of Counts II and III of the FDIC's Third Amended Complaint.

27. With respect to the 225 grossly negligent appraisals, LSI failed to ensure that the appraisal services it provided conformed to USPAP and the applicable industry standards. LSI's violations of USPAP and the applicable industry standards include inadequate or improper licensing of appraisers, inadequate research, failure to perform required site visits, lack of support for site valuations, use of appraisers unfamiliar with the relevant geographical area, failure to note information obtained from interested parties, use of improper comparables, unsupported adjustments to comparables, failure to report prior sales, failure to acknowledge a declining market or in-area price variations, and/or tying compensation or employment to appraisal results. Moreover, LSI merely

"rubber stamped" the appraisals, doing little more than checking required boxes and obtaining necessary signatures on review forms and providing no substantive assurance that any of the appraisers it provided complied with USPAP or other regulatory and industry guidelines. In addition, LSI's process made it nearly impossible for LSI to act as a "gatekeeper" between loan staff and appraisers. The automated order and mostly automated assignment process meant that LSI did not review information sent by the loan officers to the appraisers. With respect to the 12 appraisal services provided by LSI prior to entering into the LSI Agreement, these violations of USPAP and the applicable industry standards constitute breaches of the appraisal sales contracts entered into between LSI and WaMu in connection with each of those appraisal services. With respect to the 213 appraisal services provided by LSI after entering into the LSI Agreement, these violations constitute a breach of the LSI Agreement that rises to the level of at least gross negligence.

28. The following are just two examples of the grossly negligent appraisal services provided by LSI to WaMu under the LSI Agreement. In May 2007, a property in Agoura Hills, California, appraised for $5,540,000, which resulted in WaMu approving a $4,155,000 loan. (Loan No. 3017902135 on Exhibit C.) The appraiser failed to analyze the subject contract or the subject property's listing history as called for by the Fannie Mae Uniform Residential Appraisal Report form. The subject property's original listing price was $4,795,000, which was increased to $5,200,000 on January 22, 2007. The listing price was increased again on January 24, 2007, to $5,540,000, which became the contract price. By failing to analyze the subject contract and listing history, the appraiser failed to disclose that the contract price was actually $340,000, or 6.5 percent, *higher* than the already increased listing price, despite having been on the market for 485 days. The appraiser should have recognized, reported, and analyzed the increased listing price in such temporal proximity to the contract date, since, atypically, the appraisal report was completed four months after the house was under contract, at a time when all of the information regarding the history of the listing price and the contract date, was readily

available to the appraiser. The appraiser did disclose the prior site-only sale for $1,295,000, although he failed to explain how, 18 months later, he valued the site at $3,000,000. All of this in a market the appraiser summarized as "stable" with a three to six month marketing time, while the actual data he provided showed a two year supply of similar homes. The appraiser also selected inappropriate "comparables." The comparables the appraiser selected included a waterfront property with a private boat dock, a mountain-top property more than ten times the size of the subject property, and a "Rustic Contemporary" (compared to the Tuscan-style subject) on twice as much usable land. Although the subject property had a dirt driveway with no paved access to the street and no landscaping whatsoever, the appraiser made no downward adjustments for the comparables' differences, which all contained complete and extensive landscaping and hardscaping. This omission is especially egregious considering that homeowners who own homes in this price range have often invested many thousands of dollars in landscaping. These violations of USPAP and the applicable industry standards indicate that the appraiser was most likely intentionally and knowingly trying to support an inflated value, but at a minimum they indicate gross incompetence. The borrower defaulted on the loan, and WaMu charged off $1,391,500.15.

29. In September 2007, a property in Northridge, California appraised for $2.3 million, which resulted in WaMu approving a loan for $1.84 million. (Loan No. 3018491617 in Exhibit C.) The appraiser reported the prior sale of the property 25 months earlier for $732,000 and noted $250,000 in upgrades, but he provided no explanation as to how the property increased in that short time to a value of $2.3 million, a 200% increase, in a market he described as "stabilizing." The appraiser noted that the subject property was substantially larger in size than the surrounding homes, so much so that he justified increasing his search for comparables to a normally inappropriate ten-mile radius. However, he failed to address whether this almost 6,000 square-foot home was overbuilt for a neighborhood with surrounding 2500 to 3500 square foot homes. The appraiser ignored nearly a dozen closer comparables that would have caused him to arrive

at a much lower appraised value. Instead, the appraiser used comparables that were dissimilar in size and location in order to support the higher value. For these reasons and others, the $2.3 million appraised value was excessively inflated. These violations of USPAP and the applicable industry standards indicate that the appraiser was most likely intentionally and knowingly trying to support an inflated value, but at a minimum they indicate gross incompetence. Ultimately, the borrower defaulted on the loan, and WaMu charged off $1,033,020.16.

## V. CLAIMS FOR RELIEF

### COUNT 1
### BREACH OF CONTRACT WITH RESPECT TO APPRAISAL SERVICES PROVIDED BEFORE OCTOBER 16, 2006
### (Against LSI)

30. The FDIC re-alleges and incorporates by reference the allegations contained in paragraphs 1–29 above as if fully set out in this Count.

31. As set forth in paragraph 18 above, LSI and WaMu entered into appraisal sales contracts, which were founded upon an instrument in writing, with respect to the 12 appraisal services provided by LSI to WaMu prior to October 16, 2006. As also alleged above, the terms of the sales contracts are set forth in the RFP Response attached hereto as Exhibit E. In the RFP Response, LSI represented and agreed that these 12 appraisal services would conform to USPAP and all applicable industry standards and that the individual appraisers retained by LSI to perform the appraisal services would be experienced, qualified, and properly licensed. In addition, each of the appraisals and desk and field reviews provided by LSI with respect to the 12 sales contracts reiterated in writing the representations and certifications regarding compliance with USPAP and the industry standards and the experience, qualifications, and proper licensing of the individual appraisers selected by LSI.

32. WaMu fully performed its obligations pursuant to the terms of these 12 appraisal sales contracts, including payment of the agreed upon fee for the appraisal services. LSI, however, has materially failed to comply with its own obligations under

these appraisal sales contracts and is liable to WaMu for damages directly caused by WaMu's reliance on appraisal services that were not in compliance with the representations and agreements made by LSI.

33. LSI breached the appraisal sales contracts with respect to the 12 appraisal services provided prior to October 16, 2006, by, among other things: (a) failing to provide WaMu with appraisals and appraisal services that were prepared by appropriately licensed or certificated appraisers; (b) failing to provide WaMu with appraisals and appraisal services that were prepared by appraisers with the experience and competence necessary to complete the assignment; (c) failing to provide WaMu with appraisals and appraisal services that complied with USPAP and other applicable state and federal statutes and regulations; and (d) failing to provide WaMu with appraisals and appraisal services that complied with standards applicable to the appraisal and appraisal management industries.

34. As a direct and proximate result of LSI's breaches of these 12 appraisal sales contracts, WaMu suffered damages in the amount of at least $8,350,308.76.

## COUNT 2
## BREACH OF CONTRACT WITH RESPECT TO APPRAISAL SERVICES PROVIDED AFTER OCTOBER 16, 2006
## (Against LSI)

35. The FDIC re-alleges and incorporates by reference the allegations contained in paragraphs 1–34 above as if fully set out in this Count.

36. WaMu and LSI entered into the LSI Agreement on October 16, 2006. Pursuant to the LSI Agreement, LSI agreed to provide WaMu with Services, and other ancillary services, all of a certain type and quality in exchange for an agreed upon fee.

37. WaMu fully performed its obligations pursuant to the terms of the LSI Agreement, but LSI has materially failed to comply with its own obligations and is liable to WaMu for the provision of non-compliant Services under the LSI Agreement. Specifically, and as set forth above, LSI failed to comply with sections 2.1(a) and (d), 4.3, 4.4, 7.1(j), 15.2(a) & (k), Exhibit A, Exhibit A-1, and Exhibit A-2.

38. More specifically, but without limitation, LSI breached the LSI Agreement with respect to the 213 appraisal services listed in Exhibit C that were provided to WaMu after the parties entered into the LSI Agreement by, among other things: (a) failing to provide WaMu with appraisals that were prepared by appropriately licensed or certificated appraisers; (b) failing to provide WaMu with appraisals that were prepared by appraisers with the experience and competence necessary to complete the assignment; (c) failing to provide WaMu with appraisals and appraisal services that complied with USPAP and other applicable state and federal statutes and regulations; (d) failing to provide WaMu with appraisals and appraisal services that complied with standards applicable to the appraisal and appraisal management industries; (e) failing to take responsibility and assume liability for the appraisals and appraisal services provided to WaMu; and (f) failing to indemnify WaMu for losses incurred by WaMu relating to the inadequacy of LSI's Services.

39. As a direct and proximate result of LSI's breaches of the LSI Agreement, WaMu suffered damages in the amount of at least $149,380,306.04.

40. LSI's breaches of the LSI Agreement arose from LSI's gross negligence as alleged above and detailed in Exhibit C, in that LSI's conduct in breaching the LSI Agreement was the result of a want of even scant care and/or an extreme departure from the ordinary standard of care. Liability arising from such conduct is not subject to the limitations or exculpations of liability set forth in the LSI Agreement.

## COUNT 3
## Breach of Guaranty Agreement
## (Against FNTS)

41. The FDIC re-alleges and incorporates by reference the allegations contained in paragraphs 1–40 above as if fully set out in this Count.

42. As additional consideration for entering into the LSI Agreement, WaMu and FNTS entered into the Guaranty Agreement on October 16, 2006. Pursuant to the Guaranty Agreement, FNTS agreed unconditionally and irrevocably to guarantee "all obligations" undertaken by LSI under the LSI Agreement.

43. WaMu fully performed its obligations pursuant to the terms of the Guaranty Agreement. The FDIC made demand on LSI to pay the damages caused by LSI's breach of the LSI Agreement, but LSI refused to do so.

44. FNTS breached the Guaranty Agreement by failing to compensate WaMu or the FDIC for the damages caused by LSI's breach of the LSI Agreement as set forth above.

45. As a direct and proximate result of FNTS' breach of the Guaranty Agreement, WaMu suffered damages in the amount of at least $149,380,306.04.

## VI. ATTORNEYS' FEES

46. Pursuant to section 1717(a) of the California Civil Code, the FDIC is entitled to recover its reasonable attorneys' fees against LSI and FNTS incurred in this case, because this is a suit on a contract and the contract specifically provides for attorneys' fees and costs.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

## PRAYER

WHEREFORE, PREMISES CONSIDERED, the FDIC prays that Defendants be cited to appear and answer, and that upon final hearing, the FDIC have and recover judgment against Defendants for the damages described above and for such other relief, general or special, to which the FDIC may show itself justly entitled at law or in equity, together with attorneys' fees and all costs of court.

Dated: September 11, 2012

BIENERT, MILLER & KATZMAN, PLC

By: ______________________

Steven Jay Katzman
Attorneys for Plaintiff
FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of Washington Mutual Bank

MULLIN HOARD & BROWN, L.L.P
Steven L. Hoard
John Mozola
Greg Dimmick
Sarah D. Pelley
Attorneys for Plaintiff
FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of Washington Mutual Bank

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and Local Rule 38-1, the Plaintiff in this action, by and through its counsel of record, hereby demands trial of this cause by jury.

Dated: September 11, 2012

BIENERT, MILLER & KATZMAN, PLC

By: [signature]
Steven Jay Katzman
Attorneys for Plaintiff
FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of Washington Mutual Bank

MULLIN HOARD & BROWN, L.L.P
Steven L. Hoard
John Mozola
Greg Dimmick
Sarah D. Pelley
Attorneys for Plaintiff
FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of Washington Mutual Bank

**EXHIBIT A**

# EXHIBIT

# "A"

Execution Copy

# APPRAISAL OUTSOURCING SERVICES AGREEMENT

**THIS APPRAISAL OUTSOURCING SERVICES AGREEMENT** (this "Agreement") is made and entered into as of the 16th day of October, 2006 (the "Effective Date"), by and between **LSI APPRAISAL, LLC**, a Delaware limited liability company ("Company"), having offices located at 700 Cherrington Parkway, Coraopolis, PA 15108-4306, and **WASHINGTON MUTUAL BANK**, a federal savings association ("WM"), having offices located at 2273 North Green Valley Parkway, Suite 14, Henderson, NV 89014. Both Company and WM are sometimes hereinafter referred to singularly as a "Party" and collectively as the "Parties".

## WITNESSETH:

**WHEREAS,** Company manages a network of residential real estate appraisers in all fifty (50) states of the United States and the District of Columbia;

**WHEREAS,** WM is in the business of making loans secured by a security interest in residential real estate and requires that certain appraisal services be performed in connection with said loans; and

**WHEREAS,** the Parties desire to enter into a business relationship pursuant to which Company will perform certain services, as more particularly specified herein, for and on behalf of WM in connection with residential mortgage loans made by WM.

**NOW, THEREFORE,** in consideration of the foregoing premises, the mutual covenants contained herein, and other good and valuable consideration, the receipt, adequacy, and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties hereby agree as follows:

## TERMS

1. **Definitions and General Interpretive Rules.**

(a) **Definitions.** All words or phrases defined in this Paragraph 1 (except as herein otherwise expressly provided or unless the context otherwise requires) shall, for the purposes of this Agreement, have the respective meanings specified in this Paragraph 1:

(1) **Appraisal Warranty.** The appraisal warranty provided by Company to WM in connection with first Mortgage (as defined hereinafter) origination loan appraisals and second Mortgage origination appraisals (as applicable), as set forth in Exhibit B (Appraisal Warranty).

(2) **Company Consents.** All licenses, consents, permits, approvals and authorizations that are necessary to allow (A) Company and Company agents to use (1) the Company Software (as defined hereinafter), and (2) any assets owned or leased by Company; (B) Company and Company agents to (1) use any third party services retained by Company to provide the Services, (2) grant any license contemplated by this Agreement, and (3) assign to WM the Work Product (as defined hereinafter); and (C) WM and WM agents to use the Company Software.

(3) **Company Governmental Approvals**. All licenses, consents, permits, approvals and authorizations of any Governmental Authority, or any notice to any Governmental Authority, the granting of which is required by law or regulatory requirements, for Company to perform the Services or fulfill any other obligation contemplated by this Agreement.

(4) **Company Software**. Software that is owned or licensed by Company and used by Company or WM to provide the Services under this Agreement, including, but not limited to, the Company Software listed on Exhibit F (Company Software).

(5) **Deliverables**. All data, materials, Work Product, and deliverables to be developed or delivered by Company in connection with the Services with respect to a Project (as defined in Section 2.3) hereunder as set forth in an applicable SOW (as defined in Section 2.3).

(6) **Fee Schedule**. The schedule of fees specifically described in Exhibit C (Fee Schedule), or any amendments thereto, which specifies the fees which WM will pay to Company for Services (as defined hereinafter) provided by Company under this Agreement.

(7) **FHLMC**. The Federal Home Loan Mortgage Corporation, also known as Freddie Mac.

(8) **FNMA**. The Federal National Mortgage Association, also known as Fannie Mae.

(9) **FIRREA**. The Financial Institution Reform, Recovery and Enforcement Act of 1989, Title X, as amended from time to time.

(10) **Governmental Authority**. Any federal, state, municipal, local, territorial, or other governmental department, regulatory authority, judicial or administrative body in any jurisdiction in which the Services are, or may be, performed or received.

(11) **Mortgage**. Mortgage, deed of trust, or other security instrument securing a loan on real property.

(12) **Order**. The request from WM to Company for Company to provide certain specified Services and all information from WM necessary to Company to provide the Services requested.

(13) **Pre-Existing Materials**. Any Software or work product owned or licensed by Company before the Effective Date, licensed by Company from a third party after the Effective Date, or developed by Company or Company agents independently of the Services during the Term (as defined in Section 9.1) of this Agreement.

(14) **Project Staff**. The personnel of Company, or Company's agents or subcontractors, who provide any of the Services.

(15) Services. The products and/or services listed in Exhibit A (Services), or any amendment thereto, which are available to WM through Company under the terms of this Agreement and as more fully described in Section 2.1 of this Agreement.

(16) Software. Unless the source code version is specifically identified in a particular case, the object code versions of any applications programs, operating system software, computer software languages, utilities, other computer programs and related documentation, together with all corrections, modifications, enhancements, improvements, updates, and releases thereof. For avoidance of ambiguity, Software will include the tangible media on which the Software is contained.

(17) USPAP. Uniform Standards of Professional Appraisal Practice as issued and amended from time to time by The Appraisal Foundation.

(18) WM Consents. All licenses, consents, permits, approvals and authorizations that are necessary to allow Company or Company agents to access and (A) use WM's owned and leased assets, (B) use the services provided for the benefit of WM under WM's third party services contracts, or (C) use the WM Proprietary Software or WM Third Party Software.

(19) WM Governmental Approvals. All licenses, consents, permits, approvals, and authorizations of any Governmental Authority, or any notice to any Governmental Authority, the granting of which is required by law or regulatory requirements, for WM to consummate the transactions contemplated by this Agreement.

(20) WM Proprietary Software. The Software owned, acquired, or developed by WM, provided by WM to Company, and used by Company in connection with the provision of the Services.

(21) WM Third Party Software. The Software that is licensed or leased by WM from a third party, provided by WM to Company, and used by Company in connection with the provision of the Services.

(22) Work Product. Literary works or other works of authorship created under this Agreement, including appraisal reports, reports with respect to the Services, training materials and documentation, but excluding Software and Pre-Existing Materials.

(b) General Interpretive Rules. For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires or unless Exhibit B contains a contrary definition as to appraisals and the Appraisal Warranty, (1) the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular and the use of any gender herein shall be deemed to include the other gender; (2) reference herein to "Paragraphs," "Sections," and "Exhibits" without reference to a document are to be designated Paragraphs, Sections, and Exhibits to this Agreement; and (3) the words "herein," "hereunder," "hereto," or words of similar import refer to this Agreement as a whole and not to particular provisions.

2. Services.

2.1 Scope of Services. Company will provide the following services to WM:

(a) Services set forth in Exhibit A (Services);

(b) Services set forth in one or more New Services Schedules (as defined in Section 2 4), if applicable;

(c) Project services; and

(d) all ancillary services, functions, or responsibilities related to the services referred to in subsection (a) through subsection (b) of this Section which are normal, customary, and incidental to the provision of the Services or which are subtasks of the services, functions, and responsibilities set forth herein, and are reasonably required for the proper performance and provision of such services, functions, and responsibilities, whether they are documented or not, including measurement and reporting of Service Levels (as defined in Exhibit A-1) and relationship and contract management (collectively, the "Services").

2.2 Provision of Services. Upon receipt by Company of an Order from WM, Company shall provide WM with those Services specified in that Order. All Orders shall be transmitted by WM to Company by facsimile or by such other electronic means as agreed to by the Parties.

2.3 Projects. From time to time during the Term, WM may engage Company to perform non-recurring discrete services other than the Services (a "Project") in accordance with the project engagement procedure set forth in Exhibit G (Governance). Each Project will be documented via a Statement of Work (an "SOW") setting forth the specific services encompassed in the Project, and such SOW will be made an attachment to this Agreement. Company will comply with Exhibit G (Governance) and perform each Project, complete all Project milestones, and provide all Deliverables in accordance with the applicable SOW.

2.4 New Services. From time to time during the Term, WM may wish to add one or more new services to the scope of the Services ("New Services"). WM will provide Company with a description of such new services setting out the services, functions, and responsibilities within the new services (a "New Services Request"). In response to a New Services Request, Company will prepare a proposal to WM setting forth:

(a) how it would perform the New Services;

(b) the fees for the New Services;

(c) when appropriate, a transition plan, including a timetable for commencing the New Services;

(d) Service Levels to be applied to the New Services;

(e) when appropriate, a description of any new or existing Software to be provided by Company in connection with such New Service; and

(f) any other information related to the New Services requested by WM.

Pricing of New Services will be agreed upon in writing by the Parties and will be consistent with the then-current mechanisms in this Agreement. New Services shall be documented by one or more "New Services Schedules" that are executed by the Parties and made a part of this Agreement as an amendment.

2.5 **Governmental Approvals and Consents**. Company will, at its own expense, obtain and maintain all licenses, consents, permits, approvals, and authorizations of or from any Governmental Authority, or any notice to any Governmental Authority, the granting of which is required by law or regulation, for Company to provide the Services contemplated by this Agreement.

3. **Service Levels**.

3.1 **Service Levels**. Company will perform the Services in accordance with the Service Levels set forth in Exhibit A-1 (Service Level Agreement).

3.2 **New Service Levels**. Company will perform any New Services in accordance with the New Service Levels applicable to such New Services.

3.3 **Adjustment of Service Levels**. The Executive Review Team (as defined in Exhibit G (Governance)) (1) will review the Service Levels for the preceding twelve (12) months on or before the anniversary of the Effective Date each year during the Term of this Agreement, (2) with respect to those Service Levels that are no longer appropriate because of an increase, decrease, or change to the Services, will adjust the Service Levels for the subsequent contract year, and (3) with respect to all other Service Levels, may adjust the Service Levels for the subsequent contract year. In addition, either Party may, at any time upon notice to the other Party, initiate negotiations to review and, upon agreement by the Executive Review Team, adjust any Service Level which such Party in good faith believes is inappropriate.

In addition, WM may, from time to time, change the Service Levels to reflect its changing business needs, including adding or removing a Service Level. A new Service Level for which there is historical data will take effect sixty (60) calendar days after WM gives Company a notice specifying the new Service Level. A new Service Level for which there is no historical data will take effect ninety (90) calendar days after WM gives Company a notice specifying the new Service Level, during which time the Parties will measure the new Service Level. If Company can demonstrate to WM's reasonable satisfaction that such new Service Level will materially increase Company's cost of performing the Services, WM may only add that new Service Level if:

(a) Company agrees; or

(b) Company does not agree, but:

(i) WM removes an existing Service Level at the same time as introducing the new Service Level and the cost of providing the Services in accordance with the new Service Level and the cost of measuring and reporting on such new Service Level is not materially higher than the cost of providing the Services under the existing Service Level and the cost of measuring and reporting on the existing Service Level; or

(ii) WM agrees to pay Company for its incremental cost of providing the Services under the new Service Level and the cost of measuring and reporting on the new Service Level.

3.4 Measurement and Monitoring Tools. As of the Effective Date (or other date specified in Exhibit A-1 (Service Level Agreement)), Company will implement the measurement and monitoring tools and procedures required to measure and report Company's performance of the Services against the applicable Service Levels. Such measurement and monitoring and procedures will (1) permit reporting at a level of detail specified by WM that is sufficient to verify compliance with the Service Levels, and (2) be subject to audit by WM or its designee.

(a) Company will provide WM with on-line access to Service Level measurement and monitoring tools and information, so that WM is able to access the same information as soon as it is available on-line to Company;

(b) Company will provide WM with periodic reports on Company's compliance with the Service Levels as set forth in Exhibit A-1 (Service Level Agreement), or Exhibit A-2 (Reporting); and

(c) Company will provide WM and its designees access to and information concerning such measurement and monitoring tools and procedures upon request, for inspection and verification purposes.

3.5 Root-Cause Analysis. If Company fails to provide the Services in accordance with the Service Levels, Company will (1) promptly investigate, perform a root cause analysis on the failure in accordance with Exhibit G (Governance), identify the problem causing the failure, and report to WM, (2) correct the problem as soon as practicable and resume meeting the Service Levels, (3) advise WM of the status of the problem at stages determined by WM, and (4) demonstrate to WM that all reasonable action has been taken to prevent any recurrence of such default or failure. Company will, at any time at which Company anticipates that it will fail to meet a Service Level, advise WM of the status of the problem at time intervals determined by the Parties.

3.6 Service Level Termination Threshold. In the event of a failure to provide the Services set forth in this Agreement in accordance with the applicable Service Levels, WM may upon notice to Company, terminate this Agreement, in whole or in part, in which case Section 9.3 (Termination for Breach) (including the Default Cure Period) will not apply, if:

(a) Company fails to meet the same Service Level four (4) consecutive times;

(b) Company fails to meet the same Service Level six (6) times within a rolling twelve (12) month period;

(c) Company fails to meet four (4) Service Levels in the aggregate, within a rolling twelve (12) month period;

(d) Company fails to meet the draft acceptable rate of eighty percent (80%) three (3) consecutive times; or

(e) Company fails to meet the draft acceptable rate of eighty percent (80%) four (4) times within a rolling twelve (12) month period.

4. **Staffing Requirements**.

4.1 **Key Personnel**. With respect to the Key Personnel set forth and defined in Exhibit E (Key Personnel), the Parties agree as follows:

(a) All Key Personnel will be dedicated to the WM account at the levels indicated in Exhibit E (e.g., 50% dedication equals half-time dedication to the WM account, 100% dedication equals full-time dedication to the WM account);

(b) Before assigning an individual to a Key Personnel position, whether as an initial assignment or as a replacement, Company will (1) notify WM of the proposed assignment at least thirty (30) days before such proposed assignment, (2) unless otherwise agreed by WM, introduce the individual to appropriate representatives of WM, (3) provide WM with any information regarding the individual that may be reasonably requested by WM, and (4) obtain WM's approval for such assignment. Company will only assign an individual to a Key Personnel position who is approved by WM;

(c) Company will not replace or reassign (1) the Company Relationship Manager or the four (4) Priority Service Providers as set forth in Exhibit E (Key Personnel) unless WM consents to such reassignment or replacement or such Key Personnel (a) voluntarily resigns from Company, (b) is dismissed by Company for misconduct (e.g., fraud, drug abuse, theft), (c) fails to perform his or her duties and responsibilities pursuant to this Agreement, or (d) dies or is unable to work due to his or her disability;

(d) If WM decides that any Key Personnel should not continue in that position, then WM, in its sole discretion and upon notice to Company, may require removal of such Key Personnel from the Project Staff. Company will, as soon as reasonably practicable, replace such Key Personnel;

(e) Company will maintain backup procedures and conduct the replacement procedures for the Key Personnel in such a manner so as to assure an orderly succession for Key Personnel who are replaced; and

(f) Under no circumstances shall Key Personnel be deemed agents or employees of WM.

4.2 **Project Staff**. Company will appoint individuals to the Project Staff with suitable training and skills to perform the Services. Prior to assignment to the Project Staff, Company will:

(a) subject each member of the Project Staff to such background checks as WM may require from time to time. Company will not assign any person to the Project Staff who has been convicted of either (a) any felony, or (b) any misdemeanor involving a crime of moral turpitude (or the local equivalent of similarly serious crimes); and

(b) cause each member of the Project Staff to sign a written agreement, in a form reasonably satisfactory to WM, in which such person agrees to (i) comply with (x) the safety and security procedures of which Company has been informed that are